UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

CONTINENTAL CASUALTY COMPANY,

        Plaintiff,

        v.

MARSHALL GRANGER & COMPANY, LLP,
and LAURENCE M. BROWN,

        Defendants,

        and

JOSEPH J. BOUGHTON, JR. and
NORTHSTAR INVESTMENT GROUP, LTD.

        Defendants-Intervenors.

------------------------------------------------------------------X

Case No. 11 CIV 3979 (CS)

**DECLARATION OF
BEVERLEE BURROWS, CPCU
IN SUPPORT OF PLAINTIFF
CONTINENTAL CASUALTY
COMPANY'S MOTION FOR
SUMMARY JUDGMENT**

I, Beverlee Burrows, CPCU, hereby declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statement is true and correct:

1. I am employed as an Underwriting Consultant by Continental Casualty Company, one of a group of related insurance companies operating under the fleet name, "CNA Insurance Companies" ("CNA"). As such, I am responsible for reviewing and evaluating applications for Accountants Professional Liability policies in order to determine whether CNA should provide coverage and, if so, on what terms. This Declaration is based on my personal knowledge and on documents maintained by CNA in the ordinary course of its insurance business.

2. I began working at CNA in 1990. As a result of my education, experience and professional training, I have attained the designation of Chartered Property Casualty Underwriter (CPCU), the premier professional designation for underwriters in the insurance industry. At all

times relevant to this Declaration, I have served as the principal underwriter with respect to the Accountants Professional Liability insurance policies issued by CNA to Marshall Granger & Company, LLP and its nominal predecessor entities ("Marshall Granger" or "the Insured").

3.   The process of underwriting an accountants professional liability insurance policy involves the receipt, review and analysis of timely and accurate information supplied by the applicant in order to permit the insurer fully and fairly to evaluate the potential risks for which coverage is sought and to determine whether and, if so, upon what terms, to issue a policy. In order to understand and evaluate the risk fully, it is important for the underwriter to be provided accurate and complete information responsive to all of the questions the applicant is directed to answer by the application form utilized by the insurer. In this regard, it is my practice to conduct as full and complete a review and analysis of the application materials submitted with respect to an existing insured's request for the issuance of a renewal policy as I would with respect to the initial application submitted by a person or entity not previously insured by CNA.

4.   On or about March 31, 2010, Marshall Granger's insurance agent, Pace Professional Services, Ltd., transmitted to Aon Insurance Services documents comprising an application by Marshall Granger seeking Continental's renewal of a Accountants Professional Liability Policy that CNA had issued to Marshall Granger for the policy period April 1, 2009 to April 1, 2010, which was about to expire. A true and correct copy of the Marshall Granger submission, consisting of a Premier Plan Renewal Update form filled out and signed by Marshall Granger co-Managing partner Laurence Brown on March 31, 2010 and certain required supplemental documents ("the Application") is attached hereto as Exhibit A.

5.   The Application was reviewed by Aon on April 1, 2010, and then was forwarded by AON to me, with its comments, the following day.

6. Based upon my review of the Application and supporting materials, and in reliance upon the accuracy and completeness of the information provided by Marshall Granger, CNA bound the renewal coverage on April 14, 2010, and, subsequently, issued Policy No. APL-140451264 to Marshall Granger, effective as of April 1, 2010 for the one-year period concluding April 1, 2011 ("the Policy"). A true and correct copy of the Policy (except for the Application) is attached hereto as Exhibit B.

7. Commencing in or about mid-September 2010, I became aware, on the basis of communications from CNA's Professional Liability Claims Department, that claim notices had been received from Marshall Granger under the Policy, concerning claims by individuals alleging that they were current or former clients of Marshall Granger who had been solicited and persuaded to invest substantial sums of money in a natural gas pipeline enterprise known as Infinity Reserves-Tennessee. The claimants alleged that their attempts to recover the funds they had invested in Infinity Reserves-Tennessee were unsuccessful and that little or no return on their investments was realized. Moreover, the Insured's claim notices included admissions by Marshall Granger co-Managing Partner Ronald Mangini that the investors' funds were misappropriated by Laurence Brown for his and his family members' own personal use. As a result of the information provided in the Insured's claim notices and the ensuing factual investigation undertaken by CNA's claim professionals, I learned that the U.S. Securities & Exchange Commission ("SEC") had commenced a civil enforcement proceeding alleging securities fraud in federal court in New York against Mr. Brown and Mr. Mangini, and that criminal charges had been brought against Mr. Brown, all involving the allegedly fraudulent Infinity Reserves-Tennessee investment scheme.

8. In light of the nature, substance and timing of the fraud allegations brought against Marshall Granger, Mr. Brown and Mr. Mangini, I had occasion to revisit and reevaluate the Application that had been submitted to Continental in connection with the 2010-11 Policy renewal. On the basis of this reconsideration, I developed serious concerns regarding the accuracy of a number of the answers provided by the Insured to questions posed in the Renewal Update form, since those answers could not be reconciled with the substance of the Infinity Reserves-Tennessee fraudulent investment scheme alleged by former Marshall Granger clients, the SEC or federal prosecutors. I brought these concerns to the attention of the Accountants Professional Liability Claims Department.

