UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
CONTINENTAL CASUALTY COMPANY,

                            Plaintiff,

                    - against -

MARSHALL GRANGER & COMPANY, LLP, and
LAURENCE M. BROWN,                           **OPINION AND ORDER**

                         Defendants,           No. 11-CV-3979 (CS)

                and

JOSEPH J. BOUGHTON, JR. and NORTHSTAR
INVESTMENT GROUP, LTD.,

                           Defendants-Intervenors.
-----------------------------------------------------------------------x

Appearances:
Kimberly A. Ashmore
Richard A. Simpson
Theodore A. Howard
Wiley Rein LLP
Washington, DC

Mary Anne Wirth
Bleakley, Platt & Smith, LLP
White Plains, New York
*Counsel for Plaintiff*

Patrick J. Bliss
White Plains, New York
*Counsel for Defendant Marshall Granger & Co., LLP*

Jeremy M. King
Dickstein Shapiro LLP
New York, New York
*Counsel for Defendants-Intervenors Joseph J. Boughton and Northstar Investment Group, Ltd.*

Seibel, J.

Before this Court are the Motion for Summary Judgment of Plaintiff Continental

Casualty Company ("Continental") pursuant to Federal Rule of Civil Procedure 56, (Doc. 27);

the Motion to Dismiss of Defendant Marshall Granger & Co., LLP ("Marshall Granger")

pursuant to Federal Rule of Civil Procedure 12(b)(6), (Doc. 34); and the Motion to Dismiss of

Defendants-Intervenors Joseph J. Boughton, Jr. and Northstar Investment Group, Ltd.

(collectively, "Boughton Entities") pursuant to Federal Rule of Civil Procedure 12(b)(6), (Doc.

24).  For the reasons stated below, Plaintiff's Motion is DENIED without prejudice to renewal

following limited discovery; Defendant Marshall Granger's Motion is DENIED; and

Defendants-Intervenors' Motion is DENIED.

## I.  Background

For the purposes of the Defendants'[1] Motions to Dismiss, the Court accepts as true the

facts (but not the conclusions) stated in Continental's Complaint ("Compl."), (Doc. 1).[2]

### A.  Factual Background

Continental issued Accountants Professional Liability Policy No. 140451264 (the

"Policy") to Marshall Granger, a certified public accounting firm, for the period April 1, 2010 to

April 1, 2011.  (Compl. ¶¶ 1, 5.)  Laurence M. Brown and Ronald J. Mangini were Marshall

Granger's principals and general and managing partners.  (*Id.* ¶¶ 6-7.)  The Policy's contract

terms state:

---

[1] As Defendant Marshall Granger adopts as its own the legal arguments of the Boughton Entities in support of their
Motion to Dismiss, (*see* Defendant Marshall Granger & Company, LLP's Memorandum of Law in Further Support
of Motion to Dismiss Complaint, (Doc. 44), 1), I will refer collectively to the Defendants and make no distinction
between Marshall Granger and the Boughton Entities.

[2] For the purposes of Continental's Motion for Summary Judgment, any disputed material facts will be addressed in
Section III.B.1.

This Policy consists of the Declarations, the Policy form, all endorsements attached to the Policy, the completed and signed application and all supplementary information and statements **you** have provided to us.

By acceptance of this Policy **you** agree that all of the information and statements provided to us by **you** are true, accurate and complete.  This Policy has been issued in reliance upon the truth and accuracy of those representations.

No concealment, misrepresentation or fraud shall avoid or defeat recovery under this Policy unless such concealment, misrepresentation or fraud was material.  Concealment, misrepresentation or fraud in the procurement of this Policy which if known by us would have led to refusal by us to make this contract or provide coverage for a **claim** hereunder will be deemed material.

(*Id.* ¶ 12; *id.* Ex. A, at VI.G (bold denotes defined terms in the Policy).)

On behalf of Marshall Granger, Brown prepared and signed the Policy's renewal application.  (*Id.* ¶ 13; *id.* Ex. B.)[3]  Specifically, Brown answered "No" to the following application questions:

Question 1:  Does your firm or any owner, partner or officer render services or conduct any business activities under any other name?

Question 10.a:  Within the past year has your firm, firm affiliates or their personnel . . . [r]endered financial planning, asset management, or investment advisory services?

Question 12:  Within the past year has your firm, firm affiliates or their personnel . . . a. [o]rganized, promoted, solicited on behalf of or procured participants for investment ventures? b. [p]rovided management services for investment ventures? [or] c. [i]nvested in any non-public investment venture that a client has also invested in?

---

[3] Continental redacted the version of the application attached to the Complaint as Exhibit B to avoid disclosing Marshall Granger's potentially confidential business information; following Marshall Granger's dissolution, an unredacted copy was submitted with its Motion for Summary Judgment.  (Declaration of Beverlee Burrows, CPCU in Support of Plaintiff Continental Casualty Company's Motion for Summary Judgment ("Burrows Decl."), (Doc. 31), Ex. A.)

> Question 13:  Within the past year has your firm or firm affiliates rendered services, other than tax, for any client in which firm personnel, or the spouse of firm personnel, owned or received an equity interest or served as an officer, director, partner, manager or other member of a client's governing body?
>
> Question 21.c:  After inquiry of all owners, partners, officers and professionals of the firm and firm affiliates, within the past year have any past or present personnel . . . become aware of any act, omission, circumstance or fee dispute which might be expected to be the basis of a claim or suit?[4, 5]

(*Id.* ¶¶ 14-18; *id.* Ex. B, at 1-3.)  Above Brown's signature, the application contained several warnings, including that the "[a]pplicant represents, after inquiry, that the information contained herein and in any attachments, supplemental applications or forms required hereby are true, accurate and complete, and that no material facts have been suppressed or misstated."  (*Id.* ¶ 20; *id.* Ex. B, at 4.)  Immediately above the signature line, the application also stated that it "[m]ust be signed by a person who has the authority to sign on behalf of and to bind the Applicant, all firms and individuals requesting insurance through this application."  (*Id.* Ex. B, at 4.)  In reliance upon the information furnished in Marshall Granger's application and Marshall Granger's submission of the application subject to the application's admonitions, Continental issued the Policy.  (*Id.* ¶¶ 20-21.)

Unbeknownst to Continental, Brown and/or Marshall Granger had created a prospectus entitled "Infinity Reserves Tennessee – Gas Gathering and Trunk Pipeline System," which was distributed to certain Marshall Granger clients and other prospective investors beginning around

---

[4] Although the answer to Question 21.c was "No," Brown placed an asterisk next to the "No," noting that the asterisk indicated, "Other than CNA is aware."  (Compl. ¶ 18; *id.* Ex. B, at 3.)  Continental asserts that the asterisked notation refers to a single pending claim against Marshall Granger that was handled under the previous policy.  (*Id.* ¶ 19.)  Continental is one of a group of related insurance companies operating under the fleet name "CNA Insurance Companies" ("CNA").  (Burrows Decl. ¶ 1.)

