UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
CONTINENTAL CASUALTY COMPANY,

                        Plaintiff,

                 - against -

MARSHALL GRANGER & COMPANY, LLP, and
LAURENCE M. BROWN,                                   **OPINION AND ORDER**

                  Defendants,                        No. 11-CV-3979 (CS)

             and

JOSEPH J. BOUGHTON, JR. and NORTHSTAR
INVESTMENT GROUP, LTD.,

                 Defendants-Intervenors.
-------------------------------------------------------------------x

<u>Appearances</u>:
Richard A. Simpson
Theodore A. Howard
Kimberly A. Ashmore
Wiley Rein LLP
Washington, District of Columbia

Mary Anne Wirth
Bleakley Platt & Schmidt, LLP
White Plains, New York
*Counsel for Plaintiff*

Jeremy M. King
Olshan Frome Wolosky LLP
New York, New York

John Schryber
Dickstein Shapiro LLP
Washington, District of Columbia
*Counsel for Defendants-Intervenors*

Seibel, J.

Before the Court are Plaintiff's Motion for Summary Judgment, (Doc. 71), and Defendants-Intervenors'[1] Cross-Motion for Summary Judgment, (Doc. 78).  For the reasons set forth below, Plaintiff's Motion is GRANTED IN PART and DENIED IN PART and Defendants-Intervenors' Motion is DENIED.  Both denials are without prejudice to renewal following limited additional discovery.

## I.  BACKGROUND

### A.  Factual Background

The following facts are set forth on the basis of the parties' Local Rule 56.1 Statements, declarations and exhibits, and are undisputed except where noted.[2]

Defendant Marshall Granger & Company, LLC ("Marshall Granger") was a certified public accounting firm owned and managed by Laurence M. Brown and Ronald J. Mangini.  (P's 56.1 ¶¶ 1, 5, 28.)[3]  In April 2010, Plaintiff Continental Casualty Company ("Continental") issued Accountants Professional Liability Insurance Policy No. 14045126 (the "Policy") to Marshall Granger for the period April 1, 2010 to April 1, 2011.  (P's 56.1 ¶¶ 26-27.)  The Policy states, in part:

---

[1] For convenience, I will refer to Defendants-Intervenors as "Defendants."

[2] I note that Defendants' response to Continental's Local Rule 56.1 statement, (Doc. 83), is unnecessarily evasive. For example, in response to the paragraphs stating the specific answers on the application for the policy that Continental contends were the misrepresentations *at the very heart of this case*, Defendants repeatedly deny that those factual assertions have any relevance to Continental's Motion.  (*Id.* ¶¶ 20-23.)  Similarly, Defendants "object to Continental's citation" in its Rule 56.1 statement to a particular declaration to which that application is attached, "because it purports to attach a copy of the application . . . that is different [than the copy attached] to Continental's Complaint."  (*Id.* ¶¶ 19-24.)  The only difference between the two copies is that the copy attached to the Complaint has Marshall Granger's gross annual revenues and the names of its two largest clients clearly redacted.  (*See* Doc. 1 ¶ 13 and Ex. B.)  As these facts are not relevant to the case and the documents are obviously otherwise identical, the Court cannot discern what purpose was intended to be served by Defendants' "object[ion]."

[3] "P's 56.1" refers to Plaintiff Continental Casualty Company's Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue to Be Tried.  (Doc. 73.)

This Policy consists of the Declarations, the Policy form, all endorsements attached to the Policy, the completed and signed application and all supplementary information and statements you have provided to us.

By acceptance of this Policy you agree that all of the information and statements provided to us by you are true, accurate and complete.  This Policy has been issued in reliance upon the truth and accuracy of those representations.

No concealment, misrepresentation or fraud shall avoid or defeat recovery under this Policy unless such concealment, misrepresentation or fraud was material.  Concealment, misrepresentation or fraud in the procurement of this Policy which if known by us would have led to refusal by us to make this contract or provide coverage for a claim hereunder will be deemed material.

(Burrows Decl. Ex. B ("Policy"), at C00071.)[4]  The Policy was issued pursuant to a Premier Plan

Renewal Update application (the "Application"), which was filled out and signed by Brown on

behalf of Marshall Granger.  (P's 56.1 ¶ 19; *see* Burrows Decl. Ex. A ("App.").)  The

Application included the following questions:

Question 1:   Does your firm or any owner, partner or officer render services or conduct any business activities under any other name?

Question 10.a:  Within the past year has your firm, firm affiliates or their personnel . . . [r]endered financial planning, asset management, or investment advisory services?

Question 12:  Within the past year has your firm, firm affiliates or their personnel . . . a. [o]rganized, promoted, solicited on behalf of or procured participants for investment ventures?  b. [p]rovided management services for investment ventures?  [or] c. [i]nvested in any non-public investment venture that a client has also invested in?

Question 13:  Within the past year has your firm or firm affiliates rendered services, other than tax, for any client in which firm personnel, or the spouse of firm personnel, owned or received an equity interest or served as

---

[4] "Burrows Decl." refers to Declaration of Beverlee Burrows, CPCU, in Support of Continental Casualty Co.'s Renewed Motion for Summary Judgment.  (Doc. 75.)

an officer, director, partner, manager or other member of a client's governing body?

Question 21.c:   After inquiry of all owners, partners, officers and professionals of the firm and firm affiliates, within the past year have any past or present personnel . . . become aware of any act, omission, circumstance or fee dispute which might be expected to be the basis of a claim or suit?

(P's 56.1 ¶¶ 20-23; *see* App. 1-3.)  Brown answered "No" to each of these questions.  (P's 56.1 ¶¶ 20-23; *see* App. 1-3.)[5]  The Application included several warnings that submission of the Application constituted a representation that the responses were true and complete and that no material facts had been omitted.  (P's 56.1 ¶ 24; *see* App. 4.)  In reliance on the responses provided in the Application, Continental issued the Policy.  (P's 56.1 ¶ 26.)  The premium under the Policy was $30,769.00, (P's 56.1 ¶ 29; Policy at C00029), which Marshall Granger financed through First Insurance Funding Corp., an independent entity, (P's 56.1 ¶ 30; Gross Decl. ¶¶ 4-5).[6]  Thus, although Marshall Granger was making periodic payments to First Insurance Funding, Continental received the entire premium from First Insurance up front (less payments to various intermediaries).  (P's 56.1 ¶¶ 30-32; Gross Decl. ¶¶ 4-6; Haines Decl. ¶¶ 5-6.)[7]  Continental did not receive any additional premium payments in connection with the Policy after the initial payment.  (P's 56.1 ¶ 32.)

The above answers Brown provided on the Application were false.  At the time he submitted the Application, Brown was in the midst of perpetrating a securities fraud scheme,

---

[5] Next to his "No" response to Question 21.c, Brown placed an asterisk and wrote in, "Other than CNA is aware." (*Id.* at 3.)  Continental asserts that this notation refers to a single claim against Marshall Granger that was handled under the previous year's policy.  (Complaint ("Compl."), (Doc. 1), ¶ 19.)  Continental is one of a group of related insurance companies operating under the fleet name "CNA Insurance Companies" ("CNA").  (*See* Burrows Decl. ¶ 1.)

