UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

CONTINENTAL CASUALTY COMPANY,

                Plaintiff,

                                     Case No. 11 CIV 3979 (CS)

      v.

MARSHALL GRANGER & COMPANY, LLP,
 and LAURENCE M. BROWN,

                Defendants,

      and

JOSEPH J. BOUGHTON, JR. and
NORTHSTAR INVESTMENT GROUP, LTD.,

                Defendants-Intervenors.

-----------------------------------------------------------------X

## <u>PLAINTIFF CONTINENTAL CASUALTY COMPANY'S</u><br><u>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SANCTIONS</u>

Richard A. Simpson
Kimberly A. Ashmore
Ashley E. Eiler
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC  20006
(202) 719-7000

*Attorneys for Plaintiff Continental Casualty Company*

## **TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................................1

II.     BACKGROUND ........................................................................................................3

        A.      The SEC Action and the Criminal Action ............................................... 3

        B.      The Rescission Complaint ....................................................................... 4

        C.      Continental's First Summary Judgment Motion ....................................... 5

        D.      Continental's Second Summary Judgment Motion ................................. 8

        E.      Trial.......................................................................................................... 9

III.    STANDARD OF REVIEW .....................................................................................16

        A.      Rule 11 Sanctions ................................................................................. 16

        B.      Inherent Authority & 28 U.S.C. § 1927 ............................................... 18

IV.     ARGUMENT ...........................................................................................................19

        A.      Because the facts establish that Mr. Schryber and Mr. King acted in subjective
                bad faith on behalf of their clients, sanctions are warranted under the Court's
                inherent authority and Section 1927. ................................................... 19

        B.      Sanctions should also be imposed on the Boughton Entities and their counsel
                pursuant to Rule 11. .............................................................................. 22

V.      CONCLUSION........................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Caisse Nationale de Credit Agricole-CNCA, N.Y. Branch v. Valcorp, Inc.,*
  28 F.3d 259 (2d Cir. 1994)..................................................................................................18

*Chambers v. NASCO, Inc.,*
  501 U.S. 32 (1991)..............................................................................................................18

*Eisemann v. Greene,*
  204 F.3d 393 (2d Cir. 2000)................................................................................................18

*Ransmeier v. Mariani,*
  718 F.3d 64 (2d Cir. 2013)..................................................................................................18

*Schlaifer Nance & Co. v. Estate of Warhol,*
  194 F.3d 323 (2d Cir. 1999)...........................................................................................18, 22

*Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.,*
  682 F.3d 170 (2d Cir. 2012)................................................................................................17

**Statutes**

28 U.S.C. § 1927........................................................................................................1, 18, 19, 22

**Rules**

Fed. R. Civ. P. 11 ............................................................................................................. *passim*

## I.    INTRODUCTION

Plaintiff Continental Casualty Company ("Continental") respectfully seeks an order imposing sanctions against Defendants/Intervenors Joseph J. Boughton and Northstar Investment Group, Ltd. (the "Boughton Entities"), their counsel, John Schryber of Reed Smith LLP and Jeremy King of Olshan Frome Wolosky LLP, and Mr. Schryber's and Mr. King's respective law firms, pursuant to Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and/or the Court's inherent authority.

Continental brought this action in June 2011 to rescind an Accountants Professional Liability Policy (the "Policy") issued to Defendant Marshall Granger & Co. LLP ("Marshall Granger") due to material misrepresentations in Marshall Granger's application for coverage (the "Application"), including but not limited to the failure to disclose the accounting firm's and its principals' participation in a fraudulent investment scheme involving an entity known as Infinity Reserves Tennessee ("IRT").  Throughout the five-plus years this action has been pending, the Boughton Entities' counsel have engaged in obstructionist and evasive litigation tactics by refusing to admit even the most basic facts about the fraudulent IRT scheme and by repeatedly demanding discovery to determine whether the Application contained misrepresentations – notwithstanding that, by that point, one of Continental's insureds had pled guilty in connection with the fraudulent IRT scheme.  The Court accurately described this conduct as being indicative of the kind of lawyers who "people love to hate."  Ex. 1, T.T. 355:16-17.[1]

At the recent jury trial on the Boughton Entities' waiver claim, the egregiousness of the Boughton Entities' and their counsel's conduct – and the fact that their conduct rises to the level of subjective bad faith – became fully apparent.  After literally years of asserting that they could

---

[1] Exhibit 1 to this Memorandum of Law is a compendium of all of the relevant portions of the trial transcript.

not say one way or the other whether Continental's insureds had engaged in certain activities relating to the fraudulent IRT scheme, counsel for the Boughton Entities reversed course by arguing to the jury that Continental should have recognized the fraudulent IRT scheme for what it was in September 2010. In that regard, counsel argued that the information available to Continental in the fall of 2010 was more than sufficient for any reasonable person to recognize that the Application contained material misrepresentations and that Continental therefore should have immediately taken action to rescind the Policy. Counsel for the Boughton Entities made this argument to the jury both expressly and implicitly in their opening statement and through their questioning of Continental's witnesses.

When Continental confronted the Boughton Entities with the inconsistency between their trial assertions and their prior litigation positions, and sought to introduce into evidence prior inconsistent written statements by the Boughton Entities, counsel attempted to explain away their earlier statements. Most incredibly, counsel took the position that their prior refusals to admit certain facts as true did not actually mean that they or their clients did not know those facts to be true. Indeed, Mr. Schryber freely and repeatedly admitted to the Court that "everyone" – including he and his clients – knew that Continental's insured had pled guilty to fraud and therefore was liable in connection with the IRT scheme. *See, e.g.*, Ex. 1, T.T. 354:2-4. Yet, Mr. Schryber still maintained the preposterous position that because his clients did not have firsthand knowledge of the fraud, they could not admit to what "everyone" understood to be irrefutable. Thus, Mr. Schryber asserted that counsel and their clients had been justified in refusing to admit established facts that they knew to be true in earlier filings submitted to this Court. *See, e.g.*, Ex. 1, T.T. 353:25-356:18. And, even after the Court opined that it would be "unethical" for counsel to make an argument contrary to their previous position, Mr. Schryber persisted in arguing to the

jury during summation that "[o]f course it's indisputable" that the Application contained misrepresentations based on the evidence available in the fall of 2010.  *Id.*, T.T. 560:19-561:7.

