UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
CONTINENTAL CASUALTY COMPANY,

                    Plaintiff,

            - against -

MARSHALL GRANGER & COMPANY, LLP,
and LAURENCE M. BROWN,                          **OPINION & ORDER**

                    Defendants,                    11-CV-3979 (CS)

             and

JOSEPH J. BOUGHTON, JR. and
NORTHSTAR INVESTMENT GROUP, LTD.,

                  Defendants-Intervenors.
-----------------------------------------------------------------------x

Seibel, J.

       Before me is Plaintiff Continental Casualty Company's motion for sanctions against

Defendants-Intervenors Joseph J. Boughton, Jr. and Northstar Investment Group, Ltd. (together,

"the Boughton Entities") and their lawyers and respective firms, Jonathan Schryber of Reed

Smith LLP and Jeremy King of Olshan Frome Wolosky LLP (together, "the Lawyers").[1]  (Doc.

197.)  For the following reasons, Plaintiff's Motion is DENIED.

## I.  **BACKGROUND**[2]

### A.  The Securities Fraud Scheme

       Defendant Marshall Granger & Company, LLC ("Marshall Granger") was a certified

public accounting firm owned and managed by Defendants Laurence M. Brown and Ronald J.

---

[1] The Court will refer to the Boughton Entities and the Lawyers together as "Respondents."

[2] The facts of this case have been discussed at length in previous decisions by this Court, (*e.g.*, Docs. 58, 94), so familiarity with them is presumed.  I will address only the facts necessary to decide the instant motion.

Mangini. (Doc. 94 at 2.)  In April 2010, Continental Casualty Company ("Continental") issued an Accountants Professional Liability Insurance Policy to Marshall Granger based on an application that was filled out and signed by Brown on behalf of Marshall Granger. (*Id.* at 2-3.) As part of that application, Brown provided a number of answers that were false, including that no one from his firm had promoted or solicited on behalf of investment ventures. (*Id.* at 3-4.) At the time he submitted the application, however, Brown was in the midst of perpetrating a securities fraud scheme, convincing several of his accounting clients to participate in a nonexistent investment opportunity. (*Id.* at 4-5.)  As part of this scheme, Brown and possibly others created a prospectus entitled "Infinity Reserves Tennessee – Gas Gathering and Trunk Pipeline System," which was distributed to certain Marshall Granger clients and other prospective investors beginning in approximately 2007. (*Id.* at 5.)  The cover letter attached to the prospectus and the stock certificates issued to investors were both signed by Brown as the president of "Infinity Reserves-Tennessee, Inc." ("Infinity"), and the stock certificates were also signed by Mangini as Infinity's vice president. (*Id.*)  Brown continued to solicit Marshall Granger clients and other individuals to invest in Infinity securities and promissory notes until June 2010, obtaining more than $2 million in investor funds. (*Id.*)

Contrary to their assertions, neither Brown nor Mangini owned any portion of Infinity, nor was either of them an officer of that company, which was actually solely owned by Boughton, one of Marshall Granger's accounting clients. (*Id.*)  In May 2010, Mangini informed Boughton that Brown was holding himself out as an officer of Infinity and soliciting investments based on false representations regarding Infinity's operations. (*Id.*)  Boughton then reported the allegations to the Securities and Exchange Commission ("SEC"), which initiated an emergency civil enforcement action against Brown and Mangini in this Court on July 22, 2010. (*Id.* at 6.)

The SEC alleged that Brown and Mangini had been selling fictitious Infinity common stock and promissory notes as part of a scheme yielding over $2.1 million in fraudulently obtained profits. (*Id.*)  In addition to the SEC civil action, Brown was indicted in this District on federal charges of securities fraud, wire fraud, and money laundering.  (Doc. 83 ¶¶ 12, 13.)  Like the SEC's complaint, the superseding indictment in the criminal action alleged that Brown solicited investments in Infinity, which Brown knew to be inoperative, through material misrepresentations and that he converted the generated funds to his own personal use and the use of others.  (*Id.* ¶ 13.)

On August 31, 2010, the Boughton Entities sent a letter to Mangini asserting several claims of accounting malpractice and breach of fiduciary duty against Marshall Granger.  (Doc. 94 at 6.)  That same day, Mangini forwarded the letter to Continental, seeking coverage under the insurance policy for the Boughton Entities' claims.  (*Id.*)  On September 20, 2010, Mangini informed Continental of the SEC action and the criminal case against Brown, and later submitted additional claims to Continental relating to former Marshall Granger clients who had lost money in the Infinity scheme.  (*Id.* at 6-7.)  On November 1, 2010, Continental denied coverage and reserved its right to rescind the policy based on the misrepresentations Brown had made in the application.  (*Id.* at 7.)

On February 4, 2011, the SEC moved for summary judgment in the civil enforcement action against Brown and Mangini, submitting into the public record a significant amount of evidence relating to the Infinity scheme.  (*Id.* at 9.)  In March 2012, judgment was entered against Brown and Mangini in the SEC Action.  *Sec. & Exch. Comm'n v. Brown*, No. 10-CV-5564 (S.D.N.Y. Mar. 22, 2012).