9. On November 1, 2010, Ruth Pallasch, Esq., of the Accountants Professional Liability Claims Department, issued the first of several letters to Marshall Granger, setting forth Continental's coverage position with respect to the Infinity Reserves-Tennessee claims against Marshall Granger and other claims as to which CNA had received notice under the Policy, and generally reserving all of CNA's rights under the terms and conditions of the Policy and applicable law, including CNA's right to seek rescission of the Policy in the event it were determined that the Insured had misrepresented or failed to disclose material facts in the Application.

10. On February 4, 2011, I issued a letter addressed to Mr. Mangini at Marshall Granger, informing him that "upon expiration of your Accountants Professional Liability Policy, Policy Number APL-140451264, issued by Continental . . . for the policy period commencing April 1, 2010 and terminating on April 1, 2011, the Policy will not be renewed." As grounds for CNA's non-renewal determination, I identified the host of claims commenced against Marshall Granger since the inception date of the Policy, principally including the Infinity Reserves-

Tennessee claims. I also expressly noted CNA's concerns that one or more answers provided by the Insured to questions posed in the Application submitted for the 2010-11 renewal may have been false, and emphasized CNA's reservation of its right to seek rescission of the Policy, rendering it void *ab initio*, in connection with these possible false responses. A true and correct copy of my letter to Mr. Mangini dated February 4, 2011 is attached hereto as Exhibit C.

11. I am aware of and familiar with the allegations concerning the acts and omissions engaged in by the Insured and its principals in carrying out the Infinity Reserves-Tennessee fraudulent investment scheme alleged by claimants, the SEC and federal prosecutors. I am informed by counsel representing CNA in this action that Mr. Brown and Mr. Mangini both invoked their respective privileges against self-incrimination under the Fifth Amendment in lieu of responding to or disputing the SEC's allegations, and that Mr. Brown has entered a plea of guilty to the criminal charges brought against him arising from the Infinity Reserves-Tennessee enterprise.

12. On the basis of this information, including in particular Mr. Brown's admissions supporting his guilty plea, it is my understanding, and CNA's position, that certain of the answers provided by the Insured to questions posed in the Application for the 2010-11 Policy renewal were false and/or misleading.

13. I have been asked to express my view concerning whether truthful answers to any of the questions set forth in the Application to which it appears that the Insured provided false and/or misleading responses would have been material to my underwriting of the 2010-11 renewal Policy issued by CNA. For the reasons explained below, I can state without qualification that if the Application questions to which Marshall Granger provided false and/or

misleading responses had been answered truthfully, the underwriting process would have been affected in a material way.

14. The Insured answered "No" to Question No. 1 of the Application, which asked whether "your firm or any owner, partner or officers renders services or conducts any business activities under any other name?" *See* Ex. A at 1. If Marshall Granger had answered, in accordance with what appear to be the true facts, that Mr. Brown and/or Mr. Mangini were rendering services and conducting business under the name of Infinity Reserves-Tennessee, Inc., Marshall Granger would then have been obligated to complete the Separate Entity Supplement set forth on page S-1 of the Renewal Update Supplement part of the Application. *Id.*

15. The Aon Underwriting Authority -- Renewals guidelines governing CNA's evaluation of and underwriting determinations regarding applications submitted by insureds seeking the issuance of Accountants Professional Liability coverage on a renewal basis (*see* true and correct copy of relevant portions attached hereto as Exhibit D) instruct the underwriter to "[b]e extremely cautious in extending coverage to separate entities." Ex. D at 4. Here, because Infinity Reserves-Tennessee, Inc., in truth, was not subject to "[a]t least 51%" ownership or control by Marshall Granger or its principals, and it was not in the business of providing services limited to "tax, bookkeeping, compilation, review, audit (non-public), forecasts/projections, business planning [or] litigation support," it was not eligible for "separate entity" coverage under the Policy. *Id.*

16. The Insured answered "No" to Question No. 10.a. of the Application, which asked whether "[w]ithin the past year, your firm, firm affiliates or their personnel . . . rendered financial planning, asset management or investment advisory services?" Ex. A at 2. If Marshall Granger had answered, in accordance with what appear to be the true facts, that Mr. Brown

and/or Mr. Mangini were engaged, within the year prior to the March 31, 2010 Application date, in advising Marshall Granger clients to invest in the Infinity Reserves-Tennessee natural gas pipeline enterprise, Marshall Granger then would have been obligated to complete the Financial Planning and Investment Advisory Supplement set forth on page S-2 of the Renewal Update Supplement part of the Application. *Id.*

17. The Underwriting Authority guidelines establish that "[s]urcharges are mandatory for all personal financial planning services as noted. Note that the extent and complexity of services as well as professional training directly impacts the surcharge to be applied." Ex. D at 22. In accordance with CNA's standard practice under such circumstances, an automatic surcharge of at least 4% would have been imposed based upon the Insured's affirmative response to Question No. 10.a., and the overall premium for the Policy would have increased accordingly.