[5] If the answers to Questions 1, 10.a, 12, 13, or 21.c had been "Yes," the application directed Marshall Granger to submit supplementary applications relating to separate entities, financial planning and investment advisory services, investment ventures, outside interests, and/or claims/incidents.  (Compl. ¶¶ 14-18; *id.* Ex. B, at 1-3.)

October 2007.  (*Id.* ¶ 23; *id.* Ex. C.)  The prospectus's cover letter – signed by Brown as President of Infinity Reserves-Tennessee, Inc. ("Infinity") – stated that Infinity was "currently selling interests in its . . . gas gathering and trunk system, along with its interconnect into the Duke Energy . . . main east-west trunk line," and the opportunity was "an attractive package for several reasons."  (*Id.* ¶ 24; *id.* Ex. C.)  Joseph J. Boughton, Jr., a client of Marshall Granger, was the sole owner of Infinity, and Infinity's only asset – the pipeline – was inactive and non-revenue producing.  (*Id.* ¶ 26.)  Brown and/or Marshall Granger continued to solicit Marshall Granger clients and other individuals to invest in Infinity securities and promissory notes until June 2010, obtaining more than $2 million in investor funds.  (*Id.* ¶ 25.)  The Infinity stock certificates issued to investors, as well as several of the promissory notes, bore the signatures of Brown, as President of Infinity, and/or Mangini, as Vice-President of Infinity.  (*Id.* ¶ 28; *id.* Ex. D.)

In May 2010, Mangini informed Boughton that Brown was holding himself out as an officer of Infinity and soliciting investments based on false representations regarding its operations.  (*Id.* ¶ 29.)  Boughton subsequently reported the allegations to the Securities & Exchange Commission ("SEC"), which commenced an emergency enforcement action against Brown and Mangini on July 22, 2010 in this Court.  (*Id.* ¶¶ 29-30.)  The SEC alleged that Brown and Mangini had been selling fictitious Infinity common stock and promissory notes, a scheme yielding over $2.1 million in fraudulently obtained profits from at least thirteen investors – some of whom were Marshall Granger clients – that were used to pay interest to other investors in furtherance of the scheme or misappropriated for personal use by Brown, Mangini, or their families.  (*Id.* ¶ 30.)  Mangini and Brown both invoked their Fifth Amendment privileges against self-incrimination instead of providing any responses to the SEC's allegations.  (*Id.* ¶ 31.)  Brown was also subsequently indicted in this Court.  (*Id.* ¶ 30.)

On September 20, 2010, Mangini informed Continental of the SEC action and Brown's indictment, (*id.* ¶ 32; *id.* Ex. F), and Mangini later submitted claim reports to Continental relating to former Marshall Granger clients who lost money from their Infinity investments, (*id.* ¶¶ 33-35; *id.* Exs. G-I).  On November 1, 2010, Continental responded to the claims, stating that it had no coverage obligation to Marshall Granger and expressly reserving its right to seek rescission of the Policy.  (*Id.* ¶ 36.)  Apart from the claims reported by Mangini, Continental received several other claims from former Marshall Granger clients, and Continental has denied coverage and/or reserved its rights to do so for all claims.  (*Id.* ¶ 37.)

### B.  Procedural History

Continental filed the Complaint on June 13, 2011, seeking a declaratory judgment against Marshall Granger, Brown, and Mangini that Continental is entitled to rescind the Policy on the basis of material misrepresentations in the application and that Continental has no obligation to provide coverage to Marshall Granger or to defend Marshall Granger, Brown, Mangini, or any other insured in connection with claims asserted by third parties relating to the Infinity investments.  (*Id.* ¶ 3.)  On November 3, 2011, the Boughton Entities intervened after Mangini assigned all of his rights under the Policy to them.  (Doc. 13.)  Continental obtained a partial default judgment that it was entitled to rescind the policy with respect to Brown on January 20, 2012.  (Doc. 21.)  On March 9, 2012 before any discovery commenced, Defendants filed their Motions to Dismiss, (Docs. 24, 34), and Continental filed its Motion for Summary Judgment, (Doc. 27).

## II.  <u>Motion to Dismiss</u>

### A.  *Documents the Court May Consider*

When deciding a motion to dismiss, the Court's "review is limited to the facts as asserted

within the four corners of the complaint, the documents attached to the complaint as exhibits,

and any documents incorporated in the complaint by reference."  *McCarthy v. Dun & Bradstreet

Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *see Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

"When matters outside the pleadings are presented in response to a 12(b)(6) motion, a district

court must either exclude the additional material and decide the motion on the complaint alone or

convert the motion to one for summary judgment . . . and afford all parties the opportunity to

present supporting material."  *Friedl v. City of N.Y.*, 210 F.3d 79, 83 (2d Cir. 2000) (alteration

and internal quotation marks omitted).

There are circumstances, however, under which it is appropriate for a court to consider

documents outside of the complaint on a motion to dismiss.  For example, when deciding a

motion to dismiss, the Court is entitled to consider:

> (1) facts alleged in the complaint and documents attached to it or
> incorporated in it by reference, (2) documents "integral" to the
> complaint and relied upon in it, even if not attached or
> incorporated by reference, (3) documents or information contained
> in [a] defendant's motion papers if plaintiff has knowledge or
> possession of the material and relied on it in framing the
> complaint, (4) public disclosure documents required by law to be,
> and that have been, filed with the Securities and Exchange
> Commission, and (5) facts of which judicial notice may properly
> be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation

marks omitted).

"Rule 201 of the Federal Rules of Evidence permits judicial notice of a fact that is 'either

(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate

and ready determination by resort to sources whose accuracy cannot be reasonably . . .

questioned.'" *United States v. Bryant*, 402 F. App'x 543, 545 (2d Cir. 2010) (summary order)

(quoting Fed. R. Evid. 201).  Further, it is well established that courts may take judicial notice of

publicly available documents on a motion to dismiss.  *See Blue Tree Hotels Inv. (Can.), Ltd. v.

Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (courts can "look

to public records . . . in deciding a motion to dismiss").  "In the motion to dismiss context,

however, a court should generally take judicial notice 'to determine what statements [the

documents] contain[ ] . . . not for the truth of the matters asserted.'"  *Schubert v. City of Rye*, 775

F. Supp. 2d 689, 698 (S.D.N.Y. 2011) (alterations in original) (quoting *Kramer v. Time Warner

Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

    1.  <u>Attachments to Parties' Submissions</u>

Defendants submit the following documents with their Motions to Dismiss:

- Brief of Appellants, *TIG Ins. Co. v. Robertson, Cecil, King & Priutt*, 116 F.
  App'x 423 (4th Cir. 2004) (per curiam) (No. 03-1259), (King Decl. Ex. 4);[6]

- Continental's Answer and Counterclaim, *Bryan Bros. Inc. v. Cont'l Cas. Co.*, 704
  F. Supp. 2d 537 (E.D. Va. 2010) (No. 09-CV-675), (King Decl. Ex. 5);

- Continental's Answer, *Prof'l Asset Strategies, LLC v. Cont'l Cas. Co.*, 2010 WL
  4284991 (N.D. Ala. Aug. 27, 2010) (No. 09-CV-1238), (King Decl. Ex. 6);

Continental submits the following with its opposition to Defendants' Motions to Dismiss:

- Opinion and Order, *Cont'l Cas. Co. v. Battery Wealth, Inc.* (D.S.C. May 5, 2011)
  (No. 09-CV-605), (P's MTD Mem. Ex. A);[7]

---

[6] "King Decl." refers to the Declaration of Jeremy M. King.  (Doc. 25.)

[7] "P's MTD Mem." refers to Plaintiff Continental Casualty Company's Consolidated Opposition to Defendant-Interventors' Motion to Dismiss and Defendant's Motion to Dismiss.  (Doc. 41.)

- Brief of Defendant-Respondent, *Fed. Ins. Co. v. Kozlowski*, 792 N.Y.S.2d 397 (1st Dep't 2005) (No. 5109), (P's MTD Mem.Ex. B).

I will consider all of these documents for the purposes of the Defendants' Motions.  I may take judicial notice of these materials – for the fact that they exist and what is in them, but not for their truth – because they are public documents.  *See Sutton ex rel. Rose v. Wachovia Sec., LLC*, 208 F. App'x 27, 29-30 (2d Cir. 2006) (pleadings and court orders are "undisputably matters of public record"); *Global Network Commc'ns Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

### B.  Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

### C. Discussion

In support of their motion to dismiss the Complaint against Mangini, Defendants assert that the Complaint alleges concealment of material information during the policy procurement process only by Brown – not by Mangini – and that the Policy's Innocent Insureds provision[8] provides that the Policy may not be rescinded as to an insured who did not conceal material information from an insurer during the procurement process.  (Ds' MTD Mem. 1-2; Ds' Reply MTD Mem. 1-3.)[9]  In response, Continental argues that New York law allows an insurer to rescind a policy as to all insureds where the application contains a material representation, and

---

[8] The Innocent Insureds provision is located in the "Policy Conditions" Section and states:

If coverage under this Policy would be excluded as a result of any criminal, dishonest, illegal, fraudulent or malicious acts of any of **you**, we agree that the insurance coverage that would otherwise be afforded under this Policy will continue to apply to any of **you** who did not personally commit, have knowledge of, or participate in such criminal, dishonest, illegal, fraudulent or malicious acts or in the concealment thereof from us.

Compl. Ex. A, at VI.L (bold denotes defined terms in the Policy).

[9] "Ds' MTD Mem." refers to Defendants-Intervenors' Memorandum of Law in Support of Their Motion to Dismiss Continental Casualty Company's Rescission Cause of Action with Respect to Ronald J. Mangini.  (Doc. 26.)  "Ds' Reply MTD Mem." refers to Defendants-Intervenors' Reply Memorandum of Law in Further Support of Their Motion to Dismiss Continental Casualty Company's Rescission Cause of Action with Respect to Ronald J. Mangini. (Doc. 47.)  As noted earlier, Marshall Granger has adopted the Boughton Entities' legal arguments as its own for the purposes of Defendants' Motions.

the Innocent Insureds provision is not a severability clause and thus not implicated.  (P's MTD Mem. 2.)  Further, Continental asserts that there is no need to interpret the scope of the Innocent Insureds provision because Brown's misrepresentations in the application are imputed to Marshall Granger and binding on all insureds, including Mangini, (*id.* at 3), and the Complaint sufficiently alleges that Mangini had knowledge of and participated in the Infinity scheme, (*id.* at 4).

     1.  <u>Innocent Insureds Provision</u>

     Both parties agree that New York law entitles an insurer to rescind an insurance policy – and the policy is deemed void *ab initio* – "if it was issued in reliance on material misrepresentations."  *Fid. & Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp.*, 540 F.3d 133, 139 (2d Cir. 2008); *see Interboro Ins. Co. v. Fatmir*, 933 N.Y.S.2d 343, 345 (2d Dep't 2011).  A misrepresentation in an application for insurance is a false "'statement as to past or present fact, made to the insurer by . . . the applicant for insurance . . . as an inducement to the making thereof.'"  *Fid. & Guar. Ins. Underwriters*, 540 F.3d at 139 (quoting N.Y. Ins. Law § 3105(a)). "If an insurer can show that it was induced to accept an application that it might otherwise have refused it is entitled to rescind the policy."  *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 465 (S.D.N.Y. 2005); *see Interboro*, 933 N.Y.S.2d at 345 ("A misrepresentation is material if the insurer would not have issued the policy had it known the facts misrepresented.").  Further, "[e]ven an innocent misrepresentation, if material, will support rescission."  *WorldCom*, 354 F. Supp. 2d at 465; *see Vella v. Equitable Life Assurance Soc'y*, 887 F. 2d 388, 391 (2d Cir. 1989) ("So long as a misrepresentation is material, it is no defense to an action for rescission that the misrepresentation was innocently made.").

If a policy was procured through a material misrepresentation, the insurer may rescind an insurance policy as to all insureds – even those insureds with no knowledge of any misrepresentation. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Hicks, Muse, Tate & Furst, Inc.*, No. 02-CV-1334, 2002 WL 1482625, at *5 (S.D.N.Y. July 10, 2002) ("New York permits a court to void an insurance policy as to all insureds if the policy was procured through material misrepresentation."); *Wedtech Corp. v. Fed. Ins. Co.*, 740 F. Supp. 214, 218 (S.D.N.Y. 1990) ("[A] D & O policy can be found void *ab initio* and rescission deemed appropriate if the policy was obtained through a material misrepresentation, even when there are officers and directors who had no knowledge of the fraud."); *see also Am. Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp.*, No. 94-CV-2727, 1997 WL 906427, at *9-10 (S.D.N.Y. Sept. 12, 1997) (Report and Recommendation) (allowing rescission based on material misrepresentations as to all insureds, including a director who was unaware that the application contained false information).

The Complaint's allegations, taken as true, sufficiently allege that Marshall Granger's responses to Questions 1, 10.a, 12, 13, and 21.c amounted to material misrepresentations in that Continental would not have issued the Policy had it been aware of the true facts. (Compl. ¶¶ 14-19, 21-22.) The crux of the Defendants' argument, however, is that the Policy's Innocent Insureds provision functions as a severability clause, preventing rescission of the Policy as to Mangini because the Complaint fails to allege that Mangini participated in any concealment or misrepresentation during the procurement process. (Ds' MTD Mem. 1-2; Ds' Reply MTD Mem. 1-5.) I find this argument unavailing.