[6] "Gross Decl." refers to Declaration of Kenneth Gross in Support of Plaintiff Continental Casualty Company's Renewed Motion for Summary Judgment.  (Doc. 76.)

[7] "Haines Decl." refers to Declaration of Paulette Haines in Support of Plaintiff Continental Casualty Company's Renewed Motion for Summary Judgment.  (Doc. 77.)

4

duping several of his accounting clients into participating in a nonexistent investment opportunity. (P's 56.1 ¶¶ 1-7; *see, e.g.*, Ashmore Decl. Ex. N (minutes of Brown's plea of guilty to related criminal charges).)[8] As part of this scheme, Brown and possibly others created a prospectus entitled "Infinity Reserves Tennessee – Gas Gathering and Trunk Pipeline System," which was distributed to certain Marshall Granger clients and other prospective investors beginning in approximately 2007. (P's 56.1 ¶ 1.) The prospectus's cover letter – which was signed by Brown and in which Brown identified himself as the President of "Infinity Reserves-Tennessee, Inc." ("Infinity") – stated that Infinity was "currently selling interests in its . . . gas gathering and trunk system, along with its interconnect into the Duke Energy . . . main east-west trunk line," and that the investment opportunity was "an attractive package for several reasons." (*Id.* ¶¶ 2-3; *see* Ashmore Decl. Ex. A (prospectus).) Brown continued to solicit Marshall Granger clients and other individuals to invest in Infinity securities and promissory notes until June 2010, obtaining more than $2 million in investor funds. (P's 56.1 ¶ 5.) The Infinity stock certificates issued to investors, as well as several of the promissory notes, bore the signatures of Brown, as President of Infinity, and/or Mangini, as Vice President of Infinity. (*Id.* ¶ 6; *see* Ashmore Decl. Ex. G (sample stock certificates and promissory notes).)

Contrary to these assertions, however, neither Brown nor Mangini owned any portion of Infinity, nor was either of them an officer of that company. Infinity was actually solely owned by Joseph J. Boughton, Jr., one of Marshall Granger's accounting clients, and Infinity's only asset – the pipeline – had been inactive and non-revenue producing for years. (P's 56.1 ¶¶ 4, 8.) In May 2010, Mangini informed Boughton that Brown was holding himself out as an officer of Infinity and soliciting investments based on false representations regarding Infinity's operations.

---

[8] "Ashmore Decl." refers to Declaration of Kimberly A. Ashmore in Support of Plaintiff Continental Casualty Co.'s Renewed Motion for Summary Judgment. (Doc. 74.)

(*Id.* ¶ 8.)  Boughton subsequently reported the allegations to the Securities and Exchange Commission ("SEC"), which initiated an emergency enforcement action against Brown and Mangini in this Court on July 22, 2010.  (*Id.* ¶ 10.)  The SEC alleged that Brown and Mangini had been selling fictitious Infinity common stock and promissory notes as part of a scheme yielding over $2.1 million in fraudulently obtained profits from at least thirteen investors – some of whom were Marshall Granger clients – which funds were used to pay interest to other investors in furtherance of the scheme or misappropriated for personal use.  (*Id.*)  Brown was subsequently indicted by a grand jury in this District.  (*Id.* ¶¶ 12-13.)

On August 31, 2010, Boughton and his investment entity, Northstar Investment Group, Ltd. (collectively, the "Boughton Entities"), sent a letter to Mangini asserting several claims of accounting malpractice and breach of fiduciary duty against Marshall Granger.  (King Decl. II Ex. A.)[9]  That letter listed three specific sets of transactions unrelated to the Infinity scheme in connection with which the Boughton Entities were asserting claims, and also sought "indemnification for all liabilities potentially resulting from the negligent services and advice and breach of fiduciary duties, including but not limited to any tax liabilities, damages, legal costs and fees, and liabilities to other third parties."  (*Id.*)  That same day, Mangini forwarded the Boughton Entities' letter to Continental, seeking coverage under the Policy for the Boughton Entities' claims.  (King Decl. I Ex. A.)[10]  On September 20, 2010, Mangini informed Continental of the SEC action and the criminal case against Brown, (*see id.* Ex. B), and he later submitted

---

[9] "King Decl. II" refers to Declaration of Jeremy M. King.  (Doc. 80.)

[10] "King Decl. I" refers to Declaration of Jeremy M. King.  (Doc. 84.)

claims to Continental relating to former Marshall Granger clients who lost money in the Infinity scheme, (Ds' 56.1 ¶¶ 13-14, 25).[11]

On November 1, 2010, Continental sent a letter to Mangini (the "November 1 Letter") in which it denied coverage for claims relating to the Infinity scheme and expressly reserved its right to rescind the Policy on the basis that Brown had made material misrepresentations on the Application.  (Burrows Decl. Ex. C; *see id.* at 5 ("Continental reserves its right to rescind the Policy, or to deny coverage for the Infinity Reserves claims, to the extent that the application for the Policy contained one or more material misrepresentations.").)  As the basis for this denial, Continental stated, "In this case, Mr. Brown misappropriated client investment funds prior to the Policy's effective date of April 1, 2010. . . . Accordingly, by April 1, 2010, Mr. Brown indisputably was aware of acts or omissions . . . which a reasonable person would expect to be the basis of a claim against him and/or Marshall Granger."  (*Id.* at 5.)  The November 1 Letter gave Marshall Granger thirty days in which to bring to Continental's attention any information that might be relevant to Continental's assessment of rescission and coverage.  (*Id.* at 1.)  The letter also informed Mangini that Continental would be advancing defense costs in connection with the regulatory investigation as required under the Policy.  (*Id.* at 8-9.)

Later in November 2010, Mangini submitted two requests to make ministerial changes to the Policy:  one to change the address of record for Marshall Granger, and the other to change the name of the insured entity from "Marshall Granger & Company, LLP" to "Mangini & Company PLLC" to reflect that the company had changed its name.  (Ds' 56.1 ¶¶ 43-57.)  These requests were handled by Aon Insurance Services ("Aon"), Continental's national administrator.  (Burrows Decl. ¶ 5.)  Aon is Continental's agent for certain administrative tasks and has

---

[11] "Ds' 56.1" refers to [Defendants'] Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue to Be Tried.  (Doc. 79.)

authority to make minor underwriting decisions without Continental's involvement in certain circumstances.  (P's 56.1 ¶¶ 15-17.)  On November 11, 2010, Aon issued an administrative endorsement to the Policy changing Marshall Granger's address of record.  (Burrows Decl. ¶ 17; *see id.* Ex. E.)  On November 24, 2010, Aon issued a second administrative endorsement to the Policy to reflect that the insured entity's name had been changed.  (*Id.* ¶ 18; *see id.* Ex F.)  No modifications were made to the substantive terms of the Policy, nor was any additional premium paid in connection with either endorsement.  (*Id.* ¶ 16.)  Continental was not consulted on either endorsement.  (*Id.*)

On January 24, 2011, Continental sent another letter to Mangini (the "January 24 Letter").  (King Decl. I Ex. D.)  In this letter, Continental acknowledged receiving additional information relevant to its investigation, including at least one fax transmission from Mangini and information from several Marshall Granger clients directly.  (*Id.* at 1.)  Continental also indicated that it had received evidence that apart from the Infinity scheme, Brown and his daughter had allegedly misappropriated $1.6 million from a separate investment made by the Boughton Entities.  (*Id.* at 3.)  The letter states that Continental was treating that misappropriation as related to the Infinity scheme for coverage purposes and that the misappropriation "provides additional support for Continental's conclusion that the Policy is subject to rescission."  (*Id.*)  The letter concludes by again giving Mangini another thirty days in which to submit additional information, while "continu[ing] to reserve all of [Continental's] rights under the Policy and applicable law, including [the] right to rescind the Policy."  (*Id.* at 6.)