In light of Mr. Schryber's and Mr. King's respective levels of experience as practicing litigators; the explanations they offered at trial for the indefensible positions taken during this litigation on behalf of their clients; the admissions Mr. Schryber made in response to the Court's questions; and Mr. Schryber's efforts to suggest that he should not be held responsible for the positions taken because his signatures on the filings (including a sworn declaration) were electronic, the only reasonable conclusion to draw is that counsel acted in subjective bad faith on behalf of their clients, for purposes of harassment and delay.  Although the Court may impose sanctions under Rule 11 based on litigation conduct that is merely objectively unreasonable, what happened here goes well beyond that standard.  Continental therefore requests that the Court exercise its power under Rule 11, Section 1927, and/or its inherent authority to impose sanctions on the Boughton Entities, Mr. Schryber, and Mr. King (as well as Mr. Schryber's and Mr. King's law firms) in the form of compensation for Continental's fees and costs directly caused by their bad faith conduct, as well as such other sanctions as the Court deems appropriate.

## II.    BACKGROUND

### A.    The SEC Action and the Criminal Action

On July 22, 2010, the United States Securities and Exchange Commission (the "SEC") initiated an enforcement action (the "SEC Action") against, among other defendants, Laurence Brown and Ronald Mangini, both of whom were principals with the accounting firm Marshall Granger.  SEC Action, Dkt. No. 1.  In July 2010, the SEC successfully moved *ex parte* for a temporary restraining order ("TRO") against Brown and Mangini based on allegations that they had sold fictitious stock and promissory notes in IRT to at least thirteen investors.  SEC Action, Dkt. Nos. 2 & 11.  In support of its TRO request, the SEC submitted – among other things – a

declaration from an SEC employee attaching:  (1) a prospectus for IRT, signed by Brown;

(2) promissory notes for IRT, signed by both Mangini and Brown; and (3) stock certificates for

IRT, signed by both Mangini and Brown.  SEC Action, Dkt. No. 11.

Separately, on July 21, 2010, the United States initiated a criminal action against Brown

alleging various counts for fraud in connection with the IRT scheme (the "Criminal Action").

Following discovery in the SEC Action, the SEC moved for summary judgment against

Brown and Mangini in February 2011.  In support of its motion for summary judgment, the SEC

resubmitted certain of the documents it had attached to its TRO motion, as well as a large

volume of additional documents, including sworn declarations from several of the defrauded IRT

investors.  *Compare* SEC Action Dkt. No. 10 *with* SEC Action Dkt. No. 41.

**B.**    **The Rescission Complaint**

On June 13, 2011, Continental filed this declaratory judgment action against Marshall

Granger, Mangini, and Brown.  Dkt. No. 1.  Continental's complaint sought an order from the

Court declaring that the Policy is rescinded and void *ab initio* due to material misrepresentations

in the Application, including but not limited to the failure to disclose Brown's and Mangini's

involvement in the IRT scheme.  *See generally id.*  On November 4, 2011, the Court allowed the

Boughton Entities to intervene in this action pursuant to an agreement whereby Mangini

purported to assign his rights against Continental to the Boughton Entities.  Dkt. No. 13.  The

Court also dismissed Mangini from this action.  *Id.*  The Court later entered default judgment

against Brown, who failed to appear.  Dkt. No. 21.

On January 25, 2012, the court in the Criminal Action entered final judgment against

Brown based on his guilty plea to all counts in the operative indictment.

### C.    Continental's First Summary Judgment Motion

With leave of the Court, Continental moved for summary judgment on its rescission claim on February 3, 2012, arguing that there were no genuine issues of material fact as to either (1) whether Marshall Granger made misrepresentations in the Application, or (2) whether those misrepresentations were material to Continental's risk.  As to the falsity element of its rescission claim, Continental argued that the undisputed evidence – including the admissions made by Brown in support of his guilty plea – established that Marshall Granger made numerous false answers on the Application.  Dkt. No. 28, at 16.  Pursuant to the Court's Individual Practices, Continental supported its argument with a detailed Rule 56.1 Statement of Material Facts ("Continental's First SOMF"), which incorporated supporting documentation, including documents from the SEC Action and the Criminal Action.  Dkt. No. 29.

In their opposition brief – which Mr. Schryber signed and filed under his name – the Boughton Entities argued that Continental's motion for summary judgment was premature because the Boughton Entities had not yet been afforded the opportunity for any discovery.  Dkt. No. 39.  In support of the Boughton Entities' request for discovery pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, they filed a declaration by Mr. Schryber.  Dkt. No. 38.  Mr. Schryber averred, on personal knowledge and under penalty of perjury, that if the Court denied the Boughton Entities' contemporaneously filed motion to dismiss and if the Court did not otherwise deny Continental's motion for summary judgment, "the Boughton Entities will need discovery on at least the following non-exclusive list of critical factual questions regarding Continental's rescission claim . . . d. Discovery of the facts necessary for the Boughton Entities to determine whether the responses contained on the Application were actually false, including discovery from Brown regarding his purported activities."  *Id.* ¶ 13.

The Boughton Entities also filed a response to Continental's First SOMF – again signed and filed by Mr. Schryber – that refused to respond to (and thus effectively denied) nearly every factual assertion made by Continental.  Dkt. No. 40.  Most notably, the Boughton Entities asserted that they were "unable to respond to" the following factual assertions because "there has been no discovery as to any of [Brown's and/or Mangini's] purported activities":

- Brown created a prospectus for "Infinity Reserves-Tennessee" in 2007 and began distributing the document to Marshall Granger clients and prospective investors.  *See* Ex. 2, at 1.[2]

- Brown signed the IRT prospectus as "President" and mailed it from the same business address as Marshall Granger's office.  *See* Ex. 2, at 1-2.

- The prospectus portrayed IRT as an operational gas pipeline that generated revenue and presented "an excellent investment opportunity."  *See* Ex. 2, at 2.

- In actuality, IRT's natural gas pipeline was non-operational and produced no revenue, and Brown had no financial or ownership interest in IRT.  *See* Ex. 2, at 2-3.