On September 8, 2011, Brown pleaded guilty to the criminal charges of securities fraud, wire fraud, and money laundering. (*Id.* at 10.) In his plea allocution, Brown testified that he purported to sell interests in Infinity, which entity he knew to be inoperative and which interests he knew he did not have any authority to sell, to clients of Marshall Granger. (Doc. 74 Ex. N, at 8-10.) He also testified that he converted the majority of the funds thereby raised for personal use and the use of others, and that he knew what he was doing was a crime. (*Id.* Ex. N, at 11, 16.)

**B. The Current Action**

On June 13, 2011, Continental initiated the instant action against Marshall Granger, Brown, and Mangini seeking rescission of the policy. (Doc. 1.) On November 3, 2011, the Boughton Entities intervened after Mangini assigned all of his rights under the policy to them. (Doc. 13.) The suit was dismissed as against Mangini, (*id.*), and a default judgment was entered against Brown based on his failure to appear, (Doc. 21).

1. <u>Continental's First Motion for Summary Judgment</u>

On February 3, 2012, more than four months after Brown's guilty plea, Continental served its first motion for summary judgment on Marshall Granger and the Boughton Entities, (Doc. 27), arguing that given the pending SEC action against Brown and Mangini, for which a temporary restraining order ("TRO") had been issued, and the substance of Brown's guilty plea, there were no issues of material fact as to either the falsity or materiality of several of Marshall Granger's representations in its insurance application, (Doc. 28). As required by Local Rule 56.1, Continental submitted a statement of material facts that it asserted were undisputed. (Doc. 29.) Many of the paragraphs in Continental's 56.1 statement contained more than one fact. (*See id.*)

The Boughton Entities opposed the motion in a brief signed by Mr. Schryber that argued, among other things, that Continental's motion was premature given the lack of discovery to establish the falsity and materiality of statements made in Marshall Granger's application. (*See* Doc. 39 at 8-11.) In support of their opposition, the Boughton Entities submitted a declaration of Mr. Schryber, in which he asserted that summary judgment was premature because the Boughton Entities required discovery on, among other things, "the facts necessary for the Boughton Entities to determine whether the responses contained on the Application were actually false, including discovery from Brown regarding his purported activities" and Brown's understanding of the meaning of the application's questions. (Doc. 38 ¶ 13(d)-(e).)

As required by Local Rule 56.1, the Boughton Entities submitted a response to Continental's statement of undisputed material facts that was drafted by Mr. King, (Doc. 202 ¶ 3), and signed by Mr. Schryber, (Doc. 40). Their responses included several bases for objection, including that they were either entirely or partially "unable to respond" to thirty-eight out of forty-six statements because there had been no discovery. (*Id.*) At the time, I found these responses "evasive." (Doc. 58 at 22.) For example, the Boughton Entities asserted that "because there ha[d] been no discovery as to any of Brown's purported activities," they were unable to respond to paragraphs of Continental's 56.1 statement that included the following facts:

- Brown created a prospectus for the Infinity scheme and distributed it to Marshall Granger clients and other prospective investors, (Doc. 29 ¶ 1; Doc. 40 ¶ 1);

- Brown signed the prospectus's cover letter representing that he was the president of Infinity and mailed it from the Marshall Granger office, (Doc. 29 ¶ 2; Doc. 40 ¶ 2);

- From early 2008 through June 2010, Brown used these marketing materials to solicit Marshall Granger clients and other prospective investors to invest in Infinity securities and promissory notes, yielding more than $2 million in investor funds, (Doc. 29 ¶ 5; Doc. 40 ¶ 5);

- Brown issued and signed fictitious notes and stock certificates purportedly reflecting the investors' interests in the Infinity scheme, (Doc. 29 ¶ 6; Doc. 40 ¶ 6);

- Brown misappropriated "virtually all" of the $2 million in investor funds and diverted them to bank accounts for him, Mangini, and various family members, (Doc. 29 ¶ 7; Doc. 40 ¶ 7);

- Brown's plea allocution in his criminal case confirmed that at all relevant times he fully understood that the Infinity scheme was fraudulent and illegal, (Doc. 29 ¶ 14; Doc. 40 ¶ 14);

- Brown signed and submitted the policy application on behalf of Marshall Granger, and answered "no" to each of the following questions: (i) whether "your firm or any owner, partner or officer renders services or conducts any business activities under any other name?"; (ii) whether "[w]ithin the past year . . . your firm, firm affiliates or their personnel . . . rendered financial planning, asset management or investment advisory services?"; and (iii) whether "[w]ithin the past year . . . your firm, firm affiliates or their personnel have: a. [o]rganized, solicited on behalf of or procured participants for investment ventures; b. [p]rovided management services for investment ventures; [or] c. [i]nvested in any public investment venture that a client also invested in?", (Doc. 29 ¶¶ 17-19; Doc. 40 ¶¶ 17-19).