18. The Insured answered "No" to Question No. 12 of the Application, which asked whether "[w]ithin the past year . . . your firm, firm affiliates or their personnel have: a. [o]rganized, promoted, solicited on behalf of or procured participants for investment ventures; b. [p]rovided management services for investment ventures; [or] c. [i]nvested in any public investment venture that a client also invested in?" Ex. A at 2. If Marshall Granger had answered, in accordance with what appear to be the true facts, that Mr. Brown and/or Mr. Mangini were engaged, within the year prior to the March 31, 2010 Application date, in promoting the Infinity Reserves-Tennessee investment venture, soliciting investment in the venture by Marshall Granger clients, and/or procuring participants in the venture, Marshall Granger then would have been obligated to complete the Investment Venture Supplement set forth on page S-7 of the Renewal Update Supplement part of the Application. *Id.*; *see also id.* at S-7.

19.     The Underwriting Authority guidelines expressly require that the Investment Ventures Supplement "must be completed in its entirety" and direct that if a "Yes" response is provided with respect to Questions No. 6 ("Do firm clients have ownership in venture?"), No. 7 ("Did your firm recommend venture to clients?") or No. 9 ("Do any firm personnel act as the general partner (or similar capacity) for this venture?"), a Specific Investment Exclusion and a Named Entity Exclusion *must be* included in the policy, *without exception*. *See* Ex. D at 32. Thus, CNA would have included in the Policy an Endorsement excluding coverage for the Infinity Reserves-Tennessee enterprise if its existence had been disclosed by Marshall Granger in the Application, *even if the enterprise had been completely lawful, legitimate and above-board*, rather than a fraudulent scheme.

20.     The Insured answered "No [. . . [o]ther than CNA is aware]" to Question No. 21.c. of the Application, which asked whether "[a]fter inquiry of all owners, partners, officers and professionals of the firm and firm affiliates, within the past year have any past or present personnel . . . become aware of any act, omission [or] circumstance . . . which might be expected to be the basis of a claim or suit?" I have been advised that, contrary to the Insured's response, Mr. Brown has admitted in connection with his guilty plea to criminal charges that, within the year prior to the March 31, 2010 Application date, he had engaged in knowingly false, fraudulent, unlawful and, indeed, criminal acts in connection with the Infinity Reserves-Tennessee scheme. In my view, any Insured engaging in dishonest conduct directed toward the Insured's clients is, by definition, aware of circumstances which would reasonably be expected to be the basis of a claim or suit.

21.     I have conducted a review of the Applications signed and submitted by Mr. Brown on behalf of Marshall Granger pursuant to which CNA issued accountants

professional liability policies that were in effect from April 1, 2008 to April 1, 2009 and April 1, 2009 to April 1, 2010, respectively. *See* true and correct copies attached as Exhibits E and F hereto. My review of these prior Applications confirms that Marshall Granger failed to disclose the existence of or its involvement in activities relating to Infinity Reserves-Tennessee, Inc. at any time during the duration of the alleged (and admitted) fraudulent investment scheme.

22. With respect to Application Question 21.c., had Marshall Granger disclosed the potential for claims arising out of Brown's multi-year criminal scheme, through which I have been advised he has admitted that he stole millions of dollars in client funds, CNA would not have renewed coverage for Marshall Granger. To my knowledge, CNA has *never* issued coverage to a prospective insured or renewed coverage for an existing insured who has acknowledged involvement in ongoing dishonest and criminal conduct. Indeed, in my view, it is inconceivable that CNA or any other insurance carrier would write coverage for an Insured who disclosed that he was engaged in an ongoing fraudulent scheme.

23. In sum, as more fully explained above, had what I understand to be the true facts been disclosed in the Insured's responses to any of Questions Nos. 1, 10.a., 12.a., 12.b., 12.c. and 21.c. of the Application, such disclosures would have been material to CNA's determination as to whether to issue renewal coverage to Marshall Granger and, if so, on what terms. As the underwriter, I relied upon the truth, correctness and completeness of the Insured's "No" responses to Questions Nos. 1, 10.a., 12.a., 12.b., 12.c. and 21.c. of the Application, individually and collectively, in determining that CNA should bind the renewal coverage sought by Marshall Granger and issue the Policy, premised upon the terms and conditions set forth therein. If one or more of the Insured's responses to these Questions had been different and reflected what I have been advised are the true facts, CNA would have declined to issue renewal coverage at all or, at a

minimum, would have issued a Policy based on significantly different terms under which any risk exposure or potential liability associated with Infinity Reserves-Tennessee would have been expressly excluded.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1764, the foregoing statement is true and correct.

DATED:   Chicago, Illinois
         January 31, 2012

*Beverlee Burrows*
Beverlee Burrows, CPCU