"An insurance policy must be construed to 'effectuate the intent of the parties as derived from the plain meaning of the policy's terms.'" *Gfroerer v. Ace Am. Ins. Co.*, No. 03-CV-866, 2004 WL 2966173, at *4 (W.D.N.Y. Dec. 22, 2004) (quoting *Andy Warhol Found. for Visual*

*Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir. 1999)).  In New York, "[i]nsurance policies

are read in light of common speech and the reasonable expectations of a businessperson."

*United Nat. Ins. Co. v. Granoff, Walker & Forlenza, P.C.*, 598 F. Supp. 2d 540, 546 (S.D.N.Y.

2009) (internal quotation marks omitted).  Unambiguous provisions are interpreted according to

their "plain and ordinary meaning."  *Lavanant v. Gen. Accident Ins. Co. of Am.*, 79 N.Y.2d 623,

629 (1992) ("Unambiguous provisions of a policy are given their plain and ordinary meaning.").

If a provision is ambiguous, however, it is construed against the insurer.  *See K. Bell & Assocs. v.

Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996).  "An ambiguity exists where the terms of

an insurance contract could suggest more than one meaning when viewed objectively by a

reasonably intelligent person who has examined the context of the entire integrated agreement

and who is cognizant of the customs, practices, usages and terminology as generally understood

in the particular trade or business."  *Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88, 90 (2d Cir. 2010)

(internal quotation marks omitted).

   Defendants cite *Wedtech*, 740 F. Supp. at 219, for the proposition that the "Innocent

Insureds" provision functions as a severability provision, but the policy at issue in *Wedtech* –

unlike Marshall Granger's Policy – contained specific severability language.  When Wedtech's

insurer cancelled coverage following a government investigation and the convictions of several

of its former officers and directors, Wedtech sought a declaratory judgment that the policy was

not void *ab initio* and remained effective with respect to its directors and officers who had acted

in good faith.  *Id.* at 216-17.  This Court noted that while New York law could deem the entire

policy void *ab initio* – even as to the directors and officers with no knowledge of the fraud – the

policy's severability provision,[10] which expressly held that statements in the application would

---

[10] The policy stated:

not be imputed to insureds other than those who had made them, indicated that the parties had

intended to bar coverage only for the insureds who actually participated in the fraud, *id.* at 218-

19, and thus, the policy could not be void *ab initio* with respect to all insureds, *id.* at 222.

Defendants allege that the Innocent Insureds provision here is "in the nature of [a]

'severability' clause[]" and serves as "an important bargained-for promise that shields insureds

not involved in policy procurement from misstatements and errors allegedly made in applying

for the Policy," "creat[ing] a separate Policy and Application for each individual insured."  (Ds'

MTD Mem. 4-5.)  But the Policy – unlike the policies in *Wedtech* and the other cases on which

Defendants rely, (*id.* at 4-6)[11] – contains no explicit severability language.  As a sophisticated

party, Marshall Granger could have – but chose not to – bargain with Continental for the

---

The written application for coverage shall be construed as a separate application for coverage by each of the Insured Persons. . . . [N]o statement in the application or knowledge possessed by any Insured Person(s) shall be imputed to any other Insured Person(s) for the purpose of determining the availability of coverage with respect to claims made against any Insured Person(s) . . . .

*Wedtech*, 740 F. Supp. at 216.

[11] As in *Wedtech*, the policy in *Shapiro v. Am. Home Assurance Co.*, 616 F. Supp. 900 (D. Mass. 1984), contained a "clear severability provision" – stating that "this Insurance shall be construed as a separate contract with each Insured . . . and the liability of the Insurer to such Insured shall be independent of its liability to any other Insured" – preventing rescission of the policy as to all insureds on the basis of the fraudulent acts of some insureds. *Id.* at 902-03.  The court held that although the policy's severability provision "[did] not explicitly address the question whether a false representation by one insured in applying for such insurance (either willfully false or unintentionally false) would bar all other insureds," the "manifest intent" of the parties was to provide coverage for each insured unless that insured participated in the fraud.  *Id.* at 904-05.  The Policy at issue here contains no similar severability language.

Defendants also cite *Kozlowski* for a similar proposition – that the coverage of an insured turns on whether he participated in concealing material facts during the policy's procurement.  Although Defendants allege that the *Kozlowski* policy and the Marshall Granger Policy both "contained a provision making it clear that one insured could be innocent even if another insured was guilty of concealment in the procurement process," (Ds' MTD Mem. 5), the *Kozlowski* policy contained an explicit severability clause relating to the insurance application process that precluded the insurer from "imputing to any insured person a statement or knowledge possessed by any other insured person for the purpose of determining is coverage is available," *Kozlowski*, 792 N.Y.S.2d at 399 (internal quotation marks omitted).  Marshall Granger's Policy contains no similar language.  Because of the *Kozlowski* severability language, the First Department held that the insurer had to allege facts in support of its rescission claim that "Kozlowski participated, directly or indirectly, in misrepresenting facts to induce [the insurer] to issue the policy."  *Id.* at 401.  That "Continental 'makes no effort to meet this burden' and . . . 'fails to cite any alleged misrepresentation made by [Mangini] to induce the issuance of the . . . policy or even allege that [Mangini] ever signed an application or furnished any answers or information as part of the application process," (Ds' MTD Mem. 5-6 (quoting *Kozlowski*, 792 N.Y.S.2d at 401)), is unsurprising, given that the Policy contains no provision precluding Continental from imputing to Mangini the statements or knowledge of other insureds.

inclusion of such a severability clause.  *See Towers Fin. Corp.*, 1997 WL 906427, at \*10 ("[T]his

transaction involved sophisticated businessmen . . . . The case law makes clear that [the allegedly

innocent insured] could have protected himself by requiring the policy to include a severability

clause, so that a misrepresentation by [one insured] would result only in rescission of the []

insurance policy as to [that insured]."); *see also TIG*, 116 F. App'x at 427 ("The [insured] could

have, but did not, contract for additional protection in the case of a partner making

misrepresentations on behalf of the partnership on the application form. . . . Thus, although [the

other partners] may, in fact, be 'innocent,' they did not contract to be protected in this

circumstance, and as a result, rescission of the policy does not violate the 'clear intent of the

policy.'").