On February 4, 2011, Continental sent another letter to Mangini (the "February 4 Letter"), stating that "This notice is being sent to advise you that upon expiration of your Accountants Professional Liability Policy, . . . the Policy will not be renewed.  The Policy will

8

expire on April 1, 2011, and there will be no coverage available after that date." (Burrows Decl. Ex. G, at 1.) The February 4 Letter also offered the sale of Extended Claim Reporting Period Coverage (which Continental contends it was required to offer under New York insurance law). (*Id.* at 1-2.) The letter reiterated that in the November 1 Letter, "Continental noted the failure to disclose a claim and/or potential claim regarding the Infinity Reserves Scheme in response to Question 21 of the Application . . . . In addition, Continental is investigating the response . . . to Question 10(a), . . . [and] 12(a), (b) and (c) . . ." (*Id.* at 2-3.) Finally, with respect to the issue of rescission, the letter stated the following:

> Finally, we wish to emphasize that this Notice of Nonrenewal also is intended to provide notice that, in the event it is ultimately determined that Continental is entitled to rescind the Policy, rescission shall be effective immediately, and the Policy will be void *ab initio*, including any Extended Reporting Period. If Continental rescinds the Policy, it will provide notice to Marshall Granger & Company and will return the premium paid for the Policy and any Extended Reporting Period. As such, this Notice of Nonrenewal is not intended nor may it be construed as a determination by Continental not to rescind the Policy or as an admission of any kind regarding Continental's rights with respect to rescission. Continental continues to reserve its rights generally and specifically with respect to rescission of the Policy. Please note that nothing herein is intended or shall be construed as a waiver of any of Continental's rights or defenses under the Policy, at law or in equity. Therefore, Continental reserves all of its rights and remedies under the Policy. We wish to provide you with sufficient advance notice of the nonrenewal of the Policy in order to enable you to obtain coverage through another carrier.

(*Id.* at 3.)

On February 24, 2011, the SEC moved for summary judgment in the civil enforcement action against Brown and Mangini, submitting into the public record a significant amount of evidence relating to the Infinity scheme. (*See SEC v. Brown*, No. 10-CV-5564, Docs. 36-41 (S.D.N.Y. Feb. 24, 2011).) On June 9, 2011, Continental's counsel sent a letter to Mangini notifying him of its final decision to seek rescission of the Policy and tendering a full refund of

the premium.  (Ashmore Decl. Ex. Q.)  On June 11, Mangini responded to Continental's counsel

by email, refusing the tendered refund and contesting the rescission.  (*Id.* Ex. R.)  On June 13,

Continental initiated the present action for rescission.  (*See* Compl.)  On September 8, 2011,

Brown pleaded guilty to the criminal charges of securities fraud, wire fraud, and money

laundering.  (P's 56.1 ¶¶ 13-14; *see* Ashmore Decl. Ex. N; *United States v. Brown*, No. 10-CR-

991, Minute Entry of Sep. 8, 2011 (S.D.N.Y. Sep. 8, 2011).)

## B.   Procedural Posture

Continental initiated this action on June 13, 2011, seeking a declaratory judgment against

Marshall Granger, Brown, and Mangini declaring that:  (1) Continental is entitled to rescind the

Policy on the basis of material misrepresentations in the Application; and (2) Continental

therefore has no obligation to provide coverage to or defend Marshall Granger, Brown, Mangini,

or any other insured in connection with claims asserted by third parties relating to the Infinity

scheme.  (Compl. ¶ 3.)  On November 3, 2011, the Boughton Entities intervened in this case after

Mangini assigned all of his rights under the Policy to them.  (Doc. 13.)  On January 20, 2012,

Continental obtained a partial default judgment that it is entitled to rescind the Policy with

respect to Brown.  (Doc. 21.)

On March 9, 2012, before any discovery had occurred, Defendants filed Motions to

Dismiss, (Docs. 24, 34), and Plaintiff filed a Motion for Summary Judgment, (Doc. 27).  In an

Opinion and Order dated January 31, 2013, (Doc. 58), I denied Defendants' Motions to Dismiss

and denied Plaintiff's Motion for Summary Judgment without prejudice to renewal following

limited discovery as to:  (1) communications between Aon and Continental regarding the

Application; and (2) Continental's underwriting file and decision-making process with respect to

the Application.  (*Id.* at 28.)  On February 22, 2013, the Boughton Entities filed an Amended

Answer and Counterclaim, (Doc. 61), asserting a counterclaim for breach of contract against

Continental based on Continental's failure to pay the Boughton Entities' claims under the Policy.

Marshall Granger filed an Answer on May 10, 2013.  (Doc. 68.)  After completion of the limited

discovery mandated by my Opinion and Order of January 31, 2013, the parties filed the instant

Motions for Summary Judgment.  (Docs. 71, 78.)

## II.  **LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The movant

bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if

satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every

element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "The mere existence of a scintilla of evidence in

support of the [non-movant's] position will be insufficient; there must be evidence on which the

jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the

non-movant "must do more than simply show that there is some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),

and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

## III.  DISCUSSION

New York law entitles an insurer to rescind an insurance policy – and the policy is deemed void *ab initio* – "if it was issued in reliance on material misrepresentations." *Fid. & Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp.*, 540 F.3d 133, 139 (2d Cir. 2008); *see Interboro Ins. Co. v. Fatmir*, 933 N.Y.S.2d 343, 345 (App. Div. 2011). A misrepresentation in an application for insurance is a false "'statement as to past or present fact, made to the insurer by . . . the applicant for insurance . . . as an inducement to the making thereof.'" *Fid. & Guar. Ins. Underwriters*, 540 F.3d at 139 (quoting N.Y. Ins. Law § 3105(a)). "If an insurer can show

that it was induced to accept an application that it might otherwise have refused it is entitled to rescind the policy." *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 465 (S.D.N.Y. 2005); *see Interboro*, 933 N.Y.S.2d at 345 ("A misrepresentation is material if the insurer would not have issued the policy had it known the facts misrepresented."). Further, "[e]ven an innocent misrepresentation, if material, will support rescission." *WorldCom*, 354 F. Supp. 2d at 465; *see Vella v. Equitable Life Assurance Soc'y*, 887 F. 2d 388, 391 (2d Cir. 1989) ("So long as a misrepresentation is material, it is no defense to an action for rescission that the misrepresentation was innocently made."). Based on the language of the Policy and New York law, I have previously ruled that if the Policy was procured through a material misrepresentation, Continental may rescind the Policy as to all insureds – even those insureds with no knowledge of any misrepresentation. (*See* Opinion and Order of Jan. 31, 2013, at 12-18.)