- From 2008 to 2010, Brown and Mangini solicited Marshall Granger clients and other investors to invest more than $2 million in securities and promissory notes in IRT using the IRT prospectus and other similar marketing materials. *See* Ex. 2, at 3-4.

- Brown and Mangini issued fictitious notes and stock certificates to the IRT investors, which they signed in their purported capacities as, respectively, President and Vice-President of IRT.  Ex. 2, at 4.

- Brown misappropriated virtually all of the more than $2 million invested in IRT by diverting money to bank accounts controlled by Brown, Mangini, and their respective family members.  Ex. 2, at 5.

- The transcript of Brown's September 2011 guilty plea allocution in the Criminal Action demonstrated that Brown fully understood the IRT scheme was fraudulent and illegal.  Ex. 2, at 5.

- Marshall Granger's response to Question No. 1 on the Application – which asked "whether your firm or any owner, partner or officer renders services or

---

[2] A chart juxtaposing Continental's assertions of fact in its SOMF with the Boughton Entities' responses is attached as Exhibit 2.

conducts any business activities under any other name?" – was false because
Brown and Mangini rendered services and conducted business under the name
of IRT from 2008 to 2010.  Ex. 2, at 5-6.

- Marshall Granger's response to Question 10.a. on the Application – which
  asked  whether"[w]ithin the past year . . . your firm, firm affiliates or their
  personnel . . . rendered financial planning, asset management or investment
  advisory services?" – was false because Brown and Mangini rendered
  investment advisory services by advising Marshall Granger clients to invest in
  IRT.  Ex. 2, at 6-7.

- Marshall Granger's responses to Questions Nos. 12.a., 12.b. and 12.c. on the
  Application – which asked whether "[w]ithin the past year . . . your firm, firm
  affiliates or their personnel have:  a. [o]rganized, promoted, solicited on behalf
  of or procured participants for investment ventures; b. [p]rovided management
  services for investment ventures; [or] c. [i]nvested in any public investment
  venture that a client also invested in?" – were false because Brown and
  Mangini organized, promoted, solicited, and procured participants in the IRT
  investment venture and also told investors that they themselves had invested
  in IRT.  Ex. 2, at 7-8.

*Compare* Dkt. No. 28 *with* Dkt. No. 40; *see also* Ex. 2.[3]

In response to the Boughton Entities' opposition papers, Continental had to incur fees and

devote space in its reply brief to argue that the Boughton Entities' request for discovery into

Brown's activities – in the face of Brown's admission to the IRT scheme by virtue of his guilty

plea – was facially unreasonable, as the undisputed facts established at least one

misrepresentation on the Application.  Dkt. No. 42, at 1-2, 4-5, 7.  Continental asserted that the

Boughton Entities' Rule 56.1 response should be disregarded entirely because it was "evasive,

non-responsive and downright abusive."  *Id.* at 5.

In its order denying Continental's motion without prejudice, the Court characterized the

Boughton Entities' response to Continental's First SOMF as "evasive."  Dkt. No. 58, at 22.  The

Court ruled that the Boughton Entities were entitled to certain limited discovery, but declined

---

[3] At the time of these filings, Mr. Schryber and Mr. King were at the same law firm, with Mr.
Schryber serving as the partner in charge of the matter and Mr. King serving as the more junior
attorney on the matter.  Mr. King later joined his current firm.

their request for discovery into "Brown's Infinity activities" because that request related to "facts regarding Brown which cannot be reasonably disputed." *Id.* at 25-28 & n.22.  However, the Court stopped short of ruling that Continental had established the falsity element of its rescission claim. *See generally id.*

### D.    Continental's Second Summary Judgment Motion

Following the limited discovery allowed by the Court, and after the entry of judgment in the SEC Action against Brown and Mangini in March 2012, Continental renewed its motion for summary judgment on its rescission claim on June 10, 2013, again arguing that there were no genuine issues of material fact as to either (1) whether the Application contained misrepresentations or (2) whether those misrepresentations were material.  *See* Dkt. No. 72.  As to falsity, Continental again explained that the undisputed evidence – including Brown's admission in his guilty plea that he had engaged in a criminal scheme through which he misappropriated millions of dollars – established that Marshall Granger made numerous misrepresentations in its Application.  *Id.* at 11-12.  Continental again supported its argument with a detailed Rule 56.1 statement ("Continental's Second SOMF"), which again relied on and incorporated supporting documentation from the SEC Action and the Criminal Action.  Dkt. No. 73.  Many of the factual contentions asserted by Continental in the Second SOMF were identical to the assertions in the First SOMF.  *See id.*

In their response to Continental's Second SOMF – a filing that Mr. Schryber once again signed and filed – the Boughton Entities ignored the Court's prior admonishments in favor of resorting to evasion and obfuscation.  Dkt. No. 83.  In response to the statements about Brown's and Mangini's activities in connection with the IRT scheme, and to the assertions that certain answers on the Application were false, the Boughton Entities responded that they were still

"unable to respond to the allegations" because there had been no discovery into any of Brown's

or Mangini's purported activities. As just one example, Continental's first asserted fact stated:

> In or around the final months of 2007, [Brown], a principal and co-Managing
> Partner of [Marshall Granger] created, or caused to be created, a prospectus
> entitled "Infinity Reserves Tennessee -- Gas Gathering and Trunk Pipeline
> System -- Putnam and Overton Counties, Tennessee," and thereafter commenced
> distributing this document to Marshall Granger accounting clients and other
> prospective investors.

Dkt. No. 73, at 1. The Boughton Entities's response stated, in relevant part, that they "are unable

to respond to the allegations in this paragraph because there has been no discovery as to any of

Brown's purported activities." Dkt. No. 83, at No. 1; *see also id.* at Nos. 2, 4-7, 39-42 & Ex. 2.

Continental had to incur time and fees to explain (again) in its reply the ridiculousness of

the Boughton Entities' responses, including by pointing out the logical fallacy of the Boughton

Entities' statement that "discovery is needed as to Brown's purported theft of client funds"

while, at the same time, "they concede that he pleaded guilty to criminal charges in connection

with those thefts and is serving time in jail." Dkt. No. 92, at 3 n.2. For its part, the Court again

admonished the Boughton Entities in its opinion and order granting Continental's motion for

summary judgment in part, observing that the Boughton Entities' response to Continental's

Second SOMF was "unnecessarily evasive." Dkt. No. 94, at 2 n.2.