Ultimately, I denied Continental's motion and ordered limited discovery on Continental's internal communications and decision-making process, but denied the Boughton Entities' request for discovery regarding "Brown's Infinity activities and his understanding of the application questions," because I found that the facts surrounding Brown's activities could not reasonably be disputed. (Doc. 58 at 28 n.22.) The Boughton Entities filed an Answer, (Doc. 60), and the case proceeded through limited discovery.

2. Continental's Second Motion for Summary Judgment

Following limited discovery, and after judgment against Brown and Mangini in the SEC action, Continental filed a second motion for summary judgment on June 10, 2013, (Doc. 71), arguing that it was undisputed that Marshall Granger had made material misrepresentations on its insurance application, thus entitling Continental to rescind the policy, (see Doc. 72 at 1-2). The

Boughton Entities cross-moved for summary judgment, (Doc. 78), arguing that Continental's delay in seeking rescission constituted waiver of its entitlement to rescind, (Doc. 82 at 1-2).

Although I had already ruled that facts concerning Brown's involvement in the Infinity scheme were beyond reasonable dispute, the Boughton Entities in their Local Rule 56.1 counterstatement – which was again drafted by Mr. King, (Doc. 202 ¶ 4), and signed by Mr. Schryber – again objected, among other things, that they were "unable to respond" to many paragraphs that included allegations regarding Brown's fraud "because there ha[d] been no discovery as to any of Brown's purported activities," (*e.g.*, Doc. 83 ¶¶ 1, 2, 5, 6, 7). Several of the Boughton Entities' responses were even internally inconsistent. For example, they stated (among other things) that they were unable to respond to the fact that Brown misappropriated over $2 million in investor funds, (*id.* ¶ 7), despite admitting that Brown pleaded guilty to the criminal charges, (*see id.* ¶ 14), which alleged exactly that,[3] and despite Brown having allocuted to bilking about ten clients out of about $2 million through the scheme, (Doc. 74 Ex. N, at 8-12).

Further, "in response to the paragraphs stating the specific answers on the application for the policy that Continental contend[ed] were the misrepresentations *at the very heart of this case*, [the Boughton Entities] repeatedly den[ied] that those factual assertions [had] any relevance to Continental's Motion." (Doc. 94 at 2 n.2 (citing Doc. 83 ¶¶ 20-23) (emphasis in original).) The

---

[3] The full statement to which the Boughton Entities were responding was:

> Contrary to the representations embodied in these false documents, Brown misappropriated virtually all of the more than $2.1 million Marshall Granger client funds purportedly invested in the Infinity Reserves-Tennessee natural gas pipeline and diverted the funds to bank accounts controlled by himself, Mangini and their respective family members for their personal use.

(Doc. 83 ¶ 7.) In addition to asserting a need for discovery, claiming that documents Continental had submitted were unauthenticated or inadmissible, and (amazingly) denying the materiality of the statement to Continental's summary judgment motion, the Boughton Entities pointed out that the evidence Continental cited did not refer to bank accounts. Other documents in the record, however – for example Brown's plea allocution, (Doc. 74 Ex. N, at 11-15) – established that the diverted money had gone through bank accounts controlled by at least Brown and Mangini.

Boughton Entities also objected to Continental's citation to a declaration that attached the application because of purported differences between the application attached to the declaration and the one attached to Continental's Complaint.  (*See* Doc. 83 ¶¶ 19-24.)  But the only difference between the two was that the latter obviously redacted Marshall Granger's annual revenue and client names; the two copies were otherwise identical.  (*See* Doc. 1 ¶ 13 & Ex. B; Doc. 75 Ex. A.)  Because the revenue and client names were not relevant to the case or Continental's motion for summary judgment, I noted that I could not "discern what purpose was intended to be served by [the Boughton Entities'] objection."  (Doc. 94 at 2 n.2 (alteration omitted).)

I granted summary judgment in Continental's favor on the question of whether it was entitled to rescind the policy based on Marshall Granger's material misrepresentations, but denied summary judgment as to whether Continental had forfeited its right by virtue of unreasonable delay in seeking rescission or had otherwise ratified the policy.  (*See id.* at 30.)  In so doing, I noted that the Boughton Entities' 56.1 response was "unnecessarily evasive," (*id.* at 2 n.2), and that they did not "seriously dispute" the falsity of Brown's representations in the policy application, (*id.* at 13).

3.  Jury Trial

This Court held a jury trial in June 2016 to determine whether Continental had unreasonably delayed in exercising its right to rescind the policy.  At trial, the Boughton Entities contradicted their previous position that discovery was necessary to determine Brown's conduct in executing the Infinity scheme, instead arguing that by virtue of public filings in the SEC action, Continental knew or should have known as early as September 2010 that Marshall Granger's representations on its insurance application were false.