Despite Defendants' urging, the Innocent Insureds provision cannot reasonably be

construed as a severability provision relating to misrepresentations in the application.  (*See* Ds'

MTD Mem. 6; Ds' Reply MTD Mem. 2-3.)  Defendants assert that the provision's plain

language – that one insured's "concealment . . . from us" does not render the Policy inapplicable

to a different insured "who did not personally . . . participate in" the concealment – shows that

the Policy is severable as to each insured's role in the procurement process and cannot be

rescinded as to those insureds who did not conceal material information from the insurer.  (Ds'

MTD Mem. 6.)  Specifically, Defendants argue that the words "from us" necessarily refer to the

Policy procurement process because a duty to disclose to the insurer arises only at this time, and

it is thus impossible to conceal anything from an insurer outside of the procurement period.  (Ds'

Reply MTD Mem. 2, 5-7.)  Therefore, Defendants' argument goes, the inclusion of these two

words extends the applicability of the Innocent Insureds provision to any misrepresentations or

omissions during procurement and preserves coverage for any insured who did not conceal

material information from the insurer.  (*Id.*)

I disagree with Defendants' assertion that this interpretation is the only one that accords

with "common speech" and the "reasonable expectations of a businessperson."  (Ds' MTD Mem.

6 (quoting *United Nat. Ins. Co.*, 598 F. Supp. 2d at 546 (internal quotation marks omitted)).).  To

the contrary, the Innocent Insureds provision by its terms makes clear that it applies only "[i]f

coverage under this Policy would be excluded as a result of any criminal, dishonest, illegal,

fraudulent or malicious acts of any of you."  (Compl. Ex. A., at VI.L.)  This language, which

mirrors that of the Policy's "bad acts" exclusion – "This Policy does not apply to . . . any claim

based on or arising out of a dishonest, illegal, fraudulent, criminal or malicious act by any of

you," (*Id.* at V.D) – makes plain that the Innocent Insureds provision kicks in only where

coverage would otherwise be disclaimed under the bad acts exclusion.  Continental does not

invoke that exclusion from coverage here in search of a declaration that it need not cover a claim,

and thus the Innocent Insureds provision's exception to that exclusion does not apply either.

Rather, Continental seeks a declaration that it is entitled to recission of the entire Policy on the

ground that it was void from the start because of misrepresentations.  This case thus presents no

occasion to apply a clause, such as the Innocent Insureds provision, that presumes that there is a

valid policy in place under which coverage "that would otherwise be afforded" "[c]ould be

excluded."  (*Id.* at VI.L.)

Similarly, the Innocent Insureds provision's reference to concealment of bad acts "from

us" merely means that if there is a valid policy, and if under that policy coverage would

ordinarily be excluded because the claim is based on a bad act, an insured can avoid application

of the exclusion if he is "innocent," which is defined to mean he did not commit the bad act,

know of it, or participate either in the bad act or in its concealment.  In other words, an insured is "innocent" not – as Defendants argue, (Ds' MTD Mem. 4) – when he had no involvement in the misrepresentation that induced issuance of the policy, but where he had no part in committing or concealing the conduct that justifies the invocation of the bad acts exclusion.[12]

Thus, the plain language neither supports Defendants' interpretation nor is ambiguous. Rather, the Innocent Insureds provision cannot be construed by a knowledgeable objective observer as anything but an exception applicable where the insurer would otherwise disclaim coverage under the bad acts exception.  By its terms it cannot be read as affecting whether the Policy was void as a whole from inception.

Moreover, while courts in the Second Circuit have not weighed in on this issue, I find the Fourth Circuit's and the Eleventh Circuit's interpretations of identical "Innocent Insureds" provisions persuasive – that the provision saves coverage for innocent insureds only when coverage is otherwise denied based on a policy's "bad acts" exclusion.  In *Bryan Bros. Inc. v. Continental Casualty Co.* (applying Virginia law and affirming summary judgment disclaiming coverage for claims arising out of employee's theft), the Court interpreted the Innocent Insureds provision as "an exception to the bad acts exclusion," noting that because "exclusions and exceptions in an insurance policy cannot expand the scope of the agreed coverage," "the innocent insureds provision cannot provide coverage that is precluded by the plain language of the prior knowledge provision," relying in part on its earlier decision in *TIG*, 116 F. App'x at 426-27 (affirming summary judgment allowing rescission against all partners based on material

_____

[12] Defendants' argument that concealment "from us" can only refer to concealment during the application process, and that the Policy includes no other obligations of disclosure, is incorrect.  For example, the Policy requires the insured to give written notice if an insured becomes aware of a possible claim, (Compl. Ex. A, at VI.D), and in the event of a claim, to forward all documents and fully cooperate in the insurance company's investigation, (*id.* at VI.C).  Failure to do so could in some circumstances constitute concealment of a bad act, which would in turn disqualify an insured from application of the Innocent Insureds provision.

misrepresentation by one partner in policy application).  *See Bryan Bros.*, 660 F.3d 827, 831-32

(4th Cir. 2011).  Likewise, in *Professional Asset Strategies, LLC v. Continental Casualty Co.*

(applying Alabama law and affirming summary judgment for insurer disclaiming coverage for a

claim arising out of an employee's theft), the Eleventh Circuit cited *Bryan Bros.* with approval,

agreeing that the policy's Innocent Insureds provision – identical to the provision at issue here –

was applicable only if the bad acts exclusion barred coverage.  *See* 447 F. App'x 97, 100 (11th

Cir. 2011).  Finally, relying on *Bryan Bros.*, the District of South Carolina held that coverage

was precluded under the prior knowledge provision of an accountants liability policy with an

identical Innocent Insureds provision even where the innocent partner who completed the

renewal application had no knowledge of her other partner's misappropriation of client funds.

*Cont'l Cas. Co. v. Jones*, No. 09-CV-1004, 2011 WL 3880963, at *3, 6 (D.S.C. Sept. 2, 2011),

*order amended on other grounds on reconsideration*, 2012 WL 530002 (D.S.C. Feb. 17, 2012).

I agree with the reasoning of these courts, and Defendants cite no authority interpreting

the Innocent Insureds language here as a severability clause with respect to material

misrepresentations in the policy procurement process.[13]  Accordingly, dismissal based on the

Innocent Insureds provision is not warranted.

---

[13] Although Defendants argue *Bryan Bros.* and *Professional Asset Strategies* are inapposite because they involve coverage – not rescission – claims, (*see* Ds' MTD Mem. 8-9), this distinction is irrelevant to the courts' discussions of the Innocent Insureds provisions.  In both cases, an insured's knowledge of an act that was reasonably likely to become the basis for a claim was held to be a condition precedent to coverage, and, as an employee in both cases had such knowledge, claims arising from these acts were not covered.  *Prof'l Asset Strategies*, 447 F. App'x at 98-100 (insurer disclaiming coverage for claims arising from employee's theft of client funds where "no one at [the company] had knowledge of [the thefts] except [the thief]"); *Bryan Bros.*, 660 F.3d at 830-31 (insurer disclaiming coverage for claims arising from theft by firm's account clerk who "was the only person with prior knowledge of [the] thefts").  The Fourth and Eleventh Circuits addressed the scope of the Innocent Insureds provisions in response to the insureds' assertions that the provisions should be interpreted to preserve coverage for any insured who did not have knowledge of the illegal acts.  *Prof'l Asset Strategies*, 447 F. App'x at 100; *Bryan Bros.*, 660 F.3d at 829.  It is immaterial that this discussion arose in the context of an insured seeking coverage for certain claims, rather than an insurer seeking to void a policy entirely, given that the courts interpreted the Innocent Insureds provisions to apply only where a limited policy exclusion has been invoked after a policy's coverage requirements have otherwise been satisfied.