### A. <u>Material Misrepresentation</u>

It is clear – and Defendants do not seriously dispute – that Brown made misrepresentations in the Application that he submitted to Continental in April 2010 on behalf of Marshall Granger. Brown has admitted that during the relevant time period, he was in the midst of perpetrating a securities fraud on Marshall Granger clients, (*see, e.g.*, Ashmore Decl. Ex. N), and he thus gave inaccurate answers to several questions designed to assess the risk to which Continental would be exposed should it issue the Policy.

In dispute, however, is whether Continental has carried its burden of showing that the misrepresentations were material under New York law. An insurer seeking rescission has the burden of proving the existence of a misrepresentation in the procurement process and the materiality of that misrepresentation – that is, that the insurer's knowledge of the truth would have resulted in refusal to issue the policy in the first instance. *Vella*, 887 F.2d at 391; *Landmark*

*Am. Ins. Co. v. S & S Pub*, No. 10-CV-2982, 2011 WL 5825143, at *3 (E.D.N.Y. Nov. 14,

2011); *see Interboro*, 933 N.Y.S.2d at 345 ("A misrepresentation is material if the insurer would

not have issued the policy had it known the facts misrepresented.").  "The test does not require

the insurer to show that it would not have issued any policy at all to the insured – only that it

would not have issued the policy in question."  *Kantrowitz v. Paul Revere Life Ins. Co.*, No. 95-

CV-2204, 1997 WL 128463, at *4 (S.D.N.Y. Mar. 19, 1997).

Under New York law, materiality is usually a question of fact for the jury.  *See Am. Int'l*

*Specialty Lines Ins. Co. v. Towers Fin. Corp.*, No. 94-CV-2727, 1997 WL 906427, at *7

(S.D.N.Y. Sept. 12, 1997) (report and recommendation).  "To establish materiality of

misrepresentations as a matter of law, the insurer must present documentation concerning its

underwriting practices, such as underwriting manuals, bulletins or rules pertaining to similar

risks, to establish that it would not have issued the same policy if the correct information had

been disclosed in the application."  *Curanovic v. N.Y. Cent. Mut. Fire Ins. Co.*, 762 N.Y.S.2d

148, 151 (App. Div. 2003).  "Conclusory statements by insurance company employees,

unsupported by documentary evidence, are insufficient."  *Id.*; *see generally WorldCom*, 354 F.

Supp. 2d at 465.

In an attempt to satisfy its burden to produce documentary evidence of its underwriting

practices, Continental has submitted excerpts from a document entitled "Aon Underwriting

Authority – Renewals" (the "Aon Authority Guidelines"), (Burrows Decl. Ex. J), which

Continental's motion papers refer to as "Continental's underwriting guidelines," (*see, e.g.*, P's

Mem. 14).[12]  Continental has also submitted an affidavit from Ms. Beverlee Burrows, the

principal underwriter for the Policy at issue in this case.  (Burrows Decl. ¶¶ 1-3.)  In her

---

[12] "P's Mem. 14" refers to Plaintiff Continental Casualty Company's Memorandum of Law in Support of Its
Renewed Motion for Summary Judgment.  (Doc. 72.)

affidavit, Ms. Burrows claims that Continental's underwriters look to the Aon Authority

Guidelines when making underwriting decisions:

> The Aon Underwriting Authority . . . govern[s] Aon's evaluation of applications submitted by insureds seeking the issuance of Accountants Professional Liability coverage . . . . Per the terms of the Guidelines, Aon has the authority to bind coverage and issue renewal policies when certain criteria are met.  The Guidelines specify when Aon is required to refer applications to CNA.  *If Aon refers an application to CNA, CNA also consults the Guidelines, as appropriate, in making its underwriting decisions.*  The Guidelines are the only underwriting guidelines applicable to the evaluation of an underwriting determination regarding the Marshall Granger Policy at issue in this litigation.

(Burrows Decl. ¶ 6) (emphasis added).  Relying on the Aon Authority Guidelines, Continental

contends that "Continental's underwriting guidelines . . . definitively establish that the Policy

terms would have been different if Marshall Granger had provided accurate Application

answers."  (*Id.*)

As Defendants point out, however, Ms. Burrows' deposition testimony contradicts, in

some respects, the statements she makes in her affidavit:

> Q.  [D]oes CNA keep any written manuals or guidelines regarding the underwriting of accountants professional liability insurance?
> A.  We have an authority document that's provided to Aon.  And that's the only real document that we have . . .
> . . .
> Q.  Ms. Burrows, are you familiar with this document?
> A.  Yes.
> Q.  What is it?
> A.  It's Aon's underwriting authority, what they can do, what their authority is on our program.
> . . .
> Q.  These are instructions to Aon; correct?
> A.  Yes.
> Q.  At various places throughout this authority, Aon is to refer the business to CNA; is that correct?
> A.  Yes.
> Q.  In those situations, this authority doesn't dictate what CNA does with a referral, does it?
> A.  It does not.

(King Decl. I Ex. C, at 33, 95-98.)  Furthermore, when asked whether she consulted the Aon Authority Guidelines at any point while reviewing and approving the specific Application at issue in this case, Ms. Burrows testified, "I do not believe I did."  (*Id.* at 100.)

It is clear from the face of the Aon Authority Guidelines document – indeed, from the document's very title – that its purpose is to delineate which underwriting decisions Aon has authority to make on its own and which it must forward to Continental.  (*See* Burrows Decl. ¶ 6.) The excerpts submitted to this Court do not appear to include any guidelines regarding Continental's own underwriting decision-making process.  "It is well settled in this [C]ircuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."  *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987); *accord Wiggins v. Hain Pure Protein Corp.*, 829 F. Supp. 2d 231, 235 n.2 (S.D.N.Y. 2011).  I therefore decline to consider the portion of Ms. Burrows' affidavit suggesting that the Aon Authority Guidelines guided Continental's decision to underwrite the Policy.  There is no other evidence that the Aon Authority Guidelines document governs Continental's own underwriting decisions.  Accordingly, Plaintiff has not satisfied its burden under New York law of producing documentation concerning its underwriting practices to show materiality.  *See WorldCom*, 354 F. Supp. 2d at 465.

Nevertheless, I conclude that Brown's misrepresentations were material as a matter of law.  Based on all the evidence presented, no rational finder of fact could possibly conclude otherwise.  *See Anderson*, 477 U.S. at 250-52 (summary judgment appropriate where no reasonable jury could render a verdict after trial in favor of the non-movant).  Ms. Burrows states:

> There is no specific underwriting guideline in the Guidelines regarding
> whether to issue a policy where an insured is engaged in an ongoing
> fraudulent enterprise.  In my view, such a guideline is unnecessary
> because it is patently obvious that [such] a policy should not be issued
> . . . . To my knowledge, CNA has *never* issued coverage to a prospective
> insured . . . who has acknowledged involvement in ongoing dishonest and
> criminal conduct.  Indeed, in my view, it is inconceivable that CNA or any
> other insurance carrier would write [such] coverage.

(Burrows Decl. ¶ 24) (emphasis in original).