### E.    Trial

After the several rounds of summary judgment briefing, the Court ultimately determined

that a jury must decide whether the Boughton Entities proved their affirmative defense of waiver

by showing that Continental "unreasonably delayed" in pursuing rescission of the Policy after

learning of rescission-justifying facts. Dkt. Nos. 134, 142. At the three-day jury trial, the

Boughton Entities took a 180-degree turn from their earlier refusals to admit even the most basic

facts about Brown's and Mangini's fraudulent activities. Instead, the Boughton Entities argued

to the jury that Continental should have recognized as early as September 2010, based on the documents submitted in support of the SEC's TRO motion, that multiple questions on the Application were false because of the Insureds' involvement in the IRT scheme. They asserted that Continental therefore had all the information it needed to rescind the Policy in the fall of 2010 and should have immediately filed its rescission lawsuit.

The Boughton Entities began advancing this theme right off the bat. In his opening statement, Mr. Schryber stated that "Continental learned of the material false statements, the materially false content of the application, by September 20, 2010, nearly nine months before Continental filed this suit." Ex. 1, T.T., 18:10-13. Mr. Schryber went on to review the documents submitted in support of the TRO motion, including the IRT prospectus signed by Brown and the promissory notes and stock certificates signed by Mangini and/or Brown, and summed it up by saying "[t]here you have it." *Id.*, T.T. 23:9-24:5; *see also id.*, T.T., 29:13-17 (arguing that, by no later than November 1, 2010, Continental "had the evidence, the hard evidence, justifying rescission . . . not just to bring a lawsuit for rescission, but to establish it").

Throughout their questioning of former Continental employee Kelly Overman, the Boughton Entities continued to argue that any reasonable person – let alone any reasonable lawyer working for an insurance company – should have recognized, as early as September 2010, that Continental had a basis to rescind the Policy based on the documents submitted by the SEC in support of its TRO motion. For example, counsel for the Boughton Entities questioned Ms. Overman closely about the import of the declaration of SEC employee Desiree Marmita, which the SEC submitted in support of its TRO request. Ex. 1, T.T. 86-94. Counsel repeatedly emphasized in his questioning that Ms. Marmita made her declaration "under penalty of perjury" and attached copies of stock certificates and promissory notes signed by Mangini and Brown.

*Id.*, T.T. 86:11-87:20. Counsel summed up this line of questioning by asking Ms. Overman "[s]o when you reviewed the Marmita declaration, including the stock certificates and notes attached to it, you learned that an SEC accountant had sworn under penalty of perjury that Mr. Brown and Mr. Mangini solicited for investment ventures?" *Id.*, T.T. 92:20-25.

Later, with respect to the same declaration and the same stock certificates, counsel asked Ms. Overman "would it have been possible to reach the conclusion that a material misrepresentation had been made back then?" Ex. 1, T.T. 174:11-12. When Ms. Overman responded "possibly," counsel editorialized by commenting "[m]ore than possibly" – not just insinuating but expressly stating to the jury that the August 2010 declaration by Ms. Marmita established a misrepresentation on the Application. *Id.*, T.T. 174:13-14. That, of course, is precisely one of the same facts that the Boughton Entities represented they had insufficient information to admit *years later*, when they had much more information about the IRT scheme, including a criminal guilty plea. *See* Ex. 2, at 6-8, 12-14.

At the end of the first day of trial, Continental provided notice to the Court that it planned to introduce certain documents, including the Boughton Entities' responses to Continental's SOMF's and Mr. Schryber's declaration, as rebuttal exhibits. *See* Ex. 1, T.T. 186: 18-25. Continental noted that these prior statements were wholly inconsistent with counsel's assertions to the jury that Continental had ample evidence at a much earlier time both to know and to prove that the Application contained false responses. Ex. 1, T.T. 186:3-19. Mr. Schryber requested the opportunity to review the papers in question and respond the next day. *Id.*, T.T. 187-191.

Early on the morning of the second day of trial, Mr. Schryber sent an email to the Court's law clerk (without docketing the correspondence, in violation of the Court's Individual Practices) wherein he represented, in relevant part, that "[t]he intra-litigation statement(s) made by counsel

aver to the fact that Intervenors do not have -- nor could have -- firsthand knowledge of Mr. Brown's and Mr. Mangini's respective states of mind during the period of the IRT Scheme, absent a plea or judgment or testimonial admission establishing same." Ex. 3, Email dated June 2, 2016.[4] Mr. Schryber attached to his email a proffer of evidence from Mr. King, who is counsel of record for the Boughton Entities but who did not appear in person at trial. *Id.* Mr. King averred that, based on his role in preparing the documents, he could testify about the Boughton Entities' responses to Continental's Rule 56.1 statements, as well as Mr. Schryber's declaration. *Id.* Mr. King specifically represented that, with respect to Statement No. 6 in Continental's Second SOMF regarding the issuance of fake IRT stock certificates and promissory notes by Mangini and Brown, "the Boughton Entities understood that Continental was asking for the Boughton Entities' firsthand knowledge of the facts recited." *Id.* At the same time, Mr. King admitted that "[t]he Boughton Entities did have firsthand knowledge that Brown had pleaded guilty to the IRT Scheme in September 2011 and, thus, that he had been adjudged liable for issuing the fictitious notes and stock certificates signed by him and/or Mangini." *Id.*

The Court heard further argument on the issue later on the morning of June 2, 2016. *See generally* Ex. 1, T.T. 195-215. Continental provided additional details about which specific documents and statements it intended to rely upon to rebut the Boughton Entities' argument, and the Court agreed that "it seems pretty outrageous that the defendants would be able to stand up in this trial and contradict" their prior statements. *Id.*, T.T. 210:20-22, 215:5-6.