In his opening, Mr. Schryber argued that Continental "had the evidence, the hard evidence, justifying rescission" long before it filed the Complaint in this action. (Doc. 197 Ex. 1, at 29:13-14.) According to Mr. Schryber, this evidence established that Brown had solicited investments as part of the Infinity scheme prior to 2010, (*id.* Ex. 1, at 29:14-15), and that Brown had signed the prospectus's cover letter and listed himself as the contact for prospective investors, (*id.* Ex. 1, at 23:13-16). Mr. Schryber also read from the prospectus's cover letter: "Infinity Reserves-Tennesse is currently selling interests. We believe this is an attractive package." (*Id.* Ex. 1, at 23:17-18.) The Boughton Entities, through counsel, had previously asserted their inability to determine whether such a cover letter existed and if it did, what it contained, (*see* Doc. 29 ¶ 2; Doc. 40 ¶ 2), and on another occasion, through counsel, admitted its contents but professed an inability to respond without further discovery as to "Brown's purported activities," (Doc. 83 ¶ 2).

Mr. Schryber's co-counsel, Mr. Weiner, continued this theme through his questioning of former Continental employee Kelly Overman, aiming to show that Overman, based on her review of the documents that were attached to the SEC's application for a TRO, knew that Brown had made misrepresentations in the policy application, and thus that Continental could have initiated this rescission action sooner. For example, Mr. Weiner had Overman read from a statement made by an SEC accountant that Marshall Granger, at least between April 2008 and June 2010, "sold what purported to be the securities of Infinity Reserves, an entity owned by one of Marshall Granger's clients, Joseph J. Boughton, Jr." (Doc. 197 Ex. 1, at 86:19-24.) Mr. Weiner had Overman testify that Brown, holding himself out as president of Infinity, had signed the stock certificates and promissory notes that purported to grant an interest in Infinity Reserves-Tennessee. (*Id.* Ex. 1, at 87:25-89:17.) Mr. Weiner also had Overman testify

regarding the prospectus's cover letter, including quoting language in which Brown stated, "[W]e believe this is an attractive package." (*Id.* Ex. 1, at 91:16-92:19.) Finally, Mr. Weiner asked Overman, "Would it have been possible to reach the conclusion that a material misrepresentation had been made back then?" (*Id.* Ex. 1, at 174:11-12.) When Overman answered, "Possibly," Mr. Weiner responded, "More than possibly." (*Id.* Ex. 1, at 174:13-14.)

Based on the position taken by the Boughton Entities during the first day of trial – that the SEC documents provided sufficient information for Continental to have known that Brown had lied on the application – Continental informed the Court that it wished to introduce the Boughton Entities' 56.1 responses on the theory that they showed that the Boughton Entities had (with more information available to them than Overman had at the time) asserted their inability to admit the falsity of Marshall Granger's representations on the application. (*See id.* Ex. 1, at 186:18-187:19, 190:15-191:11.) In response, Mr. Schryber argued that Mr. King, who had drafted the 56.1 responses, would testify that he was unable to admit certain facts because neither he nor the Boughton Entities had firsthand knowledge as to "Brown's purported activities." (*See id.* Ex. 1, at 349:1-351:18.) He also argued that this position was not inconsistent with arguing at trial that Continental should have known the falsity of the representations sooner, because, notwithstanding the 56.1 responses stating the contrary, "everyone" understood the basic facts of Brown's fraudulent actions once he pleaded guilty. (*See id.* Ex. 1, at 355:9-11, 355:20-23, 356:3-8.) I noted that that position was "completely ridiculous," that "[n]o 56.1 statement on either side is based on personal knowledge of the lawyers," and that responses should be instead "based on what's in the record." (*Id.* Ex. 1, at 349:22-24, 350:1-2.) I explained how unreasonable it was for Mr. Schryber and Mr. King to (i) understand Continental's 56.1 statements to be addressing the personal, firsthand knowledge of the Boughton Entities, rather

than what appears in the record, and (ii) state in their 56.1 responses that the Boughton Entities did not "have enough information to know whether we dispute it or not" while subsequently arguing that they actually meant that they did not "have any firsthand information." (*See id.* Ex. 1, at 350:7-352:21.) Ultimately, I declined to admit the 56.1 statements and responses because, under Federal Rule of Evidence 403, I found that their prejudicial effect substantially outweighed their probative value. (*See id.* Ex. 1, at 493:16-496:25.) I explained that a more appropriate remedy for the Lawyers' unreasonable conduct would be sanctions, and invited Continental to move under Rule 11 or otherwise. (*Id.* Ex. 1, at 493:17-20.) I also noted that the Lawyers' conduct might be a matter for Grievance Committee. (*Id.* Ex. 1, at 493:20-21.)

On June 8, 2016, the jury returned a verdict for Continental, and judgment was entered in its favor. (Doc. 192.)

## II. <u>DISCUSSION</u>

Following this Court's invitation, Continental now seeks sanctions against Respondents pursuant to Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and/or the Court's inherent authority. (Doc. 197.) Although this case is now closed, "[i]t is well established that a federal court may consider collateral issues after an action is no longer pending." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990). "Collateral issues" include requests for attorneys' fees and whether sanctions are appropriate as a result of attorney misconduct, because these are "independent proceeding[s] supplemental to the original proceeding and not a request for a modification of the original decree." *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 170 (1939); *see Cooter & Gell*, 496 U.S. at 395.