2.  Continental's Allegations Regarding Mangini

Defendants also argue that the Complaint does not state a plausible cause of action for rescission against Mangini because it does not allege that Mangini signed the policy application; had knowledge of any questions asked or answers provided in the application prior to the Policy's issuance; made any statement to Continental suggesting that Brown had authority to sign the application on his behalf; made any statement to Continental on which Continental relied in issuing the Policy or supplied any information to Brown for submission to Continental; or even was aware that Brown was procuring insurance.  (Ds' MTD Mem. 3-4.)  Defendants further assert that nothing in the SEC enforcement action is relevant to the issue of whether Continental relied upon misrepresentations by Mangini in issuing the Policy.  (*Id.* at 9-10.)  I find Defendants' arguments unavailing.

First, as noted above, because the Innocent Insureds provision does not apply, Mangini need not have personally been involved in the procurement process for Continental to have the right to rescind the Policy as to him.  Under New York law, Brown's responses bind Marshall Granger and its partners, including Mangini.  *See Madison Recycling Assocs. v. Comm'r of Internal Revenue*, 295 F.3d 280, 286-87 & n.14 (2d Cir. 2002); *Kaur v. Royal Arcadia Palace, Inc.*, 643 F. Supp. 2d 276, 295 (E.D.N.Y. 2007); *see also* N.Y. P'ship Law §§ 20, 22-24, 26.  By signing the application, Brown represented to Continental that he inquired into the truth, completeness, and accuracy of the application's responses; that the responses were true, accurate, and complete; that no material facts had been suppressed or misstated; and that he had the authority to sign on behalf of and to bind Marshall Granger and its employees to the information

contained in the application.[14]  (Compl. ¶ 20; *id.* Ex. B, at 4.)  Brown's representation to

Continental as a Marshall Granger partner that he had the authority to bind the company and its

employees is sufficient, and it is thus irrelevant that Mangini did not sign the application himself;

inform Continental that Brown had authority to sign the application; or know of any questions

asked on the application, answers provided to Continental, or that Brown was procuring

insurance on behalf of Marshall Granger.

Moreover, the Complaint adequately alleges that Mangini had knowledge of and

involvement in the Infinity scheme.  Specifically, the Complaint alleges that Mangini was listed

as an officer of Infinity in its fraudulent marketing materials and that Mangini's signature

appeared on counterfeit promissory notes and stock certificates issued to investors.  (*Id.* ¶ 28; *id.*

Ex. D.)  Further, contrary to Defendants' assertion that the SEC enforcement action is irrelevant,

(*see* Ds' MTD. Mem. 9-10), the Complaint incorporates the SEC's allegations that both Brown

and Mangini violated the Securities Act of 1933 and the Securities Exchange Act of 1934 by

offering and selling fictitious Infinity securities and misappropriating the proceeds for personal

use. (Compl. ¶ 30.)  Thus, the Complaint sufficiently alleges that Mangini knew of and

participated in the Infinity scheme such that it is plausible that Continental could seek rescission

of the Policy as to Mangini – a managing and general partner of Marshall Granger – for material

misrepresentations made by another partner during the Policy procurement process.

### III.  <u>Motion for Summary Judgment</u>

#### A.  *Legal Standard*

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

---

[14] In addition to the representations in the application, the Policy itself stated, "By acceptance of this Policy [the insureds] agree that all of the information and statements provided to us . . . are true, accurate and complete.  This Policy has been issued in reliance upon the truth and accuracy of those representations."  (Compl. Ex A, at VI.G.)

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R.

Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d

Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of

fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed

for purposes of the motion" or "grant summary judgment if the motion and supporting materials

– including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ.

P. 56(e)(2), (3).

    B.  *Discussion*

        1.  <u>Factual Background</u>

    Continental's 56.1 Statement of Material Facts incorporates in greater detail all of the

Complaint's allegations outlined above.  (Doc. 29.)  Given the disposition of the Motion, and the

Defendants' evasive 56.1 response, (Doc. 40), I need not determine at this stage which material

facts are actually undisputed.  I note, however, that Defendants dispute all of the facts

enumerated in Continental's 56.1 Statement, save the following:  that Continental issued the

Policy insuring Marshall Granger, Brown, and Mangini, (P's 56.1 ¶¶ 24-25; Ds' 56.1 ¶¶ 24-

25);[15] that Boughton has an ownership interest in Infinity Reserves-Tennessee, Inc., (P's 56.1 ¶¶

4, 8; Ds' 56.1 ¶¶ 4, 8); that Mangini contacted Boughton on or about May 12, 2010 to inform

Boughton of Brown's sales of Infinity stock, promissory notes, and convertible debt, (P's 56.1 ¶

8; Ds' 56.1 ¶ 8); that Mangini notified Continental of claims made under the Policy relating to

---

[15] "P's 56.1" refers to Plaintiff Continental Casualty Company's Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue To Be Tried.  (Doc. 29.)  "Ds' 56.1" refers to Defendant-Intervenors' Response to Continental's Statement Pursuant to Local Rule 56.1.  (Doc. 40.)  The Boughton Entities ignored my individual rule of practice requiring the opposing party to reproduce each entry in the moving party's 56.1 statement before setting out its response beneath it.  I expect their counsel to comply with that rule in the future.

Defendant Marshall Granger has adopted the legal and factual arguments asserted by the Boughton Entities in their opposition brief and 56.1 statement.  (Defendant Marshall Granger & Company, LLP's Memorandum of Law in Opposition to Continental Casualty Company's Motion for Summary Judgment, (Doc. 37), 7; Defendant's Response to Continental's Statement Pursuant to Local Rule 56.1, (Doc. 48), 1-2.)  As with the Motions to Dismiss, I will refer to the Defendants collectively and make no distinction between the Boughton Entities and Marshall Granger.

the Infinity scheme, (P's 56.1 ¶¶ 30, 44-45; Ds' 56.1 ¶¶ 30, 44-45); that the SEC initiated an

enforcement action in which Brown and Mangini invoked their Fifth Amendment rights, (P's

56.1 ¶¶ 10-11; Ds' 56.1 ¶¶ 10-11); that Brown was indicted and pleaded guilty on September 8,

2011 (P's 56.1 ¶¶ 12-14; Ds' 56.1 ¶¶ 12-14); and that Brown did not answer the Complaint and a

default judgment has been entered against him in this action, (P's 56.1 ¶ 46; Ds' 56.1 ¶ 46).