The validity of this reasoning is inescapable.  A similar situation was presented in *Chi.*

*Ins. Co. v. Fasciana*, No. 04-CV-7934, 2006 WL 3714310, at *5-6 (S.D.N.Y. Dec. 13, 2006).  At

the time he applied for insurance, the insured in that case was also in the midst of perpetrating a

criminal fraud that he did not disclose on the application.  *Id.* at *5.  Applying New York law,

the *Fasciana* Court concluded – solely on the basis of an affidavit from the insurer's underwriter

similar to the one here – that the failure to disclose the fraudulent scheme was material as a

matter of law:

> The facts here are clear. . . .  [B]ecause of the gravity of [the insured's]
> conduct, [the underwriter's] affidavit is [a] sufficient basis for a finding of
> materiality.  It is not a conclusory statement but sets out the facts and the
> conclusion to be drawn from those facts.  No reasonable factfinder would
> find [the insured's] misstatement on the . . . application not to be material,
> and no reasonable factfinder would find that an insurance company would
> have issued the policy [that the insurer] issued had it known of the true
> facts.  Accordingly, I find [the insured's] misstatement to be material as a
> matter of law.

*Id.* at *6; *see also Equitable Life Assurance Soc'y of U.S. v. O'Neil*, 413 N.Y.S.2d 714, 716

(App. Div. 1979) ("Although a question whether . . . such misrepresentation was material, would

normally be for a fact-finder, the indisputable misrepresentations here are material as a matter of

law. . . . The conclusion is irresistible that had plaintiff been aware of the true facts the [terms of

the contract would have been different], and in these circumstances there is no need . . . to

introduce evidence of the insurer's underwriting rules or practices.").

17

The same conclusion is warranted here.  Common sense dictates that it is simply impossible to believe that, had the full facts regarding Brown's fraudulent scheme been disclosed on the Application, Continental would still have issued the Policy on the same terms.  While in many cases the question of whether the insurer would have issued the policy on the same terms depends heavily on the insurer's precise underwriting practices, this is not such a case.  "It may be a question of fact as to whether [the insurer] would have entered this arrangement under the same terms had it known of [the insured's] thefts, but it is a question of fact with only one rational answer – if [the insurer] had known that [the insured] had embezzled, it would not have insured the [company], at least not on the same terms."  *Mazur v. Gaudet*, 826 F. Supp. 188, 193 (E.D. La. 1992).[13]  Defendants were entitled to conduct discovery regarding Continental's underwriting practices, both in general and in connection with this specific Application, "to explore the circumstances [surrounding approval of the Application] before having to oppose a motion for summary judgment," (Opinion and Order of Jan. 31, 2013, at 27 n.21), but that discovery failed to uncover any evidence to undermine the obvious materiality of the misrepresentations.[14]  I therefore find that the misrepresentations contained in the Application

---

[13] I therefore respectfully disagree that a trial is required where documentation is absent, *see Chi. Ins. Co. v. Kreitzer & Vogelman* (*Kreitzer & Vogelman II*), 210 F. Supp. 2d 407, 411-13 (S.D.N.Y. 2002), because here that trial could have but one outcome.  The New York courts could not have intended such an empty exercise.  *See Process Plants Corp. v. Beneficial Nat'l Life Ins. Co.*, 385 N.Y.S.2d 308, 310-11 (App. Div. 1976) ("[W]here the evidence concerning the materiality is clear and substantially uncontradicted, the matter is one of law for the court to determine."), *aff'd*, 42 N.Y.2d 928 (1977).  Moreover, the insured in *Kreitzer & Vogelman* omitted from an application for a legal malpractice policy that he had been accused of neglecting client matters.  *See Chi. Ins. Co. v. Kreitzer & Vogelman* (*Kreitzer & Vogelman I*), No. 97-CV-8619, 2000 WL 16949, at *1-2 (S.D.N.Y. Jan. 10, 2000).  The fraud omitted in this case is more obviously outside the scope of what a rational insurer would have insured.  One can hardly expect an insurer to maintain written guidelines as to how an admission of an ongoing criminal fraud would affect the decision whether to issue a malpractice policy; not only would such an admission never, as a practical matter, be made, but the effect on the insurer's decision is so obvious that written guidelines would be not just superfluous, but downright silly.

[14] For example, had discovery revealed that nobody at Continental looked at the Application, materiality would be in question.  But no such evidence was developed.

were material as a matter of law and grant partial summary judgment to Continental on this issue.

**B.  Waiver of Right to Rescind**

The existence of a material misrepresentation on the Application does not end the inquiry.  Defendants argue that Continental has waived its right to seek rescission of the Policy because, after learning of sufficient facts to justify rescission, it both unreasonably delayed in seeking rescission and engaged in acts that ratified the Policy.  (*See, e.g.*, Ds' Mem. 12-25; Ds' Opp. 7-12.)[15]  I find Defendants' argument as to ratification to be unpersuasive, but I agree with Defendants that they are entitled to take limited discovery on the issue of unreasonable delay.

1.  Unreasonable Delay

It is well established that "[w]here a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. . . . He is not permitted to play fast and loose."  *Grymes v. Sanders*, 93 U.S. 55, 62 (1876).  Thus, New York law requires a party seeking rescission of a contract to act without unreasonable delay upon learning of the grounds for rescission.  *Ballow Brasted O'Brien & Rusin P.C. v. Logan*, 435 F.3d 235, 239-40 (2d Cir. 2006).  An insurer who fails to rescind a policy promptly after learning of sufficient facts to justify rescission will be deemed to have forfeited the right to rescind.  *See, e.g.*, *U.S. Life Ins. Co. v. Blumenfeld*, 938 N.Y.S.2d 84, 86 (App. Div. 2012).[16]

---

[15] "Ds' Mem." refers to Defendants-Intervenors' Memorandum of Law in Support of Their Motion for Summary Judgment.  (Doc. 82.)  "Ds' Opp." refers to Defendants-Intervenors' Memorandum of Law in Opposition to Continental Casualty Company's Motion for Summary Judgment.  (Doc. 85.)

[16] The parties disagree as to whether unreasonable delay in seeking rescission constitutes waiver or estoppel, and thus whether prejudice to the insured is required.  "Waiver and estoppel are distinct in New York insurance law. Waiver is the 'voluntary and intentional relinquishment of a known right.' . . . Estoppel, on the other hand, arises where an insurer acts in a manner inconsistent with a lack of coverage, and the insured reasonably relies on those actions to its detriment. Thus, estoppel requires a showing of prejudice to the insured."  *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 95 (2d Cir. 2002) (quoting *Albert J. Schiff Assocs. v. Flack,* 51 N.Y.2d 692 (1980)).  Defendants in this case are arguing that Continental has *waived* its right to seek rescission, not that it is *estopped* from doing so.  (*See* Defendants-Intervenors' Reply Memorandum of Law in Further Support of Their