At the lunch break, the Court heard argument from Mr. Schryber. Ex. 1, T.T. 345:16-380:9. Mr. Schryber first attempted to distance himself from the statement in his own declaration that the Boughton Entities needed discovery on Brown's activities to determine

---

[4] Although Andrew Weiner – one of attorneys who joined Mr. Schryber at trial as counsel for the Boughton Entities – sent the email, it was signed by Mr. Schryber. *See* Ex. 3.

whether the Application contained any false statements. *Id.*, T.T., 346:10-347:9. He specifically argued that the request for discovery was not "about the things that were known, because of the liability through the plea, to be false, which are the four or five things we're talking about now, but the responses which may actually have been false that weren't put in" to Continental's complaint. *Id.*, T.T., 347:3-7.

Mr. Schryber next turned to the Boughton Entities' responses to Continental's First and Second SOMF's and stated that:

> Mr. King will testify that one of the things that was going, as we've pointed out to the Court before, was the attempt to impute to Mr. Boughton some kind of inside knowledge about the intent of Mr. Mangini and Mr. Brown. He had no firsthand knowledge about their mental state. Everything that he knew about firsthand, to the extent he had firsthand knowledge, was in his declaration. *In terms of legal liability for fraud, well, that was established as to Brown, and these statements are being made after Brown took a plea*[.]

Ex. 1, T.T. 349:1-11 (emphasis added). When the Court observed that Mr. Schryber's argument was not at all consistent with what the Boughton Entities' Rule 56.1 responses actually said, Mr. Schryber maintained that Mr. King "will testify that his actual intent in answering this was with respect to the firsthand knowledge of" his clients – an argument that the Court correctly described as "completely ridiculous." *Id.*, T.T. 349:12-24. Mr. Schryber continued to insist that, notwithstanding the rules governing Rule 56.1 statements, Mr. King's intent in responding to Continental's SOMF's was to answer based on the Boughton Entities' actual, personal knowledge. *Id.*, T.T. 350:7-17.

Throughout this colloquy with the Court, Mr. Schryber took pains to ascribe this purported "intent" to Mr. King and to distance himself completely from the filings at issue, even though Mr. Schryber signed and filed the documents and has, at all times, been the senior attorney on this case. When counsel for Continental pointed out that Mr. Schryber – not Mr.

King – signed the documents, Mr. Schryber protested that the signatures were only "electronic" and that "[t]he [filings] were done by Mr. King" (who, at the time of the filings, was the junior attorney reporting to Mr. Schryber and who was not present at trial to defend himself).  Ex. 1, T.T. 351:1-18.  Mr. Schryber admitted that it "may not be" a "reasonable construction" to interpret Continental's SOMF's as asking for the Boughton Entities' personal knowledge, but he reaffirmed that Mr. King "meant" to be responding with that understanding, such that there was no conflict between the prior statements and the arguments presented at trial.  *Id.*, T.T. 352:1-4.

The Court, after expressing incredulity about the argument being advanced by Mr. Schryber, asked again why Continental's proposed exhibits should not be offered into evidence:

> THE COURT:  Why shouldn't the jury learn that, while you're urging the jury to disbelieve Ms. Overman when she says I didn't know enough in the fall of 2010 to make a rescission decision, that you've taken the position quite clearly, through your opening and through Mr. Weiner's examination of Ms. Overman, that they shouldn't believe her when she says that because she had enough to go forward with rescission -- in other words, to be confident that there were false statements in the application that warranted that remedy -- and, yet, at the same time, withhold from them that the exact same person who's telling the jury don't believe her when she says she doesn't have enough information has himself said years later, with a much larger store of information, I don't have enough information either?

> MR. SCHRYBER: But he didn't say that. That proves too much.  *He knew, obviously -- everyone knew at that point in time -- that Brown had taken a plea. Everybody knew that he was liable for fraud.* So no one is going to think that whatever's being said here means that Jeremy King doesn't understand that there's liability for fraud. He's pleaded to liability for fraud -- meaning Mr. Brown -- at that point. So that does not mean -- that cannot be what it means. It cannot mean -

> THE COURT: So what does it mean?

> MR. SCHRYBER: What it means, and this will be explained, from what I understood last night --

> THE COURT: It means that he doesn't have personal knowledge?

MR. SCHRYBER: He doesn't have firsthand knowledge because he's not part and parcel with Brown and Mangini.

THE COURT: I am floored. I am absolutely floored that this is the argument. You must have responded to scores, if not hundreds of 56.1 statements in your careers. Are you saying that you dispute -- or you refuse to admit things that you have every reason to believe are true because you don't have firsthand knowledge of their truth? Are you saying that you don't scour the record to determine whether you have a basis to dispute it and, if you don't, you admit it? You're saying that, unless you have firsthand knowledge or your client has firsthand knowledge, you put in a 56.1 response like this?

MR. SCHRYBER: No.   . . .

THE COURT: So how can I possibly interpret what you're saying? It's contrary to the law. It's contrary to what everybody learns in law school. It cannot possibly be true.

MR. SCHRYBER: But it can also not possibly be true that Mr. King didn't understand Brown had taken a plea and that this was some kind of open issue. *It was an established issue.*

THE COURT: So it seems like there's one of several possibilities. Either Mr. King is incompetent or Mr. King was being a huge –

MR. SCHRYBER: No.

THE COURT: Mr. King was the kind of lawyer that people love to hate because, even though he knew damn well what the facts were, he was, come hell or high water, not going to say it, or it's what he wrote down here.

MR. SCHRYBER: It can't be what he wrote down here because Brown had already taken a plea. *And nobody would understand that on the other side of this case that there's a dispute as to whether Brown was engaged in fraudulent conduct,*

THE COURT: Well, that's why an ethical lawyer would say I don't dispute.

MR. SCHRYBER: Well, Judge, again -- . . . it is a different issue between whether this was a model 56.1 statement and whether or not it actually communicates a position that can reasonably be received by the other side as meaning we need discovery to know whether Brown is liable for fraud. *Everybody knows he's taken a plea, so that can't be what it is.. . .*

> THE COURT: So what you're saying is we get to basically lie in our 56.1 and then, when it comes back to bite us, we get to walk away from it because everybody would know it was a lie.