## A. Rule 11

### 1. Violation of Rule 11(b)

Federal Rule of Civil Procedure 11(b) provides:

> By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law . . . ; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). Rule 11 "explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed." *Gutierrez v. Fox*, 141 F.3d 425, 427 (2d Cir. 1998) (internal quotation marks omitted). As such, "[s]anctions may be . . . imposed when court filings are used for an 'improper purpose,' or when claims are not supported by existing law, lack evidentiary support, or are otherwise frivolous." *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012). Further, if a pleading is "factually without foundation" it may violate Rule 11 "even though not signed in subjective bad faith." *Wechsler v. Hunt Health Sys., Ltd.*, 216 F. Supp. 2d 347, 356 (S.D.N.Y. 2002). "[D]istrict courts generally have wide discretion in deciding when sanctions are appropriate." *Morely v. Ciba-Geigy Corp.*, 66 F.3d 21, 24 (2d Cir. 1995) (alteration in original) (internal quotation marks omitted).[4]

---

[4] Although courts are required to issue a show-cause order before imposing sanctions on their own initiative under Rule 11(c)(3), sanctions awarded pursuant to a motion require only that the party alleged to have violated the Rule have "notice and a reasonable opportunity to respond." *See* Fed. R. Civ. P. 11(c)(1), 11(c)(5).

Courts look to an objective standard of reasonableness rather than "the subjective beliefs of the person making the statement." *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 177 (2d Cir. 2012) (internal quotation marks omitted).

> Under the objective standard, district courts should impose sanctions whenever a pleading has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law.

*Calloway v. Marvel Entm't Grp.*, 854 F.2d 1452, 1468 (2d Cir. 1988) (internal quotation marks omitted), *rev'd in part on other grounds*, 493 U.S. 120 (1989). The following factors are among those considered in deciding whether to impose sanctions:

> (1) whether the improper conduct was willful, or negligent; (2) whether it was part of a pattern o[f] activity, or an isolated event; (3) whether it infected the entire pleading, or only one particular count or defense; (4) whether the person has engaged in similar conduct in other litigation; (5) what effect it had on the litigation process in time or expense; (6) whether the responsible person is trained in the law; (7) what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case.

*Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 265 (S.D.N.Y. 2009); *see Simpson v. Putnam Cty. Nat'l Bank of Carmel*, 112 F. Supp. 2d 284, 291-92 (S.D.N.Y. 2000). Rule 11 sanctions "should be imposed with caution, resolving all doubts in favor of the party facing sanctions." *Ho Myung Moolsan Co.*, 665 F. Supp. 2d at 263 (citation, alteration, and internal quotation marks omitted).

It is clear that Respondents violated Rule 11(b) by virtue of their 56.1 responses. Rule 11(b) requires that a signer's "knowledge, information, and belief [be] formed after reasonable inquiry . . . ." Fed. R. Civ. P. 11(b). Any inquiry at all, let alone a reasonable one, would have provided Respondents with information sufficient to respond to many of the facts asserted in Continental's first and second 56.1 statements to which Respondents purported to be unable to

respond. And Mr. Schryber argued just that to the jury: had Continental examined publicly available filings in the SEC action, it would have known about the Infinity scheme and the falsity of Marshall Granger's insurance application. The same must be true for Respondents: had they made any inquiry at all into "Brown's purported activities," (Doc. 40, Doc. 83), they could not have taken the position that they were "unable to respond" to those facts.

When confronted with this contradictory position, Mr. Schryber made several startling arguments that highlighted how frivolous and unreasonable the positions taken in the 56.1 responses were. First, Mr. Schryber suggested that Mr. King had responded to the 56.1 statements on the understanding that Continental was seeking the Boughton Entities' personal, firsthand knowledge of the facts. (Doc. 198 Ex. 1, at 351:24-352:4.) As I explained, this position was plainly unreasonable and not "warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *Calloway*, 854 F.2d at 1468 (internal quotation marks omitted). Even Mr. Schryber acknowledged that it "may not be" "a reasonable construction." (Doc. 198 Ex. 1, at 352:1-3). Second, Mr. Schryber argued that the 56.1 responses should not be understood to deny facts such as the content of Brown's guilty plea, despite doing just that, because "everybody knew" once Brown "had taken a plea . . . that he was liable for fraud," (*id.* Ex. 1, at 354:3-4), and that notwithstanding what Respondents said in those responses, Continental should have understood that Respondents were not claiming to need discovery to know whether Brown was liable for fraud, (*id.* Ex. 1, at 356:3-8). And third, Mr. Schryber repeatedly insisted that he had not "signed" either 56.1 response because it was Mr. King who drafted those documents and attached Mr. Schryber's electronic signature, apparently trying to suggest – in a manner seemingly revealing consciousness of guilt – that he should not

be held responsible for any sanctionable assertion made therein.  (*Id.* Ex. 1, at 351:1-8, 366:14-17.)[5]

Respondents spend much of their brief[6] arguing that the positions taken at trial were not inconsistent with their 56.1 responses.[7]  But they miss the point – Continental does not argue that the inconsistency of Respondents' arguments is sanctionable.  Instead, Continental argues, and I agree, that Respondents' concessions at trial merely confirm that the 56.1 responses were made knowingly and without reasonable inquiry.