     1.  <u>Federal Rule of Civil Procedure 56(d)</u>

     Rule 56(d) gives the court discretion to deny or defer an otherwise supported motion for

summary judgment to allow for further discovery if the nonmoving party "shows by affidavit

that, for specified reasons, it cannot present facts essential to justify its opposition" to the motion.

Fed. R. Civ. P. 56(d).  The affidavit must explain:  "'[(1)] the nature of the uncompleted

discovery; [(2)] how the facts sought are reasonably expected to create a genuine issue of

material fact; [(3)] what efforts the affiant has made to obtain those facts; and [(4)] why those

efforts were unsuccessful.'" *Hoffman v. Airquip Heating & Air Conditioning*, 480 F. App'x 110,

112 (2d Cir. 2012) (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir.

1994)).  Even where a Rule 56(d) affidavit is adequate, "a district court may refuse to allow

additional discovery 'if it deems the request to be based on speculation as to what potentially

could be discovered' – that is, a mere fishing expedition." *Seneca Beverage Corp. v. Healthnow

N.Y., Inc.*, 200 F. App'x 25, 27 (2d Cir. 2006) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh v.

Stroh Cos.*, 265 F.3d 97, 117 (2d Cir. 2001)).

     Defendants' primary argument is that summary judgment is inappropriate here where

they have been afforded no opportunity for discovery, and discovery is reasonably anticipated to

raise genuine issues of material fact.  (Ds' SJ Mem. 1-2, 8-11.)[16]  Specifically, Defendants allege

that they need discovery on the following issues for the following reasons:

- Communications between Aon – CNA's National Administrator for certain
  Accountants Professional Liability policies, including the Marshall Granger
  Policy, (*see* Burrows Reply Decl. ¶ 3)[17] – and Continental regarding Marshall
  Granger's application, which relates to Continental's evaluation of the risk and
  decision-making prior to issuing the Policy, (Schryber Decl. ¶ 13a);[18]

- Continental's underwriting file and decision-making process, including
  Continental's past underwriting of similar risks, which relates to whether
  Continental relied on any purported material misrepresentations, (*id.* ¶ 13b);

- Mangini's knowledge of the procurement process and the application's answers,
  which relates to the Innocent Insureds provision and the representations made to
  Continental, (*id.* ¶ 13c);

- Brown's activities related to Infinity and Brown's understanding of the
  application questions, which relates to determining if the application responses
  were actually false, (*id.* ¶¶ 13d-13e); and

- Information from the drafters of the application and Policy regarding the meaning
  of certain provisions, (*id.* ¶¶ 13e-13f).

Defendants also allege that, although they have tried to obtain Continental's underwriting

guidelines, as well as any recommendations or written comments from Aon to Continental

concerning the Policy's renewal, the only documents they have received have been those

---

[16] "Ds' SJ Mem." refers to Defendants-Intervenors' Memorandum of Law in Opposition to Continental Casualty Company's Motion for Summary Judgment.  (Doc. 39.)

[17] "Burrows Reply Decl." refers to the "Supplemental Declaration of Beverlee Burrows, CPCU."  (Doc. 46.)

[18] "Schryber Decl." refers to the Declaration of John W. Schryber.  (Doc. 38.)

submitted in connection with this Motion, and that Defendants require a judicially-enforceable manner in which to obtain these necessary documents.  (*Id.* ¶¶ 11-12; Ds' SJ Mem. 11 & n.2.)  I agree that summary judgment is premature, and Defendants are entitled to conduct limited discovery as set forth below.

2.   Rescission

An insurer seeking rescission has the burden of proving the existence of a material misrepresentation in the procurement process and that the insurer's knowledge of the truth would have resulted in refusal to issue the policy in the first instance.  *Vella*, 887 F. 2d at 391; *Landmark Am. Ins. Co. v. S & S Pub*, No. 10-CV-2982, 2011 WL 5825143, at *3 (E.D.N.Y. Nov. 14, 2011).  Although materiality is usually a question of fact for the jury, *see Towers Fin. Corp.*, 1997 WL 906427, at *7, an insurer may establish materiality as a matter of law by submitting "evidence of its underwriting practices with respect to similar applicants" but "may not rely merely on statements by representatives of the insurer that it would not have issued the policy but for the representation."  *WorldCom*, 354 F. Supp. 2d at 465 (internal quotation marks omitted); *see Curanovic v. N.Y. Cent. Mut. Fire Ins. Co.*, 762 N.Y.S.2d 148, 151 (3d Dep't 2003) ("To establish materiality of misrepresentations as a matter of law, the insurer must present documentation concerning its underwriting practices, such as underwriting manuals, bulletins or rules pertaining to similar risks, to establish that it would not have issued the same policy if the correct information had been disclosed in the application.  Conclusory statements by insurance company employees, unsupported by documentary evidence, are insufficient . . . .").

Defendants assert that Continental thus cannot establish a material misrepresentation as a matter of law because the evidence that Continental has submitted – declarations from the Policy's principal underwriter, (*see* Burrows Decl.; Burrows Reply Decl.), and the relevant

portions[19] of its underwriting guidelines, (Burrows Decl. ¶ 15; *id.* Ex. D) – is insufficient.  First,

Defendants question the applicability of the underwriting guidelines submitted with the Motion,

pointing out that the document is actually titled "Aon Underwriting Authority, Renewals;" that

Continental has not set forth any evidence showing how it followed these guidelines; that the

document does not appear to govern Continental's underwriting process, only the process by

which Aon submits its recommendations and referrals to Continental; and that the declaration of

the underwriter regarding the use of the document contradicts the document's text.  (Ds' SJ

Mem. 7, 15-16, 18.)  Also, while Continental refers to Aon's comments on Marshall Granger's

application, (Burrows Decl. ¶ 5), Continental has not provided these comments – which relate to

its decision to renew the Policy – to Defendants or submitted them with its Motion, (Ds' SJ

Mem. 16, 18-19.)  Defendants further allege that Continental promulgates and maintains

underwriting guidelines bearing CNA's logo, not Aon's, and these guidelines have also not been

provided to Defendants or submitted with its Motion.  (Schryber Decl. ¶ 10.)[20]

     Defendants also dispute that Continental has shown that the Policy would not have been

issued had truthful information been disclosed in the application.  (Ds' SJ Mem. 16-17.)