An insurer need not, however, make a rushed and uninformed decision; it is entitled to a reasonable period of time in which to investigate the potential basis for rescission.  *Chi. Ins. Co. v. Kreitzer & Vogelman* (*Kreitzer & Vogelman III*), 265 F. Supp. 2d 335, 344 (S.D.N.Y. 2003); *see Banque Arabe Et Internationale D'Investissement v. Md. Nat'l Bank*, 850 F. Supp. 1199, 1211 (S.D.N.Y. 1994) ("[T]he party need not raise the claim *immediately* upon notice of the fraud but is afforded a reasonable period after notice of the fraud within which to consider whether or not to rescind.") (emphasis in original), *aff'd*, 57 F.3d 146 (2d Cir. 1995).  Only if the insurer delayed *unreasonably* in seeking rescission will it be found to have forfeited its right to do so.  *See Principal Life Ins. Co. v. Locker Grp.*, 869 F. Supp. 2d 359, 365-67 (E.D.N.Y. 2012) (seven-month investigation is reasonable); *Kreitzer & Vogelman III*, 265 F. Supp. 2d at 344 (six-month investigation into basis for rescission is reasonable); *see also Republic Ins. Co. v. Masters, Mates & Pilots Pension Plan*, 77 F.3d 48, 53 (2d Cir. 1996) (more than one-year investigation not unreasonable where non-movant policyholder failed to show insurer had full knowledge of facts, as opposed to mere allegations, supporting rescission); *cf. GuideOne Specialty Mut. Ins. Co. v. Congregation Adas Yereim*, 593 F. Supp. 2d 471, 484 (E.D.N.Y. 2009) (ten-month delay *after* insurer had full knowledge of facts justifying rescission is unreasonable).

Here, the parties disagree over when Continental obtained sufficient knowledge of the facts surrounding Brown's securities fraud scheme to justify rescission.  Defendants argue that Continental had sufficient knowledge as early as November 1, 2010.  (*See* Ds' Mem. 12-16.)  As evidence of Continental's knowledge, Defendants point to "Continental's November 1 Letter [which] cites to the allegations made in the SEC Action and the evidence submitted therein," (*id.* at 13), and they argue that if Continental had enough information at that time to deny coverage

_____

Motion for Summary Judgment ("Ds' Reply"), (Doc. 88), 2-3.)  They have not alleged any respect in which they detrimentally relied on Continental's actions.

for claims in connection with the alleged fraud, then it also had enough information to rescind, (*id.* at 14.)  This argument misses the mark.  On the very first page, the November 1 Letter states, "Based on our review of the available materials, . . . there *does not appear to be* coverage for certain of the claims made under the Policy, for the reasons described below," and invites Mangini to contest any of the allegations contained in the Letter or submit additional material for consideration within thirty days.  (Burrows Decl. Ex. C, at 1) (emphasis added).

The evidence shows that as of November 1, Continental was aware of the *allegations* Mangini had made against Brown, the *allegations* levied by the SEC in its civil enforcement action against both Brown and Mangini, and the criminal *allegations* against Brown contained in the indictment against him.  (*See, e.g.*, Dwares Decl. ¶¶ 5-6.)[17]  Given the serious nature of these accusations, it was reasonable for Continental to communicate its current position regarding coverage in a letter to Mangini while continuing to investigate – including by asking Mangini to submit additional information.  This Court does not accept Defendants' premise that merely because Continental believed it had sufficient information to reach a preliminary conclusion with respect to coverage under the Policy, it must have also had sufficient information to conclude that the contract should be rescinded.  *See Masters, Mates & Pilots*, 77 F.3d at 53 (knowledge of mere allegations, without factual investigation to confirm, does not require insurer to immediately rescind).  By basing its initial determination as to coverage for the claims in connection with the Infinity scheme on allegations, Continental was effectively stating that based on matters as they appeared at that time – in other words, if the allegations were true – the claims in question would not be covered under the Policy.  (*See* Dwares Decl. ¶¶ 5-6.)  Such a position does not suggest that Continental possessed conclusive proof as to whether Brown and/or

---

[17] "Dwares Decl." refers to Declaration of David R. Dwares, In Support of Continental Casualty Co.'s Opposition to the Boughton Entities' Motion for Summary Judgment.  (Doc. 91.)

Mangini were indeed engaged in a securities fraud scheme; it merely invited the insured to state its position and provide any additional information that would shed light on what was clearly a non-final determination that, given the allegations, the Policy would not cover the claims made in connection with the Infinity scheme.

In contrast, a final decision to rescind the Policy cannot be made without strong evidence that such a remedy is necessary and appropriate.  Rescission is a far more drastic step that disclaiming coverage.  *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 143 (2d Cir. 2000) ("Under New York law, rescission is an extraordinary remedy.") (alteration and internal quotation marks omitted).  Continental's assertion that it "did as any prudent insurer should do before proceeding with rescission, which was to attempt on two separate occasions to obtain additional information from the [i]nsured," (P's Reply 5), may well be correct.[18]  Despite some sentences without qualifiers such as "alleged," "it appears," or "based on the information available," the overall tone of the letters is that while Continental was increasingly persuaded that coverage was absent or that rescission might well be appropriate, it remained willing to hear more from Mangini before reaching a final conclusion.  An insurer need not qualify every single sentence with such language in order to convey that no final decisions have been reached.  Further, the January 24 Letter states that it was prompted by allegations made in a letter from counsel for the Boughton Entities and does not reveal independent investigation by Continental.  It cannot fairly be regarded as committing Continental to rescind or as suggesting that Continental believed it had enough hard information to proceed down that path.

After twice giving Mangini an opportunity to submit information, Continental claims to have undertaken a thorough factual investigation based in part on the significant amount of new

---

[18] "P's Reply" refers to Plaintiff Continental Casualty Company's Reply in Support of Its Renewed Motion for Summary Judgment.  (Doc. 92.)

information submitted into the public record by the SEC in February 2011.  David Dwares, the

Continental employee responsible for making the decision to rescind the Policy, stated as

follows:

> After Mangini failed to respond to CNA by February 24, 2011, *i.e.*, within
> the thirty-day period provided for in the January 24, 2011 letter, CNA . . .
> consulted both in-house and outside counsel to seek advice regarding
> whether to go forward with rescission based on the available information.
> . . . [B]ecause Mr. Brown's fraud had not been established by a conviction
> or judgment, CNA undertook a particularly in-depth investigation to
> determine if the information that was available provided a clear basis for
> rescission . . . including but not limited to wading through myriad
> documents filed in the action against Mr. Brown and Mr. Mangini by the
> Securities and Exchange Commission.

(Dwares Decl. ¶ 11.)  "Indeed, public policy supports the allowance of such a reasonable

investigation; it would be unwise to give insurers an economic incentive to rescind insurance at

the drop of a hat and without sufficient investigation.  Such willy-nilly actions would obviously

result in less insurance coverage, but also would engender countless lawsuits."  *Kreitzer &

Vogelman III*, 265 F. Supp. 2d at 344.