Ex. 1, T.T. 353:12-356:13 (emphases added). Ultimately, although the Court found counsel's tactics to be "distasteful" and "slimy," it excluded Continental's proposed rebuttal exhibits, pursuant to Fed. R. Evid. 403, because the potential for prejudice outweighed the exhibits' probative value. *Id.*, T.T. 491:8-510:5. The Court did, however, specifically invite a motion for sanctions, noting that Mr. Schryber's statements "sounded awfully close to an admission that either they don't understand summary judgment or they're dishonest." *Id.*, T.T. 493:23-24. The Court also warned that "it would be unethical for the lawyers to make an argument contrary to what they've previously made, and that may tie their hands in what they can say [in summation], and that may get them sued by Mr. Boughton if he loses[.]" *Id.*, T.T. 507:5-8.

Mr. Schryber ignored the Court's warning during his summation, arguing that:

> By November the 1st, this evidence -- not allegations, evidence -- that's in front of Continental leads them to write in DX32 and for Ms. Overman to confirm, citing SEC exhibits, citing the exhibits we're talking about, Brown indisputably aware of acts that may lead to a claim. And they say, well, you know, we really shouldn't have used the word indisputably, but they used the word indisputably right after they used the word accordingly, which comes right after they cite the SEC exhibits. They've got the exhibits, so, accordingly, it's indisputable. They have evidence, so, therefore, it's indisputable. *They've got Brown's name on a marketing letter. They've got Brown's name on stock certificates. **Of course it's indisputable. That's all you need.***

Ex. 1, T.T. 560:19-561:7 (emphases added).

Continental now makes its motion for sanctions, pursuant to the Court's invitation as well as the Court's endorsement on Continental's pre-motion letter. Dkt. No. 193.

## III. STANDARD OF REVIEW

### A. Rule 11 Sanctions

Rule 11(b) of the Federal Rules of Civil Procedure provides that:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . .
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).  The 1993 Advisory Notes to Rule 11 further expand on when it is, and when it is not, appropriate to deny a factual contention:

> Often, of course, a denial is premised upon the existence of evidence contradicting the alleged fact. At other times a denial is permissible because, *after an appropriate investigation*, a party has no information concerning the matter or, indeed, has a reasonable basis for doubting the credibility of the only evidence relevant to the matter. *A party should not deny an allegation it knows to be true*; but it is not required, simply because it lacks contradictory evidence, to admit an allegation that it believes is not true.

Fed. R. Civ. P. 11 (adv. committee's notes to 1993 amendments) (emphasis added).

Rule 11(c)(1) establishes a means of recourse against attorneys and parties who fail to adhere to the rule's standards by providing that, "[i]f, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."  *Id.*  "[T]he standard for triggering [sanctions] under Rule 11 is objective unreasonableness and is not based on the subjective beliefs of the person making the statement." *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 178 (2d Cir. 2012) (internal quotation marks omitted).  In deciding whether to impose sanctions, the Court may consider the following factors:

> (1) Whether the improper conduct was willful, or negligent; (2) whether it was part of a pattern or activity, or an isolated event; (3) whether it infected the entire pleading, or only one particular count or defense; (4) whether the person has engaged in similar conduct in other litigation; (5) what effect it had on the litigation process in time or expense; (6) whether the responsible person is trained in the law; (7) what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case.

Fed. R. Civ. P. 11 (adv. committee's notes to 1993 amendments).

The principal objective of Rule 11 sanctions is to deter baseless filings and curb abuses. *Caisse Nationale de Credit Agricole-CNCA, N.Y. Branch v. Valcorp, Inc.*, 28 F.3d 259, 266 (2d Cir. 1994). Sanctions under Rule 11 may nonetheless include "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4).

### B.    Inherent Authority & 28 U.S.C. § 1927

The standards for imposing sanctions under the Court's inherent authority and for imposing sanctions under Section 1927 are closely connected. Section 1927 states that:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. Similarly, pursuant to the Court's inherent authority to control the proceedings that take place before it, any federal court "may exercise its inherent power to sanction *a party or an attorney* who has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-44 (1991)) (emphasis added).

Under either inherent authority or Section 1927, "a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith—that is, 'motivated by improper purposes such as harassment or delay.'" *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000) (quoting *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999)). Bad faith may be inferred if the party's or attorney's actions "are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.'" *Schlaifer*, 194 F.3d at 336.

- 18 -

## IV.    ARGUMENT

Mr. Schryber and Mr. King, on behalf of their clients, engaged in evasive, obstructionist, and abusive tactics throughout this litigation by refusing to admit irrefutable facts asserted by Continental in support of its rescission claim, despite the overwhelming evidence establishing those facts, including a guilty plea by Brown and, later, a civil judgment against both Brown and Mangini.  They then took a directly contrary position at trial for the purpose of criticizing and attempting to discredit Ms. Overman in front of the jury.  In trying to explain their conduct, counsel maintained that their prior filings did not actually mean what they unambiguously said.  Mr. Schryber also admitted in response to the Court's questions, in substance, that he and everyone else knew that the facts asserted in Continental's SOMF's about misrepresentations in the Application and Brown's participation in the IRT scheme were true.  Yet, the Boughton Entities, through counsel, nonetheless refused to admit those facts.

The Court could and should impose sanctions even if this conduct were simply objectively unreasonable.  Under these circumstances, however, the only reasonable inference is that Mr. Schryber and Mr. King, on behalf of their clients, acted in subjective bad faith for the purposes of delay and harassment.  Accordingly, sanctions are warranted under Section 1927, the Court's inherent authority, and/or Rule 11.

### A.    Because the facts establish that Mr. Schryber and Mr. King acted in subjective bad faith on behalf of their clients, sanctions are warranted under the Court's inherent authority and Section 1927.

As an initial matter, there can be no doubt that Mr. Schryber and Mr. King had no reasonable or good faith basis to refuse to respond to the factual contentions asserted by Continental in its SOMF's (which, for all practical purposes, amounted to denying those assertions).  At the time Continental filed its First SOMF, Brown had pled guilty to all counts of the indictment against him, which asserted numerous fraud-based crimes.  Continental based its

factual contentions about Brown's and Mangini's participation in the IRT scheme (and the corresponding misrepresentations on the Application) on the admissions made by Brown in his plea allocution, as well as the documents submitted by the SEC in support of its motions for a TRO and for summary judgment. *See* Dkt. Nos. 29 & 73. Thus, even though the falsity element of Continental's rescission element was not subject to reasonable dispute, counsel for the Boughton Entities were intent on avoiding or delaying summary judgment at all costs, and wanted to force Continental to take discovery to prove facts that they knew were true.