### 2.  Rule 11(c) Sanctions

I will now analyze the seven factors to determine whether the Boughton Entities' and the Lawyers' Rule 11 violation warrants sanctions.  *See Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004) ("Even if the district court concludes that the assertion of a given claim violates Rule 11, . . . the decision whether or not to impose sanctions is a matter for the court's discretion."); *Braun ex rel. Advanced Battery Techs., Inc. v. Fu*, No. 11-CV-4383, 2015 WL 4389893, at *12 (S.D.N.Y. July 10, 2015) ("[A] finding that Rule 11 has been violated does not compel the imposition of sanctions.") (internal quotation marks omitted).

---

[5] Mr. Schryber never asserted that Mr. King affixed his signature without authorization or that he had not reviewed the 56.1 responses, and he now confirms both his authorization and his review.  (Doc. 200 ¶ 79.)

[6] Mr. Schryber's twenty-six page brief was accompanied by a thirty-six page "Declaration" by Mr. Schryber, (Doc. 200), with a seventeen-page single-spaced "Appendix," (*id.* Ex. A).  These submissions purport to include facts about this proceeding but are better understood as fifty-three (or, more accurately, seventy) pages of additional argument, in violation of my Individual Practices 2(B)(i).  Further, Mr. Schryber violated my rule requiring memoranda of law to be double-spaced, instead using a smaller gap between lines, apparently to evade the page limit set in my rules.  Such a ploy is unworthy of counsel in this Court.

[7] They also spend considerable time arguing that their clients' position regarding the promptness of Continental's rescission action was correct despite the jury's finding to the contrary.  Respondents also spill much ink arguing why they were justified in not admitting the contested 56.1 statements, but that also is not the issue.  One may be justified in not admitting an asserted fact for any number of reasons, but one is not justified in saying one is "unable to respond" because of lack of discovery into "Brown's activities" if the lack of such discovery is not in fact an impediment to responding.

Nearly all of the factors weigh in favor of imposing sanctions. First, the positions on the 56.1 responses were taken willfully. They were not mistakenly or negligently made, as is made clear not only through their repetition within and among the two 56.1 responses (the second after the Court found that the facts as to Brown's activities could not reasonably be disputed), but also through Respondents' continuing insistence of their validity, even on this motion. (*See, e.g.*, Doc. 199 at 19 (continuing to argue that Continental's statements of fact "might have been refuted with further discovery"); Doc. 200 Ex. A, at 4, 6, 7, 8, 11, 18 (arguing that the statement "there has been no discovery as to any of Brown's purported activities" was correct, without acknowledging that that phrase appeared *after* the indefensible claim that Respondents were "unable to respond" for that reason); *id.* at 8 (stating "nothing in the prospectus states that the pipeline was generating any revenues," when prospectus, (Doc. 74 Ex. A, at 4), says one of the "advantages" of the pipeline was "[q]uality gas . . . garnering good pricing").)[8]

Second, the same facts demonstrate that Respondents have engaged in a pattern of conduct rather than an isolated incident.

Third, while Continental argues that the frivolous 56.1 responses infected the entire proceeding because they prevented this Court from granting summary judgment to Continental on the issue of the falsity of Marshall Granger's representations, (Doc. 198 at 24), I cannot now say that I would have granted summary judgment on that issue but for the Boughton Entities 56.1 responses, which at the time I found "evasive." But in any event the Rule 11 violation related to the issue of when Continental should have known what about the falsity of Marshall Granger's representations, which was the central issue of the jury trial.

---

[8] Mr. King, in his opposition, even goes so far as to argue that he and the other Respondents should be awarded sanctions against Continental for the instant motion. (*See* Doc. 201 at 2.) Obviously, for the reasons discussed in this opinion, Continental's motion is not at all frivolous, although Mr. King's suggestion may well be.

Fourth, I cannot say whether the Boughton Entities or the Lawyers have taken similar positions in other 56.1 responses. When I asked Mr. Schryber whether he or Mr. King had a regular practice of responding to 56.1 statements based only on their own personal knowledge, Mr. Schryber demurred, stating that, "It is not my position to do that." (Doc. 198 Ex. 1, at 351:15.) I thus cannot say on this record whether or not Respondents have engaged in this kind of evasive, unreasonable conduct elsewhere.

Fifth, Respondents' failure to acknowledge even basic facts about Brown's fraud caused Continental and this Court to expend time addressing Respondents' baseless assertions, although I cannot say that these efforts significantly threw off the litigation process.

Sixth, Messrs. King and Schryber are both lawyers and are presumed to have known that when they submitted the 56.1 responses, they were not in accordance with Rule 11(b).

On balance these factors militate in favor of sanctions to compensate Continental for the time and expense incurred in responding to the Boughton Entities' frivolous arguments, as well as to deter Respondents from similar conduct in the future. But the unusual procedural posture of this motion requires further discussion.