Continental's underwriter "state[s] without qualification" – after comparing the application's

responses to its guidelines – "that if the Application questions to which Marshall Granger

provided false and/or misleading responses had been answered truthfully, the underwriting

---

[19] The underwriting guidelines document submitted with Continental's Motion is not complete; it contains only ten pages, but the full document seems to be, based on the pagination, at least thirty-two pages in length.  (Burrows Decl. Ex. D.)

[20] Continental responds that while it maintains multiple sets of underwriting guidelines pertaining to its different lines of business, (Declaration of Richard A. Simpson, (Doc. 45), ¶¶ 10-11; Burrows Reply Decl. ¶ 2; Plaintiff Continental Casualty Company's Consolidated Response to Defendant-Intervenors' and Defendant's Statement of Additional Material Facts as to Which There Exists an Issue To Be Tried ("P's Reply 56.1"), (Doc. 43), ¶¶ 1-2),  the "Aon Underwriting Authority, Renewals" document is the only underwriting guideline applicable to its "evaluation of and underwriting determination regarding the Marshall Granger Policy," (Burrows Reply Decl. ¶ 4; *see* P's Reply 56.1 ¶ 3).

process would have been affected in a material way" – specifically that Continental "would have declined to issue renewal coverage at all or, at a minimum, would have issued a Policy based on significantly different terms under which any risk exposure or potential liability associated with Infinity Reserves-Tennessee would have been expressly excluded."  (Burrows Decl. ¶¶ 13-23.)

While it seems highly unlikely to the Court that that Defendants' assertions are correct, it is peculiar that Continental did not simply provide its files regarding its underwriting decision with respect to the Policy.  Because an insurer must present documentation – the applicability of which is in dispute here – concerning its underwriting practices to show that it would not have issued the Policy but for the misrepresentation, *see WorldCom*, 354 F. Supp. 2d at 465; *Curanovic*, 762 N.Y.S.2d at 151, I agree that summary judgment is premature and limited discovery on Continental's underwriting guidelines and process for the Policy is necessary.[21] Without discovery, I cannot determine whether the questions Defendants have raised about the applicability of the partial underwriting guidelines submitted by Continental have merit.  *See generally Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 303 (2d Cir. 2003) ("[Rule 56(d)] provides . . . that when a party facing an adversary's motion for summary judgment reasonably

---

[21] Defendants also argue that Continental has failed to submit any evidence of its underwriting practices with respect to similar applicants. (Ds' SJ Mem. 19.)  Continental responds that, "CNA has *never* issued coverage to a prospective insured or renewed coverage for an existing insured who has acknowledged involvement in ongoing dishonest and criminal conduct.  Indeed, in my view, it is inconceivable that CNA or any other insurance carrier would write coverage for an Insured who disclosed that he was engaged in an ongoing fraudulent scheme." (Burrows Decl. ¶ 22 (emphasis in original).)  While these assertions could arguably be construed as conclusory or self-serving, common sense dictates that neither Continental nor any insurer could ever produce evidence of its underwriting practices with respect to insurance applicants who actually admit to fraudulent or dishonest activity in the application. *See Mazur v. Gaudet*, 826 F. Supp. 188, 193 (E.D. La. 1992) ("It may be a question of fact as to whether [the insurer] would have entered this arrangement under the same terms had it known of [the insured's] thefts, but it is a question of fact with only one rational answer – if [the insurer] had known that [the insured] had embezzled, it would not have insured the [company], at least not on the same terms.").  It is thus not reasonable to expect Continental to produce evidence regarding other accountants who committed fraud.  But it seems entirely reasonable to expect it to produce evidence regarding *this* Policy, what it knew when it issued it, and how it decided to issue it.  If, for example, the undisclosed evidence revealed that Continental failed to review the statements in the application or chose to ignore its underwriting guidelines, it might have an uphill battle in attempting to prove materiality as a matter of law.  As unlikely as such scenarios might be, Defendants are entitled to explore the circumstances before having to oppose a motion for summary judgment.

advises the court that it needs discovery . . . the court should defer decision of the motion until

the party has had the opportunity to take discovery and rebut the motion. Accordingly, we have

held that summary judgment should only be granted if after discovery, the nonmoving party has

failed to make a sufficient showing on an essential element of its case with respect to which it

has the burden of proof.") (internal quotation marks, citations, and alterations omitted); *see also*

*Themis Capital, LLC v. Democratic Republic of Congo*, No. 09-CV-1652, 2012 WL 3114732, at

*18-20 (S.D.N.Y. July 26, 2012) (pre-discovery summary judgment premature where discovery

necessary to resolve questions regarding key document and communications culminating in

transaction). Therefore, Defendants may conduct limited discovery with respect to (1)

communications between Aon and Continental regarding Marshall Granger's renewal

application and (2) Continental's underwriting file and decision-making process with respect to

Marshall Granger's renewal application. (*See* Schryber Decl. ¶¶ 13a-13b.)[22]

---

[22] I decline to allow Defendants to pursue the other discovery they seek: Mangini's knowledge of the procurement process and the application's answers; Brown's Infinity activities and his understanding of the application questions; and interpretations from the drafters of the application and Policy as to the meaning of certain provisions. (*See* Schryber Decl. ¶¶ 13c-13f.). These requests seek information related to the Innocent Insureds provision, or facts regarding Brown which cannot reasonably be disputed, and given the disposition of Defendants' Motions to Dismiss, discovery on these items cannot be "reasonably expected to create a genuine issue of material fact" with respect to Continental's rescission claim. *Hoffman*, 480 F. App'x at 112 (internal quotation marks omitted).

I also need not address the arguments raised in Defendants' June 21 and June 29, 2012 letters. (Docs. 56, 57.) In any event, Defendants' positions seem to be without merit. Continental's payment of defense costs does not undermine its position. *See WorldCom*, 354 F. Supp. 2d at 465 ("Until the issue of rescission is adjudicated, a contract of insurance remains in effect and the duty to pay defense costs is enforceable."). Likewise, because New York law requires that extended reporting period coverage must be available when claims-made liability policies – such as the Marshall Granger Policy – are terminated, N.Y. Comp. Codes R. & Regs. tit. 11 § 73.3(c)(1), Continental's offer of such coverage in this case does not undermine its position.

**IV.  Conclusion**

      For the foregoing reasons, Continental's Motion for Summary Judgment is DENIED without prejudice to renewal following limited discovery; Defendant Marshall Granger's Motion to Dismiss is DENIED; and Defendants-Intervenors Boughton Entities' Motion to Dismiss is DENIED.  The Clerk of Court is respectfully directed to terminate the pending motions.  (Docs. 24, 27, 34.)  The parties are to appear for a status conference on February 28, 2013 at 3:30 p.m.

**SO ORDERED.**

Dated:  January 31, 2013
        White Plains, New York

                                      _____
                                      CATHY SEIBEL, U.S.D.J.