There is no bright-line rule as to when the length of a rescission investigation becomes

unreasonable or how long the insurer is entitled to consider whether or not to pursue rescission

after completing its investigation.  *Compare Masters, Mates & Pilots Pension Plan*, 77 F.3d at

53 (more than one-year investigation not unreasonable absent evidence that insurer had full

knowledge of facts, rather than allegations), *Locker Grp.*, 869 F. Supp. 2d at 365-67 (seven-

month investigation is reasonable), *and Kreitzer & Vogelman III*, 265 F. Supp. 2d at 344 (six-

month investigation is reasonable) *with GuideOne*, 593 F. Supp. 2d at 484 (ten-month delay with

full knowledge of facts is unreasonable), *SEC v. Credit Bancorp, Ltd.*, 147 F. Supp. 2d 238, 256-

57 (S.D.N.Y. 2001) (delay of more than a year is unreasonable), *and Blumenfeld*, 938 N.Y.S.2d

at 86-87 (delay of more than a year is unreasonable when insurer continued to accept premium payments during that period).[19]

  Continental has presented evidence that it conducted an appropriate investigation before pursuing rescission, including giving the insured two opportunities to submit additional information.  From November to February, Continental kept the insured informed about its current thinking and repeatedly requested input.  At the end of February 2011, Continental apparently concluded that it would make its final determination based on the information then available, and it filed this action in early June.  Defendants have not yet had the opportunity, however, to take discovery regarding what investigative or deliberative actions, if any, Continental took during the relevant periods – the four-month period from November 2010 to February 2011 in which Continental sought information from the insured, and the three-month period of further investigation and deliberation from late February 2011 to June 2011.  Defendants are entitled to take limited discovery on that issue before having to answer a Motion for Summary Judgment seeking a finding that Continental's conduct during that period did not constitute unreasonable delay.[20]  (*See* Ds' Mem. 12-13 n.2.)  If it turned out, for example, that despite the qualifications in the letters, Continental had in fact made a firm decision to rescind well before June 2011, or that it did nothing between February and June 2011, the delay might well be regarded as unreasonable.  Accordingly, summary judgment on this issue is not appropriate at this time.

---

[19] Defendants cite *Saitta v. N.Y.C. Transit Auth.*, 866 N.Y.S.2d 62, 62 (App. Div. 2008), for the proposition that a four-month delay in seeking rescission is unreasonable.  But *Saitta* involved a denial of coverage, not rescission of the entire policy, and thus is inapposite.

[20] Defendants did not raise this issue during the first round of motion practice, and thus this issue was not one of the subjects for limited discovery in my Opinion and Order of Jan. 31, 2013.

2.  <u>Affirmative Waiver</u>

Defendants also contend that, apart from delay, Continental took several acts after learning of the grounds for rescission that constitute waivers of the right to rescind the Policy. Under New York law, waiver is "the voluntary and intentional relinquishment of a known right." *Am. Gen. Life Ins. Co. v. Salamon*, No. 09-CV-5428, 2011 WL 976411, at *3 (E.D.N.Y. Mar. 16, 2011), *aff'd*, 483 F. App'x 609 (2d Cir. 2012) (summary order).  "Waiver requires evidence of a clear manifestation of intent, and cannot be 'lightly inferred.'"  *Id.* (quoting *Mooney v. City of N.Y.*, 219 F.3d 123, 131 (2d Cir. 2000)).  If, "'subsequent to the discovery of [material misrepresentations], the party later claiming the right to rescind has continued to accept the benefits of the agreement or acted in some other fashion inconsistent with exercise of a right to rescind,' that party will be deemed to have waived the misrepresentations and ratified the agreement."  *Locker Grp.*, 869 F. Supp. 2d at 366 (quoting *Prudential Ins. Co. of Am. v. BMC Indus., Inc.*, 630 F. Supp. 1298, 1300 (S.D.N.Y.1986)).  "Ratification should not be confused with the promptness requirement.  The rule requiring promptness must be distinguished from the rule that intentional acts, performed in recognition of a contract as valid, result in a ratification of a previously voidable contract and bar rescission. . . . . Ratification . . . must be intentional."  *Banque Arabe*, 850 F. Supp. at 1212-13 (internal quotation marks, citations, and alterations omitted).

For example, it is a "well settled rule of New York insurance law that the continued acceptance of premiums by the carrier after learning of facts which allow for the rescission of the policy, constitutes a waiver of . . . the right to rescind."  *Salamon*, 483 F. App'x at 610 (internal quotation marks omitted).  Electing to cancel a policy and retain the premium – rather than rescind it and return the premium – on the basis of a material misrepresentation also waives the

right to subsequently change course and seek rescission once new claims are made on the policy. *See Nat'l Grange Mut. Ins. Co. v. Judson Constr., Inc.*, 931 F. Supp. 2d 373, 380-82 (D. Conn. 2013) (applying New York law) (collecting cases).  In each situation, the conduct of the insurer is incompatible with an intention to rescind and instead indicates the insurer's intent to waive that remedy.

In this case, Defendants point to several acts by Continental that they claim constitute waivers of the right to rescind:  (1) issuance of the two November 2010 administrative endorsements; (2) payment of defense costs to Marshall Granger in the November 1 Letter as required by the Policy; and (3) the notice of non-renewal and offer of extended reporting period coverage in the February 4 Letter.[21]  (*See, e.g.*, Ds' Mem. 16-21.)

First, the policy amendments in this case cannot be considered waivers of Continental's rights.  Defendants rely on *Credit Bancorp*, 147 F. Supp. 2d at 256-57, for the proposition that issuing an endorsement to an insurance policy constitutes a ratification of that policy and waives the right to rescind it.  In *Credit Bancorp*, however, after learning of sufficient facts to support a decision to rescind, the insurers issued endorsements that changed the substantive scope of coverage, negotiated adjusted premiums to reflect these changes, and engaged in annual re-signings of the policies.  *Id.* at 256-57 & nn.8-9, 11.  Defendants also cite to *Sotheby's Fin. Servs., Inc. v. Baran*, 107 F. App'x 235 (2d Cir. 2004) (summary order), for the general proposition that affirming a contract with knowledge of the relevant facts waives any fraud claims in connection with the formation of that contract.  In *Sotheby's*, a borrower continued to

---

[21] Defendants also argue that Continental's retention of the Policy's premium constitutes a waiver.  (Ds' Mem. 16, 18.)  Defendants claim that Continental "admits it has not yet returned those premiums."  (*Id.* at 18.)  It is hard to believe Defendants are seriously making this argument.  It is undisputed that in the letter to Mangini dated June 9, 2011, Continental's counsel informed Mangini of the final decision to rescind the contract and tendered a full refund of the Policy premium, (Ashmore Decl. Ex. Q), *which Mangini rejected two days later*, (*id.* Ex. R).

make payments on a loan after learning of the facts surrounding a potential fraud claim and subsequently executed an agreement explicitly ratifying the loan.  *Id.* at 236-37.

In the instant case, in contrast, Continental's national agent merely issued ministerial endorsements changing the name and mailing address of the insured entity.  No substantive change to the scope of coverage was effected, no additional premium was exchanged, and no renewals were signed.  The law does not require an insurer to refuse a request to update the mailing address of the insured entity out of concern it could be inadvertently waiving its legal rights.  Indeed, it is not hard to imagine the problems that would ensue if insurers were required by law to continue sending correspondence either to an insured's outdated mailing address or addressed to an outdated entity name even after being notified of the change.  These purely ministerial endorsements do not constitute a waiver of the rescission remedy.