By the time Continental filed its Second SOMF, this Court had actually opined that Continental's factual assertions regarding Brown's conduct in connection with the IRT scheme "cannot reasonably be disputed." Dkt. No. 58, at 28 n.22. In addition, the court in the SEC Action had entered judgment against Brown *and* Mangini. Yet, Mr. Schryber and Mr. King remarkably continued to refuse to admit even the most basic facts about the IRT scheme and Brown's and Mangini's involvement therein, again in an obvious effort to avoid summary judgment, delay the proceedings, and impose costs on Continental.[5] The Boughton Entities' responses to Continental's SOMF's were completely unfounded and lacking merit – a point that Continental had to spend time, money, and effort to make in its reply briefs in support of its first two summary judgment motions.

It was not until trial, however, that Continental became aware of the full extent of counsel's misconduct on behalf of their clients. After years of refusing to admit the significance of the documents filed in the SEC Action and maintaining that they needed discovery about

---

[5] Any attempt by Mr. Schryber or Mr. King to explain away their actions by relying on distinctions between Brown and Mangini cannot be supported. In the Boughton Entities' responses to both of Continental's SOMF's – including Continental's Second SOMF, which was filed *after* the SEC had obtained a judgment against both Brown and Mangini – they did not distinguish between factual contentions about Brown, those about Mangini, and those about Brown *and* Mangini; rather, they refused to respond to (and therefore effectively denied) all of these assertions. *See generally* Ex. 2.

Brown's activities and the falsity of the Application responses (even after Brown's guilty plea), counsel for the Boughton Entities relied on a small subset of *exactly the same documents* to argue to the jury that Ms. Overman should have recognized, as early as September 2010, that Continental had the type of "hard evidence" necessary not just to bring its rescission action, but to prove it. *See supra* at 10-11.  Even more significantly, Mr. Schryber himself conceded on no fewer than *five* different occasions during trial that, at the time of the Boughton Entities' responses to Continental's SOMF's, "everyone knew" that Brown had engaged in fraudulent activity by virtue of his guilty plea, just as Continental had asserted in its SOMF's.  Ex. 1, T.T. 354:2-4; T.T. 347:4-5 (describing Brown's liability for fraud through the plea as something "that w[as] known"); T.T. 349:8-9 ("In terms of legal liability for fraud, . . . that was established as to Brown[.]"); T.T. 355:9-11 (describing Brown's liability for fraud as "an established issue"); T.T. 355:21-23 ("[N]obody would understand that . . . there's a dispute as to whether Brown was engaged in fraudulent conduct.").  Mr. King made a similar admission in his undocketed proffer, explaining that the "Boughton Entities did have firsthand knowledge that Brown had pleaded guilty to the IRT Scheme in September 2011 and thus, that he had been adjudged liable for issuing the fictitious notes and stock certificates" as part of the IRT scheme.  Ex. 3, King Proffer.

In short, at trial, the Boughton Entities' counsel made a complete about-face from their earlier position, pursuant to which they refused to admit basic facts about the IRT scheme and Brown's and Mangini's involvement in that scheme.  They have now effectively conceded that their position was entirely unfounded and without merit, given that – at least as to Brown – "everyone knew" that he was liable for fraud in connection with the IRT scheme at the time they responded to Continental's SOMF's.  Ex. 1, T.T. 354:2-4.  The Boughton Entities changed their position for the sole purpose of attempting to discredit Ms. Overman in front of the jury, and

then tried to weasel out of their prior statements by giving an explanation that the Court rightly characterized as "completely ridiculous." *Id.*, T.T. 349:22.  Mr. Schryber continued to pursue this argument in his closing statement, even after the Court warned that it would be "unethical" to make arguments contrary to the positions previously taken. *Id.*, T.T. 507:5-8.

Under these circumstances, the only reasonable inference to be drawn is that the Mr. Schryber and Mr. King were acting in subjective bad faith, with the intent to delay and avoid summary judgment on the falsity element of Continental's rescission claim by refusing to admit facts that they and their clients knew full well were true.  Likewise, at trial, counsel acted in bad faith and with the intent to harass by attempting to convince the jury not to believe Ms. Overman's testimony – *i.e.*, that she did not think Continental had sufficient evidence in the fall of 2010 to conclude definitively that the Application contained misrepresentations – even while the Boughton Entities and their counsel had represented to the Court at a much later time and when much more evidence was available that they could not admit that the Application contained misrepresentations. *Schlaifer*, 194 F.3d at 336 (bad faith may be inferred if the party's or attorney's actions "are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay").  Accordingly, Continental requests that the Court award sanctions against the Boughton Entities pursuant to its inherent authority and against Mr. Schryber and Mr. King and their respective law firms pursuant to Section 1927 and its inherent authority.

### B.   Sanctions should also be imposed on the Boughton Entities and their counsel pursuant to Rule 11.

Mr. King's and Mr. Schryber's ludicrous explanation about their "intent" in responding to the Rule 56.1 statements (*i.e.*, the "completely ridiculous" argument that they were intending to respond only based on the Boughton Entities' personal knowledge of the IRT fraud, Ex. 1,

T.T. 349:22) cannot and should not be credited; it makes no sense. Even if one were to accept it, however, the explanation still does not come close to comporting with the strictures of Rule 11, which expressly require denials of factual contentions to be "warranted on the evidence" after an "inquiry reasonable under the circumstances" and to "the best of the person's knowledge, information, and belief."