3. Bad Faith

The Boughton Entities argue that because the instant motion comes after trial when they do not have the opportunity to correct their pleadings, Rule 11's safe harbor cannot apply. They argue that where this is the case, Rule 11 requires a showing of bad faith before sanctions may be imposed. (*See* Doc. 199 at 12-13.)

Rule 11's safe harbor provides that a motion for sanctions must be served according to Rule 5 but "not filed or . . . presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or

within another time the court sets." Fed. R. Civ. P. 11(c)(2). This safe harbor "is a strict procedural requirement." *Star Mark Mgmt.*, 682 F.3d at 175. The Second Circuit recognizes an exception to the objective unreasonableness standard where "a district court initiates Rule 11 sanctions *sua sponte* 'long after' the sanctioned lawyer had an opportunity to correct or withdraw the challenged submission. In such cases, a lawyer may be sanctioned only upon a finding of subjective bad faith." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 150 (2d Cir. 2009) (quoting *In re Pennie & Edmonds LLP*, 323 F.3d 86, 91 (2d Cir. 2003)); *see Braun*, 2015 WL 4389893, at *14 (noting that the Second Circuit has not defined "long after," but reasoning that "if the court initiates sanctions proceedings while simultaneously concluding an action, the bad faith standard applies").

Here, the Court does not impose sanctions *sua sponte* – Continental moved for sanctions and technically met the requirements of the safe harbor. It served the instant motion on Respondents on July 18, 2016, (Doc. 197 at 3), and waited to file the motion until twenty-three days later, on September 8, 2016, (*id.*). Nevertheless, Respondents argue that the exception extends to this case because (i) Continental did not file its motion until after judgment was entered, and (ii) Respondents do not have an opportunity to withdraw their 56.1 responses. (*See* Doc. 199 at 12-13.) The Second Circuit has not addressed whether a request for Rule 11 sanctions made by motion, but after judgment has been entered and the opportunity to correct the submission has passed, should be analyzed under the objective reasonableness standard or whether a showing of subjective bad faith is required. But it seems only fair that it be the latter. *See Castro v. Mitchell*, 727 F. Supp. 2d 302, 309 (S.D.N.Y. 2010) (discussing imposition of *sua sponte* sanctions and explaining that "a court cannot impose sanctions after a party is no longer

able to withdraw or amend its challenged pleading unless the court makes a finding of subjective bad faith").

"'[B]ad faith' is a relatively loosely defined term of art." *In re Gushlak*, No. 11-MC-218, 2012 WL 2564523, at *2 (E.D.N.Y. July 2, 2012). "[C]ourts in this Circuit have found subjective bad faith in a variety of cases, 'ranging from those involving overtly dishonest or contemptuous behavior, down to those where the court simply regarded an argument as frivolous.'" *Cardona v. Mohabir*, No. 14-CV-1596, 2014 WL 1804793, at *3 (S.D.N.Y. May 6, 2014) (quoting *In re Gushlak*, 2012 WL 2564523, at *2)). Judge Garaufis concluded that the standard must lie somewhere in between – in other words "frivolous-plus" – requiring that direct or circumstantial evidence show that the sanctioned party must have known that the position taken was without merit. *In re Gushlak*, 2012 WL 2564523, at *2. "[T]he requisite actual knowledge may be demonstrated by circumstantial evidence and inferred from conscious avoidance." *Braun*, 2015 WL 4389893, at *15. A finding of bad faith "must be supported by a high degree of specificity in the factual findings, [and] bad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 143 (2d Cir. 2012) (citation and internal quotation marks omitted).

As noted, many of Respondents' 56.1 responses were submitted without factual basis. Mr. Schryber all but conceded that these responses were a sham at the time they were made. He opposed their admission when Continental offered them at trial to rehabilitate Overman's credibility on the theory that Respondents themselves did not have sufficient factual basis to admit basic aspects of Brown's fraudulent activities and misrepresentations to Continental. In so doing, he stated that everyone knew the contours of Brown's fraud, and so the only reasonable

reading of the 56.1 responses was that they were denials of Respondents' *personal*, *firsthand* knowledge of that fraud.  (*See, e.g.*, Doc. 198 Ex. 1, at 354:2-16 ("[E]veryone knew . . . that Brown had taken a plea [and was] liable for fraud . . . [s]o no one is going to think that whatever's being said here means that Jeremy King doesn't understand that there's liability for fraud."), 355:9-11 (whether Brown had pleaded guilty to the criminal charges was "an established issue"), 355:21-23 ("[N]obody would understand that on the other side of this case that there's a dispute as to whether Brown was engaged in fraudulent conduct.").)  These assertions suggest that Mr. Schryber knew this position to be unreasonable, but proceeded anyway.  *See In re Gushlak*, 2012 WL 2564523, at *3.

Mr. Schryber's attempt to point blame at his subordinate, Mr. King, for the frivolous 56.1 responses further suggests that he knew that the 56.1 responses were a problem and was trying to avoid blame for purporting to understand the 56.1 responses as asking for personal, firsthand knowledge of Respondents.