Second, neither can the payment of defense costs or the issuance of a non-renewal letter offering extended reporting period coverage be considered an intentional waiver of Continental's rights.  For substantially the reasons set forth in Continental's motion papers, (*see* P's Mem. 14-16), these actions were mandated by New York law.  *See XL Specialty Ins. Co. v. Level Global Investors, L.P.*, 874 F. Supp. 2d 263, 288 (S.D.N.Y. 2012) ("[W]here an insurer pursues the dramatic remedy of voiding a contract *ab initio*, it is appropriate that advancement [of defense costs] continue until a neutral arbiter has resolved this dispute."); *Worldcom*, 354 F. Supp. 2d at 465 (thoroughly canvassing case law before concluding that "[u]ntil the issue of rescission is adjudicated, a contract of insurance remains in effect and the duty to pay defense costs is enforceable");[22] N.Y. Comp. Codes R. & Regs. tit. 11 § 73.3(c)(1) ("Upon termination of

---

[22] Defendants argue that *WorldCom* only addressed an insurer's obligation to advance defense costs once a formal action for rescission has been initiated and does not control an insurer's obligation to do so while it is merely investigating rescission before any formal action has been filed.  (*See* Ds' Opp. 9.)  I find this argument illogical.  If the law were as Defendants argue, insurers would be obligated to advance defense costs before learning of a

27

coverage, extended reporting period coverage required by this Part must be available for any claims-made liability coverage provided under the policy."); *id.* § 73.3(e)(1) ("[T]he insurer must advise the insured in writing of the automatic extended reporting period coverage and the availability of, the premium for, and the importance of purchasing additional extended reporting period coverage.").[23]  (*See also* Opinion and Order of Jan. 31, 2013, at 28 n.22.)  Continental cannot be deemed to have intentionally waived the rescission remedy by complying with the requirements of the law.  Indeed, both the November 1 Letter (in which Continental agreed to make the defense payment) and the February 4 Letter (in which Continental offered extended reporting period coverage) explicitly state that Continental was continuing to investigate rescission and that nothing in either letter should be construed as a waiver of any rights.  (*See* Burrows Decl. Exs. C, G.)[24]

With respect to the February 4 non-renewal letter, Defendants rely on *GuideOne*, 593 F. Supp. 2d at 471, for the proposition that sending a non-renewal letter constitutes a waiver of the right to rescind.  In *GuideOne*, the insurer continued to accept premium payments after learning

---

potential ground for rescission (as normally required under the policy), would be forbidden from advancing defense costs during an investigation into that potential ground (lest it later be found to have waived rescission), and then would be again obligated to resume advancing defense costs once a formal action for rescission was filed (under *WorldCom*).  This flip-flopping cannot be what the law requires.

[23] Defendants contend that Continental was not required by law to send a notice regarding extended reporting period coverage because "[r]escission is not a 'termination of coverage' as defined by the statute."  (Ds' Mem. 20-21.) This argument misunderstands Continental's actions.  Continental did not offer the extended coverage in connection with rescission of the Policy; it offered it in connection with the Policy's upcoming natural expiration and non-renewal on April 1, 2011, which it was clearly obligated to do.  *See* N.Y. Comp. Codes R. & Regs. tit. 11 § 73.1(n) ("Termination of coverage means . . . (1) cancellation or nonrenewal of a policy . . .").  (*See generally* P's Opp. 20 n.11.)

[24] Defendants argue that "[a]s a matter of law, a unilateral 'reservation of rights' by an insurer to rescind at a later date of its own choosing – when the law imposes an affirmative duty on the insurer to rescind promptly – cannot change the insurer's duty to rescind promptly."  (Ds' Opp. 9; *see* Ds' Mem. 24-25.)  This is correct with respect to the issue of whether unreasonable delay constitutes a forfeiture of the right to rescind.  *See Estee Lauder Inc. v. OneBeacon Ins. Grp.*, 873 N.Y.S.2d 592, 594-95 (App. Div. 2009). But to the extent Defendants argue that positions taken in any of Continental's letters to Mangini should be construed as intentional waivers of the right to rescind, I see no reason why an explicit statement in each letter that Continental did *not* intend to waive its right to rescind should be ineffectual.  Defendants' reliance on *Blumenfeld*, 938 N.Y.S.2d at 86, is misplaced.  *See id.* ("An insurer's attempt to reserve its rights *while accepting premiums* is unenforceable for lack of mutuality.") (emphasis added).

28

of facts justifying rescission and later sent a non-renewal notice similar to the one in this case. *Id.* at 485.  In support of its holding that sending a non-renewal letter (in conjunction with the continued acceptance of premiums) constituted a waiver of the rescission remedy, the *GuideOne* Court cited *Stein v. Sec. Mut. Ins. Co.*, 832 N.Y.S.2d 679, 681 (App. Div. 2007).  As the language from *Stein* quoted in *GuideOne* makes clear, however, *Stein* involved an insurer's decision to *cancel* a policy as its chosen remedy upon discovering material misrepresentations by the insured – an election of remedies which precludes a later change of heart to then seek rescission.  The *GuideOne* Court appears to conflate the concepts of cancellation (a remedy for misrepresentations which prospectively terminates coverage as of a particular date) with non-renewal (a decision not to enter into a new and separate contract).  *Stein* does not state (as *GuideOne* seems to assume) that a non-renewal letter precludes later rescission; it states only that a decision to cancel does.  I thus find the *GuideOne* case unpersuasive as to the effect of a non-renewal letter on a subsequent rescission decision.  Moreover, *GuideOne*'s holding was based on both the insurer's sending the non-renewal letter *and* continuing to accept premium payments, the latter of which did not occur here.  Similarly, Defendants' citation to *Judson*, 931 F. Supp. 2d at 382, is inapposite:  *Judson*, like *Stein*, involves an insurer's election of remedies in pursuing cancellation rather than rescission and does not address the effect of a notice of non-renewal that reserves the right to rescind upon completion of an investigation.  Defendants have cited no authority holding that a non-renewal notice which is required by law and which includes a warning that rescission is still being investigated constitutes a waiver of the right to rescind.  Given Continental's clear language regarding the continuing rescission investigation, there can be no genuine dispute that Continental did not waive its right to pursue rescission in either the

November 1 Letter or the February 4 Letter.[25]  Accordingly, Plaintiff is entitled to partial summary judgment on this issue.

**IV.   <u>CONCLUSION</u>**

       For the reasons stated above, I conclude that:  (1) it is undisputed that Marshall Granger's application for insurance contained misrepresentations; (2) those misrepresentations were material as a matter of law; and (3) none of Continental's letters sent during the relevant period constitutes a waiver of the right to rescind.  Accordingly, on these issues Plaintiff's Motion for Summary Judgment is GRANTED and Defendants' Cross-Motion for Summary Judgment is DENIED.  Regarding the limited issue of whether Continental has forfeited the right to rescind by unreasonably delaying in pursuing that remedy, I find that Defendants are entitled to discovery.  As to that issue, therefore, Plaintiff's Motion is DENIED and Defendants' Cross-Motion is DENIED.  Both denials on the issue of unreasonable delay are without prejudice to renewal following limited discovery.  The Clerk of Court is respectfully directed to terminate the pending Motions.  (Docs. 71, 78.)  The parties are directed to appear for a status conference on Thursday April 17, 2014 at 4:00 p.m.

**SO ORDERED.**

Dated: March 20, 2014
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[25] To the extent Defendants argue that the non-renewal notice was an intentional waiver of the right to rescind because it included a statement that the Policy would terminate on April 1, 2011 (the natural end date of the Policy), I find this argument unpersuasive.  It is quite clear from the language used in the rest of the letter that Continental was not foregoing rescission.