The Advisory Notes to Rule 11 specifically admonish attorneys and parties that "[a] party should not deny an allegation it knows to be true." *Id.* Reasonable attorneys are well aware of the standard necessary to refuse to admit factual contentions made in an opposing party's court filings. As the Court aptly hypothesized at trial:

> THE COURT: So if a 56.1 statement said Judge Seibel has brown hair and there were a hundred witnesses who put in affidavits saying Judge Seibel has brown hair, but Mr. Boughton had never seen me before, your advice would be -- and you personally knew that I had brown hair, your advice to your client would be we can't admit that because you, Mr. Boughton, don't personally know whether the Judge has brown hair.
>
> MR. SCHRYBER: I would not do that, but --
>
> THE COURT: But Mr. King would?
>
> MS. ASHMORE: But you signed it.
>
> MR. SCHRYBER: I did not sign it, so stop saying that.
>
> THE COURT: Well, you know, the rules are electronic signatures are the same as yours.

Ex. 1, T.T. 366:5-18.[6] Indeed, at points, Mr. Schryber appeared to acknowledge that the positions he advanced were not reasonable. *Id.*, T.T. 352:1-3 (admitting that the Boughton Entities' interpretation of Continental's SOMF's "may not be" "a reasonable construction").

---

[6] Despite Mr. Schryber's protestations that his signatures should carry less weight because they were "electronic," the Court's ECF Rules and Instructions are perfectly clear that "[t]he user log-in and password required to submit documents to the ECF system serve as the Filing User's signatures on all electronic documents filed with the Court. They also serve as a signature for

Thus, at the very minimum, the Boughton Entities and their counsel engaged in objectively unreasonable conduct, such that Rule 11 sanctions are appropriate. Virtually all of the relevant factors under Rule 11 weigh in favor of awarding sanctions. *See* Fed. R. Civ. P. 11 (adv. committee's notes to 1993 amendments). *First*, as discussed, the only reasonable inference to be drawn is that the Boughton Entities and their counsel acted willfully and with subjective bad faith. It is difficult to believe that any lawyer who has read the applicable rules, let alone experienced litigators, could honestly believe that a party may refuse to admit factual assertions in a Rule 56.1 statement because the party does not have personal knowledge of the facts. *Second*, the improper conduct was not isolated; counsel took unreasonable positions on multiple occasions, in response to not one but two different summary judgment motions. *Third*, the Boughton Entities' conduct infected their entire oppositions to Continental's motions, particularly the first summary judgment motion, as it prevented the Court from deciding, at the outset, that the falsity element of Continental's rescission claim was not in dispute. *Fourth*, although Continental does not have specific knowledge of any similar conduct by Mr. Schryber or Mr. King in other cases, their conduct in this case had a negative impact in terms of time and expense, as both Continental and the Court had to expend resources responding to the Boughton Entities' ridiculous positions, which unnecessarily prolonged this litigation. *Fifth*, the individuals responsible for the actions, Mr. King and Mr. Schryber, are seasoned litigators who are well-trained in the law. *Finally*, sanctions in the form of Continental's attorneys' fees

---

purposes of the Federal Rules of Civil Procedure, including Rule 11, the Federal Rules of Criminal Procedure, the Local Rules of this Court, and any other purpose for which a signature is required in connection with proceedings before the Court." SDNY Electronic Case Filing Rules & Instructions, Section 8.1. Moreover, one of the documents in question is a declaration by Mr. Schryber that was submitted to the Court with his signature, under penalty of perjury and purportedly based on personal knowledge. Mr. Schryber's effort to foist responsibility for that sworn statement and for the other filings submitted under his ECF credentials to another lawyer (who, at the time, was a more junior lawyer working under his supervision and who is not alleged to have signed or filed without permission) is itself sanctionable.

expended as a direct result of the improper conduct are necessary to deter the Boughton Entities, Mr. Schryber, and Mr. King from repeating their conduct.

Continental seeks sanctions in the form of (1) compensation for time spent responding to the bad faith filings; (2) compensation for time spent at trial preparing for and arguing the rebuttal issues; and (3) compensation for time spent preparing the instant motion.  Upon direction from the Court, Continental is prepared to submit detailed documentation supporting its fees and costs expended in these areas.  Continental also defers to the Court's opinion as to what additional monetary or nonmonetary sanctions are appropriate.

## V.    CONCLUSION

Continental respectfully requests that the Court enter an order imposing sanctions on the Boughton Entities, Mr. Schryber, and Mr. King, in the form of (1) compensation for time spent by Continental responding to the bad faith filings; (2) compensation for time spent by Continental at trial preparing for and arguing the rebuttal issues; (3) compensation for time spent preparing the instant motion; and (4) such other sanctions as the Court deems appropriate.

Respectfully submitted,

Richard A. Simpson
(rsimpson@wileyrein.com)
*Admitted Pro Hac Vice*
Kimberly A. Ashmore
(kashmore@wileyrein.com)
*Admitted Pro Hac Vice*
Ashley E. Eiler
(aeiler@wileyrein.com)
*Admitted Pro Hac Vice*
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC  20006
(202) 719-7000

DATED:     July 18, 2016              By: /s/ Richard A. Simpson
           Washington, D.C.           *Attorneys for Plaintiff*
                                      *Continental Casualty Company*

- 26 -

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this the 18th day of July 2016, a true and correct copy of the

foregoing brief was served *via* electronic mail and U.S. mail, postage prepaid, upon the

following:

> Patrick J. Bliss, Esq.
> 399 Knollwood Road
> Suite 204
> White Plains, NY  10603
> (pjbesq@aol.com)
>
> *Attorney for Defendant Marshall Granger & Co., LLP*
>
> John W. Schryber, Esq.
> Andrew Weiner, Esq.
> Kristin Cooke Davis, Esq.
> REED SMITH LLP
> 1301 K Street, N.W.
> Suite 1100 - East Tower
> Washington, D.C.  20005
> Phone: 202- 414 9277
> Facsimile:  202 414 9299
> (JSchryber@ReedSmith.com)
> (AWeiner@ReedSmith.com)
> (KDavis@ReedSmith.com)
>
> Jeremy M. King, Esq.
> Ellen Holloman, Esq.
> OLSHAN FROME WOLOSKY LLP
> Park Avenue Tower
> 65 East 55th Street
> New York, NY  10022
> (JKing@olshanlaw.com)
> (EHolloman@olshanlaw.com)
>
> *Attorneys for Defendants-Intervenors Joseph J. Boughton, Jr.*
> *and Northstar Investment Group, Ltd.*

/s/ Richard A. Simpson
Richard A. Simpson