Respondents now argue that because they admitted several of the basic facts regarding Brown's fraud in their Answer, (Doc. 60), their 56.1 responses addressed only collateral issues that were unsupported by evidence cited by Continental, (*see* Doc. 199 at 8).  That they may have corrected their factual assertions in the Answer, which was filed after Continental's first motion for summary judgment, does not mean that the first 56.1 response was not made in bad faith.  And that they continued to assert their inability to respond to basic facts – even after admitting them in their Answer – is additional evidence that at least the second 56.1 responses were without basis.

In short, the conduct of counsel here was entirely unbecoming of members of our profession.  Nevertheless, in light of the high standard for bad faith, *see In re Gushlak*, 2012 WL

2564523, at *2 (bad faith standard cannot "be so lenient as to allow the court to impose sanctions for nothing more than a frivolous argument"), and the caution with which courts should approach the question of bad faith, *see Walker v. Smith*, 277 F. Supp. 2d 297, 301 (S.D.N.Y. 2003) (courts must exercise caution when imposing sanctions for bad faith conduct pursuant to courts' inherent power), I will not find bad faith, for two principal reasons.

First, the problem here, which could have been avoided in large part had Continental not put so many facts into a single paragraph of its 56.1 statement, *see Auto. Ins. Co. of Hartford, Conn. v. Electrolux Home Prods., Inc.*, No. 10-CV-11, 2012 WL 6629238, at *1 n.1 (S.D.N.Y. Dec. 20, 2012) (moving party should not put multiple facts in one paragraph of a 56.1 statement), has not been the subject of judicial discussion. If a lawyer has an inclination to weasel, compound facts in a 56.1 statement provide room for him to do so. And while it should be obvious that when faced with a compound paragraph, one may not represent that one needs discovery to respond at all when in fact one needs discovery only to respond to a portion, the Court was unable to locate authority for that proposition.[9] That may be because it is so obvious, but the Court is reluctant to tar a lawyer with a finding of bad faith in the absence of authority that what he did is improper.

Second, it is not my impression that Mr. Schryber or Mr. King acted in subjective bad faith – that is, "ha[d] *actual knowledge* that a pleading or argument that [they were] advancing is frivolous." *Braun*, 2015 WL 4389893, at *14. Granted, "bad faith may be inferred . . . if actions are so completely without merit as to require the conclusion that they must have been undertaken

_____

[9] The closest the Court came was *Bordelon v. Board of Education of the City of Chicago*, No. 11-CV-8205, 2014 WL 12661306, at *1 (N.D. Ill. Sept. 13, 2014), *aff'd*, 811 F.3d 984 (7th Cir. 2016), which stated that it was the opposing party's "responsibility to identify relevant Rule 56.1 facts in his response to the . . . motion for summary judgment – especially where a single Rule 56.1 paragraph improperly contained multiple facts and [the opposing party] merely referenced the paragraph generally." This out-of-Circuit authority is not directly on point.

for some improper purpose such as delay." *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999) (internal quotation marks omitted). But what we have here strikes the Court as inexcusably hypertechnical nit-picking, a misplaced belief that stubbornly refusing to give an inch is the best way to represent a client, and a misguided, scorched-earth attitude that led counsel to cross the line from appropriately zealous advocacy into unreasonable conduct. But I do not believe that counsel subjectively understood that their conduct was improper and proceeded anyway in order to harass the other side. I think they thought, and perhaps still think, that their conduct was justified and appropriate. For that reason, they need to review this matter with a lawyer who specializes in legal ethics. They also ought to consider that such conduct is not only inimical to their own credibility, but is also ineffective, and therefore disserves their clients in the long run.

But "as troubling as the conduct by both counsel . . . has been, this Court cannot conclude that either acted with the subjective bad faith that, in the case's present posture, would be necessary for the Court to impose sanctions." *Braun*, 2015 WL 4389893, at *2. "While [counsel] took unjustified positions, [those positions] do not give rise to the clear conclusion that they were undertaken with subjective bad faith." *Sorenson v. Wolfson*, 170 F. Supp. 3d 622, 633 (S.D.N.Y. 2016), *aff'd*, No. 16-1224, 2017 WL 1043073 (2d Cir. Mar. 16, 2017).[10]

## III. <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff's Motion for sanctions under Rule 11 is DENIED. Mr. Schryber and Mr. King should take no satisfaction in this outcome. It is their good luck that a procedural quirk protected them from the imposition of sanctions despite their conduct. The Clerk of Court is respectfully directed to terminate the pending Motion, (Doc.

---

[10] Because I cannot say that Respondents acted with subjective bad faith, sanctions under § 1927 or the Court's inherent power are also inappropriate. *See Enmon*, 675 F.3d at 143-44.

197), as well as Mr. King's and Mr. Schryber's requests for oral argument, (Docs. 204, 205),

which I find to be unnecessary.

**SO ORDERED.**

Dated: May 9, 2017
      White Plains, New York

                                              CATHY SEIBEL, U.S.D.J.